# Exhibit 1

Jason S. Takenouchi (CBN 234835)
**Kasowitz Benson Torres LLP**
101 California Street, Suite 3000
San Francisco, California 94111
Telephone: (415) 421-6140
Fax: (415) 398-5030
JTakenouchi@kasowitz.com

Marc E. Kasowitz (*pro hac vice forthcoming*)
Christine A. Montenegro (*pro hac vice forthcoming*)
**Kasowitz Benson Torres LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Fax: (212) 506-1800
mkasowitz@kasowitz.com
cmontenegro@kasowitz.com

*Attorneys for Plaintiff MLW Media LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MLW MEDIA LLC,    ) | CASE NO. ____ |
| ) | |
| Plaintiff,    ) | **COMPLAINT FOR:** |
| ) | |
| v.    ) | **1) INTENTIONAL INTERFERENCE** |
| ) | **WITH CONTRACTUAL RELATIONS;** |
| WORLD WRESTLING    ) | **2) INTENTIONAL INTERFERENCE** |
| ENTERTAINMENT, INC.,    ) | **WITH PROSPECTIVE ECONOMIC** |
| ) | **RELATIONS;** |
| Defendant.    ) | **3) VIOLATION OF SECTION 2 OF THE** |
| ) | **SHERMAN ANTITRUST ACT; AND** |
| ) | **4) BUS. & PROF. CODE §17200 *ET SEQ.*** |
| ) | |
| ) | |
| ) | **REDACTED VERSION** |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |

Plaintiff MLW Media LLC ("MLW"), for its complaint against defendant World Wrestling

Entertainment, Inc. ("WWE"), alleges as follows:

---

**COMPLAINT**

**Preliminary Statement**

1.      This action arises out of the egregious efforts of professional wrestling company WWE to destroy its competitor MLW's business and maintain its dominance of the U.S. broadcasting market for professional wrestling by unlawfully interfering with MLW's access to media markets and wrestling talent.

2.      MLW, a professional wrestling company that generates cutting-edge professional wrestling content and sells broadcasting rights to that content, competes with other wrestling companies, including WWE, through locating and signing up-and-coming wrestling talent, promoting and selling tickets for live events, and broadcasting and licensing wrestling programs.

3.      WWE has dominated the U.S. market for wrestling broadcasting content -- to the tune of 85% of the market -- since 2001, when it acquired its biggest competitor, World Championship Wrestling, maintaining its dominance through unfair and anticompetitive business practices, including poaching talent, misappropriating confidential information, interfering with competitors' contracts and cutting off competitors' access to their viewing audiences.

4.      With the popularity of WWE's programs declining over the last five years -- due to, among other things, inferior content -- WWE targeted MLW with unlawful predatory conduct, including airing without authority MLW wrestling footage, inducing MLW wrestlers under exclusive contracts with MLW to terminate those contracts, and encouraging MLW wrestlers to breach their contracts with MLW by disclosing MLW's confidential and proprietary business information.

5.      For example, WWE unlawfully interfered with MLW's television broadcasting agreement with VICE TV ("VICE"), one of the fastest growing entertainment cable networks in America.  Under that May 2021 agreement, VICE agreed to air MLW's archival footage, and the parties were also engaged in negotiations to expand the agreement to include the broadcasting of new licensed programs.

6.      When WWE found out about the MLW/VICE agreement, its Senior Vice President, Susan Levison, called a VICE executive to tell him that WWE's owner, Vince McMahon -- notorious for his aggressive business tactics -- was "pissed" that VICE was airing MLW content and wanted VICE to stop doing so.  The VICE executive told Levison that "I think that this is illegal what you're doing" and that it was probably an antitrust violation, to which Levison responded that she could not control Vince McMahon.  WWE had considerable leverage over VICE because professional wrestling was an important part of VICE's programming and wrestling viewers were an important part of VICE's audience.  VICE therefore needed WWE, as the overwhelmingly dominant wrestling company, to ensure the success of VICE's wrestling-related programs, which included a series, Dark Side of the Ring, often focused on WWE storylines based on input from WWE. WWE's interference resulted in VICE withdrawing from negotiations over airing new MLW content and in VICE airing only a single MLW program.

7.      WWE's interference with MLW's business continued in mid-2021 after MLW entered into a lucrative agreement with Tubi -- a California-based streaming service owned by major media company Fox Corporation ("Fox").  Under the agreement, ██████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████.  The agreement would have had a profound impact on MLW's business by giving it exposure to Fox's broad television and NFL football audience, further positioning MLW for future media deals.

8.      When WWE found out about the agreement, WWE contacted a Tubi executive located in Tubi's headquarters in San Francisco and threatened that if Tubi did not terminate the MLW contract, WWE would cease doing business with Fox and would pull important WWE programs from Fox platforms.  Soon thereafter, and just days before MLW content was to begin airing on Tubi, the MLW contract was terminated, resulting in substantial losses to MLW and harm to consumers, including in California.

9.      WWE's wrongful interference with the Tubi/MLW agreement reversed the momentum the company had been generating with fans, cutting off MLW's access to a broader fan base and leading to event cancellations and delays, resulting in a 40% drop in ticket sales within weeks and a substantial decline in MLW's valuation.

10.      WWE's pattern of predatory and exclusionary conduct has hampered competition in the U.S. wrestling market by depriving MLW and other competitors of distribution channels, and its conduct has harmed consumers by depriving them of content and keeping prices high.

11.      As a result of WWE's wanton misconduct, MLW has suffered and will suffer monetary damages and irreparable harm, resulting from, among other things, continued loss of brand recognition and valuable talent, posing a serious risk that its business will be destroyed.

12.      MLW therefore seeks compensatory, treble and exemplary damages arising from WWE's unlawful conduct and injunctive relief barring WWE from inflicting further irreparable harm through its anticompetitive and tortious conduct.

## PARTIES

13.      Plaintiff MLW is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Mamaroneck, NY.  MLW is a subsidiary of its holding company MLW LLC.  MLW is in the business of promoting sporting events, particularly live events, programming, and digital content related to professional wrestling.

14.      Defendant WWE is a corporation organized under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut.  WWE is registered and transacts business in the State of California.  WWE has been in the entertainment business promoting wrestling and sports entertainment for decades under various names.

**COMPLAINT**

**JURISDICTION AND VENUE**

15.     This action seeks damages caused by WWE's violation of, among other things, Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.  This Court therefore has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over MLW's California state law claims.

16.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 22, 26, and 28 U.S.C. § 1391(b)(2), inasmuch as WWE transacts business and has an agent in this District, and it is the District where a substantial part of the events or omissions giving rise to the claims occurred.

**BACKGROUND**

A.     **The Professional Wrestling Industry.**

17.     WWE, MLW, non-party All Elite Wrestling ("AEW") and non-party Impact Wrestling ("Impact") are competitors in the United States professional wrestling market.  The relevant product market for purposes of this action is the national market for the sale of broadcasting rights for professional wrestling programs to networks, cable and streaming services (the "Relevant Market").

18.     The business of promoting professional wrestling as sports entertainment is fundamentally a media industry, with revenues and business valuation driven largely by fees obtained from broadcasting rights deals.  For example, almost 90% of WWE's revenues in the first six months of 2021 came from its long-standing media rights agreements with media distribution channels such as NBCUniversal and Fox Sports, which is headquartered in California.

19.     These corporations, including NBCUniversal owned by Comcast, WarnerMedia owned by AT&T, and the Fox media companies, purchase broadcasting rights in the Relevant Market for their various distribution channels such as broadcast networks, cable and satellite services, streaming networks, and film production companies.  Some of these distribution channels

offer content to consumers for free (paid for by advertising), while others, like cable and pay-per-view networks, offer access only through a subscription fee.  Streaming, both free and subscription, is becoming increasingly popular with consumers.

20.     WWE broadcasts on Fox TV and USA Network and streams on WWE Network.  NBCUniversal recently purchased WWE's streaming rights for its subscription streaming service Peacock.  AEW broadcasts on WarnerMedia's TNT and will move to WarnerMedia's sister channel TBS in 2022.  AEW offers streaming content through subscription streaming services which offer access to the cable TV channel TNT, such as Sling TV, Hulu with Live TV, YouTube TV, and through TNT's website.  Impact broadcasts on AXS TV and streams these broadcasts simultaneously on its Twitch channel.  Impact also streams its content on its proprietary subscription streaming service, Impact Plus.

**B.     WWE's Market Power.**

21.     WWE's estimated annual total revenue for 2020 in North America was over $764 million.  By contrast, AEW's estimated revenue was $64 million -- less than 10% of WWE's.

22.      The combined average annual value of WWE's U.S. TV rights for its programs WWE Raw and WWE Smackdown alone is $470 million.  By contrast, the average annual value of AEW's U.S. TV rights for its most popular program, Dynamite, is just $43.8 million.

23.     WWE Smackdown, WWE Raw, and WWE NXT together averaged over 4.7 million U.S. television viewers per episode in 2020, with average ratings in the important 18-to-49 year-old demographic of .575, .5075, and .206 respectively.[1]  By contrast, AEW's Dynamite averaged 810,755 U.S. television viewers per episode in 2020, with an average rating of .344 in the 18-to-49 year old demographic, and Impact averaged 154,038 U.S. television viewers per episode in 2020, with an average rating of .03 in that demographic.

[1] The 18-to-49 year-old demographic is the primary demographic by which ad rates are set for entertainment programming.  Ratings essentially represent the percentages of a given demographic watching a given program.  Thus, the higher the rating, the more popular the program with that demographic.

24.     WWE holds approximately 85% of the market share of the Relevant Market.  It attracts the vast majority of viewer time, the vast majority of the media rights deals, and the resulting vast majority of broadcast and media revenue.

25.     Because of its market dominance, WWE has the ability to raise prices for consumers of professional wrestling entertainment for a significant period of time and lower the quality of goods in this market available to consumers.

26.     WWE's monopoly position in the market is protected by high barriers to entry.  These barriers include, among others:  production costs for professional wrestling shows; exclusive contracts controlling wrestling talent; and the importance of brand recognition to attract the talent necessary to produce content and entice potential new business partners to enter into distribution deals.

27.     Despite growing criticism of the quality of WWE's wrestling content in the last five years, WWE has maintained its market dominance through anticompetitive conduct that has increased the already high barriers to entry.  Through its media rights contracts with major networks and distribution channels, WWE has locked networks (including streaming networks) and other partners into offering only WWE content, or into giving WWE content more favorable time slots and marketing opportunities.

28.     WWE has also leveraged its decades-long relationships with virtually every major arena in the United States to make it harder for WWE's competitors to book arenas which are critical for wrestling promotions and the production of weekly programming.  For example, WWE has blocked AEW from hosting an event in two arenas in Cincinnati, Ohio.

**C.      WWE Employs Anti-Competitive, Predatory Conduct Towards MLW To Maintain Its Market Power.**

29.     Through WWE's predatory, anti-competitive conduct, WWE has attempted to monopolize the professional wrestling market and has a dangerous probability of success at achieving monopoly power.

30.     MLW, as an innovative startup, caught the attention of consumers by developing cutting-edge storylines and character wrestlers with distinct and unique identities.  MLW has built a reputation for hiring new wrestlers (also known as "fighters") and spending its time and resources to train and develop those wrestlers to become highly skilled professional fighters.  MLW's success is dependent upon its ability to hire and maintain relationships with its fighters and to market and distribute content featuring those fighters.

31.     Since 2017, Court Bauer -- who worked at WWE until 2007 -- has been the CEO of MLW.  Mr. Bauer, who is the driving force in developing and training MLW talent, is well-known for promoting diversity at MLW and in the sport.

32.      The disclosure to its competitors of MLW's confidential policies, practices, and trade secrets, including the terms of its wrestling contracts with its fighters and how it hires and maintains relationships with them, would irreparably harm MLW's business.  Accordingly, MLW enters into confidentiality agreements with its fighters.

33.     Beginning in early 2020, WWE sought to poach MLW's fighters who were under exclusive contracts, and even aired footage of an MLW wrestler without MLW's consent.  WWE also attempted to induce MLW wrestlers to breach their contracts and reveal confidential and proprietary information about MLW's business.  WWE also sought to prevent wrestlers from working with MLW by refusing to hire wrestlers who had worked for MLW.  As a result of WWE's efforts, one of MLW's wrestlers demanded to be released early from his contract so he could join WWE.

34.     In the spring of 2021, MLW entered into a television deal with VICE, under which VICE would air MLW's archival footage.  At the same time, MLW and VICE were negotiating an expanded relationship which would include the airing of new MLW programs on VICE platforms.

35.     In June 2021, after WWE learned about MLW's agreement with VICE, WWE executive Levison warned a VICE executive to stop airing MLW programs, saying that Vince McMahon was "pissed" that VICE was airing MLW content.  At the time, WWE knew that it had

8
**COMPLAINT**

leverage over VICE because VICE, which caters to viewers of professional wrestling, needed WWE's continued cooperation and access from WWE to ensure the success of its wrestling-related programs.  For instance, WWE knew that VICE's special programs included a series, Dark Side of the Ring, that often focused on WWE storylines and included input from individuals associated with WWE.  Indeed, later in 2021 VICE aired WWE attorney, Jerry McDevitt, in a starring role on an episode of the VICE series "Dark Side of the Ring," which focuses on wrestling stories, including many involving WWE.  Additionally, A&E, which owns a 20 percent stake in VICE and runs and owns a majority of VICE's production operations, has a relationship with WWE, airing WWE programs and A&E/WWE partnership programs.

36.     The VICE executive responded to Levison that "I think this is illegal what you're doing" and that it was probably an antitrust violation.  Levison responded that she could not control McMahon.  As a result of WWE's threats to VICE, VICE stopped engaging in discussions with MLW about an expanded media rights deal. WWE's interference resulted in VICE withdrawing from negotiations over airing new MLW content and in VICE airing only a single MLW program.

37.     Around this same time, FITE, a streaming service focused on combat sports, approached MLW with a media rights offer that would have paid MLW for providing wrestling programs to FITE.  MLW immediately agreed to discuss the terms of the deal, but FITE then abandoned it.  MLW later learned that FITE's Executive Advisor of Corporate Development, Gregg Bernard, was at the same time working for WWE as Senior Vice President of Strategy and Operations, which -- along with FITE's past use of WWE content, and WWE's ongoing attempts to disrupt MLW opportunities -- further illustrates WWE's dominance and unfair competition in the market.

**D.**     **WWE Pressures Tubi To Terminate Its Contract with MLW.**

38.     On July 22, 2021, MLW entered into a lucrative deal with Tubi -- an ad-supported streaming service owned by Fox -- to air MLW programs documented in a license agreement ("License Agreement").

39.     Under the License Agreement, ███████████████████████████████ ████████████████████████████.

40.     The License Agreement was valid and enforceable ███████████████████ ███████████████████████████ in the State of California, where Tubi is headquartered. California is also home to two of the largest national media markets, the Los Angeles and San Francisco Bay Area media markets, which together comprise the largest media market in the United States.

41.     The License Agreement had a profound impact on MLW's business, greatly increasing the company's valuation, strengthening its brand recognition -- including among viewers of Fox television and NFL football -- and making the company more attractive to new wrestling talent.  Tubi benefitted because it would have new, modern professional wrestling content on its platform.

42.     After the License Agreement was executed, MLW began preparing two live events, including a FUSION wrestling performance that was set for September 11, 2021.  In preparation for the to-be-televised event, MLW rented space at the NYTEX Sports Centre.  The second live event was scheduled to take place in Mexico for an Azteca wrestling performance.

43.     MLW also took other steps to prepare Tubi programming, including hiring staff for MLW's AZTECA UNDERGROUND series, hiring editors, a public relations agency and a marketing consultant, signing several new wrestlers, and increasing salaries.  MLW also ceased all talks with other potential partners in mid-July 2021, ████████████████████████████ ███████████████████████████.

44.     In advance of the highly anticipated September 11, 2021 launch date, Tubi and MLW agreed to issue a joint press release on August 10, 2021 to announce the parties' new agreement.

45.     Prior to Tubi and MLW issuing the joint press release, WWE learned about the terms and existence of the License Agreement.  On or about August 9, 2021, WWE executive Stephanie McMahon spoke with a Tubi executive located in California about the License Agreement.  Ms. McMahon initially pressured the Tubi executive to deny MLW a time slot that would compete head-to-head with WWE's NXT programs on Tuesday nights.  But Ms. McMahon ultimately pressured the Tubi executive and other senior executives at Fox to terminate the agreement in its entirety.  Tubi's affiliate, Fox, could lose WWE's business or preferred content if Tubi did not acquiesce to WWE's demand and terminate its agreement with MLW.  On August 9, 2021 -- the night before a planned press release about the Tubi-MLW deal -- as a result of WWE's pressure and interference, MLW received a letter purporting to terminate the License Agreement.

46.     Thus, with wanton, reckless disregard for MLW's rights and the antitrust laws, WWE intentionally and unlawfully interfered with the performance of the License Agreement and procured its termination.  WWE purposefully directed its communications to Tubi in California in order to disrupt MLW's relationship with Tubi and to cut off MLW's access to and competition in major national media markets.

47.     Wrestling industry publications reported on WWE's interference with the License Agreement shortly after it happened.  One report noted that "shortly before the [Tubi-MLW] deal was to be announced publicly in August, WWE was made aware of it.  A source close to Fox . . . indicated that WWE did not respond favorably to the deal, which was to be announced imminently after WWE was made aware.  As a result, the future of that third party deal was in question."  As noted by that same publication in other reports, WWE had substantial leverage over Fox because Fox was competing with another network for better WWE programming at the same time that WWE was pressuring Tubi to cancel the License Agreement.

### E.     WWE's Anti-Competitive and Tortious Conduct Has Caused Irreparable Harm To MLW and Consumers.

48.     As a result of WWE's anti-competitive and tortious conduct, MLW has lost a profitable contract with Tubi, along with lost future profits and marketing opportunities, and the company's valuation has substantially declined.  MLW also lost the momentum it had built with fans, including a major fan base in California, with ticket sales dropping by 40% within weeks of WWE's wrongful interference with the License Agreement.

49.     Because MLW had ceased its discussions with other potential partners in advance of signing the License Agreement, those partners moved on with other deals, and when the Tubi deal abruptly ended, MLW was unable to resume those discussions.

50.     As a result of WWE's interference, MLW has lost a critical platform to air its new programs.  It can take months, if not years, to find such a platform.  Although MLW had been offering and still offers its content for streaming on YouTube, that does not afford it a meaningful audience, and MLW receives no fees for the rights to its content and marketing support which are critical to its success as a business.

51.     In order to survive economically and meaningfully compete in the Relevant Market, professional wrestling companies need fair, competitive access to media rights partners.  As a result of WWE's interference with MLW's ability to retain media rights, MLW's brand recognition has declined and will continue to decline, it has lost and will continue to lose its valuable talent, and its business will be destroyed.

52.     WWE's exclusionary and anti-competitive conduct has also harmed consumers, including in California.  But for WWE's anti-competitive conduct, consumers would have increased access to professional wrestling entertainment at lower prices without having to pay subscription fees, and they would have access to and enjoy a greater variety of professional wrestling content with higher quality.

## FIRST CLAIM FOR RELIEF
### (Intentional Interference with Contractual Relations)

53.     Plaintiff MLW realleges and incorporates by reference Paragraphs 1 through 52 as if fully alleged herein.

54.     MLW had a valid and enforceable contract with Tubi, executed ██████████ ██████████████████ in the State of California, which is home to two of the largest national media markets and where Tubi is headquartered.

55.     MLW substantially performed its obligations under the License Agreement and was ready, willing and able to do so by, among other things, investing resources to rent space for a scheduled live performance, hiring staff for a planned series to be aired and distributed through Tubi, hiring editors, a public relations agency and a marketing consultant, and retaining several new wrestlers.

56.     Also as a result of entering into the License Agreement, MLW lost potential economic opportunities when it ceased all talks with other potential partners and rights bidders ██ ██████████████████████████████████████████████ ██████████████.

57.     WWE knew about the existence and terms of the License Agreement.  With the intent of disrupting that contract, WWE demanded that Tubi terminate the License Agreement.  WWE knew that it had leverage over Tubi due to WWE's business relationship with Tubi and its affiliate, Fox.  WWE caused a disruption of the contractual relations by wrongfully inducing Tubi's early termination of the License Agreement.

58.     WWE, acting with malice and willful disregard for MLW's rights, interfered with the License Agreement with the intent of causing harm to MLW.  MLW has been damaged as a result of WWE's tortious and wrongful conduct, which was a substantial factor in causing that harm, including lost profits and money expended preparing programming pursuant to the now-terminated contract.

59.     By reason of the foregoing, MLW has incurred and will continue to incur actual damages in an amount to be determined at trial.  Because WWE acted with oppression, fraud and malice, MLW is also entitled to exemplary damages.

## SECOND CLAIM FOR RELIEF
### (Intentional Interference with Prospective Economic Advantage)

60.     Plaintiff MLW realleges and incorporates by reference Paragraphs 1 through 59 as if fully alleged herein.

61.     As alleged herein, in the spring of 2021, MLW announced that it had an agreement with VICE for the airing of older MLW programs on VICE platforms.  At the same time, MLW was negotiating a media rights deal with VICE that would have resulted in an array of MLW programs airing on VICE platforms.

62.     In June 2021, after WWE learned about the growing relationship between VICE and MLW, WWE executive Levison warned a VICE executive to stop airing MLW programs, saying that Vince McMahon was "pissed" that VICE was airing MLW content.  At the time, WWE knew that VICE needed continued acquiescence, if not cooperation, from WWE for purposes of ongoing coverage of professional wrestling, and that this gave WWE leverage in discussions with VICE.

63.     The VICE executive responded to Levison that "I think this is illegal what you're doing" and that it was probably an antitrust violation.  Levison responded that she could not control McMahon.

64.     As a result of WWE's threats to VICE, VICE stopped engaging in discussions with MLW about an expanded media rights deal.  While VICE subsequently aired one MLW program in the fall of 2021, this was far smaller than the broad media rights deal the parties had been discussing before WWE's interference.  That media rights deal would have resulted in expanded profits and marketing opportunities for MLW.

65.     WWE acted with malice and willful disregard for MLW's prospective economic advantage with the intent of causing harm to MLW and MLW's relationship with VICE.  MLW has been damaged as a result of WWE's tortious and wrongful conduct, which was a substantial factor in causing that harm, including lost profits and marketing opportunities.

66.     By reason of the foregoing, MLW has incurred and will continue to incur actual damages in an amount to be determined at trial.  Because WWE acted with oppression, fraud and malice, MLW is also entitled to exemplary damages.

### THIRD CLAIM FOR RELIEF
### (Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)

67.     Plaintiff MLW realleges and incorporates by reference Paragraphs 1 through 66 as if fully alleged herein.

68.     The Relevant Market is the national market for the sale of broadcasting rights for professional wrestling programs to networks, cable and streaming services.

69.     WWE's predatory efforts to prevent MLW from broadcasting its licensed programs on media platforms such as VICE TV and Tubi were done with the specific intent to attempt to monopolize the Relevant Market in violation of Section 2 of the Sherman Antitrust Act.

70.     WWE is the dominant competitor in the market.  WWE's dominance and the high barriers to entry in the market give it the ability to control prices and exclude competition in the market.

71.     WWE's unfair business practices include, among other things, cutting off competitors' access to viewers and licensing opportunities, interfering with contracts, poaching talent, eliminating price competition, and misappropriating and attempting to misappropriate confidential information of its competitors.  As a result of WWE's anti-competitive conduct, WWE has unlawfully restrained and undermined competition, thus maintaining and building its dominance

of the Relevant Market and threatens a dangerous probability of success at monopolizing the Relevant Market.

72.     Because of its unlawful acts of interference with MLW's contractual relations, among other unlawful acts, WWE has harmed MLW's ability to attract and acquire talent, gain exposure to new customers, attract and enter into business partnerships for its media rights, and to operate and meaningfully compete in the market.  WWE's exclusionary behavior has also stifled competition generally.  MLW's ability to produce a viable substitute for WWE's content is diminished, resulting in harm to consumers by a reduction of choice and elimination of price competition.

73.     WWE's willful conduct as described above has given it the ability to control prices and exclude competition and has caused MLW an antitrust injury.

74.     Because of WWE's history of anticompetitive behavior, such as interfering with its competitors' contracts, and its entrenched domination of the market, there is a dangerous probability that WWE will be successful in its intended goal of attempting to obtain monopoly power in the Relevant Market.

75.     There is no legitimate business justification for WWE's conduct.

76.     MLW has suffered and will suffer irreparable harm to its business from its antitrust injuries caused by WWE's unlawful attempts to exclude competitors, manipulate the market, and unlawfully attempt to monopolize the Relevant Market.  MLW therefore is entitled to an injunction that terminates the ongoing violations alleged in this Complaint pursuant to Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

77.     MLW also has incurred and will continue to incur actual damages as a result of WWE's anticompetitive conduct and is entitled to recover trebled damages along with reasonable attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**
**(Cal. Bus. & Prof. Code §17200 *et seq.*)**

78.     Plaintiff MLW realleges and incorporates by reference Paragraphs 1 through 77 as if fully alleged herein.

79.     As described herein, WWE has a history of attempting to unfairly compete against MLW.  In 2020, WWE attempted to poach MLW's talent and aired footage of one of MLW's fighters without authorization or consent.  WWE also attempted to induce MLW's wrestlers to breach their contracts and reveal confidential and proprietary information about MLW's business.

80.     WWE's efforts to prevent MLW from broadcasting its licensed programs on other media platforms, such as VICE TV and Tubi, violated Section 17200 of California's Business and Professions Code (the Unfair Competition Law or "UCL") and California common law.  WWE's anticompetitive conduct also violated the UCL.

81.     MLW is entitled to an injunction barring WWE from further interference with MLW's operations and business opportunities.

**DEMAND FOR A JURY TRIAL**

MLW hereby demands a trial by jury of all issues triable of right by a jury.

**PRAYER FOR RELIEF**

WHEREFORE, MLW prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including but not limited to an order granting:

1.     Judgment in favor of MLW and against WWE;

2.     An award of actual damages and all damages that were a natural result of WWE's tortious conduct, in an amount to be calculated at trial, inclusive of any pre-judgment or post-judgment interest accrued, pursuant to Cal. Civ. Code § 3333;

3.  An award of exemplary damages for WWE's oppressive and malicious tortious conduct, pursuant to Cal. Civ. Code § 3294;

4.  A declaration that WWE's unlawful and predatory interference with MLW's access to the media markets and wrestling talent was and is decreed a violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

5.  Injunctive relief to prevent WWE from engaging in anti-competitive and unfair business practices towards MLW pursuant to California Business and Professions Code § 17200 *et seq.*;

6.  Injunctive relief to prevent WWE from engaging in anti-competitive and unfair business practices towards MLW pursuant to Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26;

7.  An award of treble the amount of MLW's damages resulting from its antitrust injuries to be proven at trial in accordance with Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15;

8.  An award of MLW's costs and expenses of litigation, including attorneys' fees and expert witness fees, in accordance with Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15;

9.  Interest; and

10. Such other relief as the Court deems just and proper.

Dated: January 11, 2022              Respectfully submitted,

                                     */s/ Jason S. Takenouchi*
                                     Jason S. Takenouchi (CBN 234835)
                                     **Kasowitz Benson Torres LLP**
                                     101 California Street, Suite 3000
                                     San Francisco, California 94111
                                     Telephone: (415) 421-6140
                                     Fax: (415) 398-5030
                                     JTakenouchi@kasowitz.com

**COMPLAINT**

Marc E. Kasowitz (*pro hac vice forthcoming*)
Christine A. Montenegro (*pro hac vice forthcoming*)
**Kasowitz Benson Torres LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Fax: (212) 506-1800
mkasowitz@kasowitz.com
cmontenegro@kasowitz.com

*Attorneys for Plaintiff MLW Media LLC*

**COMPLAINT**