Daniel W. Fox (SBN 268757)
K&L GATES LLP
Four Embarcadero Center
Suite 1200
San Francisco, CA  94103
Telephone: (415) 882-8200
Facsimile:  (415) 882-8220
daniel.fox@klgates.com

Jerry S. McDevitt (*pro hac vice pending*)
K&L GATES LLP
210 Sixth Ave.
Pittsburgh, PA 15222
Telephone:  (412) 355-8608
jerry.mcdevitt@klgates.com

Christopher S. Finnerty (*pro hac vice pending*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone:  (617) 261-3123
christopher.finnerty@klgates.com

Derek W. Kelley (*pro hac vice pending*)
K&L GATES LLP
K&L Gates LLP
1601 K St. NW #1
Washington, D.C. 20006
Telephone: (202) 778-9467
derek.kelley@klgates.com

*Counsel for Defendant*
World Wrestling Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MLW MEDIA LLC, | **Case No. 5:22-cv-00179-EJD** |
| Plaintiff, | **DEFENDANT WORLD WRESTLING** |
| v. | **ENTERTAINMENT, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF MLW MEDIA LLC'S COMPLAINT AND MEMORANDUM IN SUPPORT** |
| WORLD WRESTLING ENTERTAINMENT, INC., | |
| Defendant. | Hearing Date: September 29, 2022 |
| | Time: 9:00 AM |
| | Place: Courtroom 4 or videoconference |
| | Judge: Hon. Edward J. Davila |

<u>**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT**</u>

**PLEASE TAKE NOTICE** that on September 29, 2022, or as soon thereafter as this matter may be heard, either in Courtroom 4 of this Court, located at 280 South 1st Street, San Jose, California 95113, or by videoconference or teleconference (if the Court prefers), Defendant World Wrestling Entertainment, Inc. ("WWE") will and hereby does move the Court for an order granting Defendant's Motion to Dismiss Plaintiff MLW Media LLC's ("MLW") Complaint with prejudice. The grounds for dismissal are as follows:

First, WWE moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss MLW's federal antitrust claim because MLW failed to plausibly plead (1) a facially sustainable relevant market, (2) monopoly power or anticompetitive conduct, or (3) antitrust injury. WWE further moves to dismiss MLW's remaining state law claims pursuant to Federal Rule of Civil Procedure 12(b)(1) because the Court lacks subject matter jurisdiction over them if the federal antitrust claim is dismissed.

Second, WWE moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all state law claims should this Court exercises jurisdiction over them.  MLW's claim for intentional interference with contractual relations is unsupported by factual allegations, and what allegations MLW pleads are entirely implausible. MLW's claim for intentional interference with prospective economic advantage fails because MLW does not allege that WWE knew about MLW's negotiations to sell a third party first-run programming, nor does MLW plausibly allege that WWE's alleged single communication with the third party influenced its decision not to purchase MLW's content.  Finally, MLW's unfair competition claim fails because (1) it is not tethered to some other viable antitrust or tort claim, and (2) MLW lacks Article III and statutory standing to assert such a claim.

Finally, WWE moves pursuant to Federal Rule of Civil Procedure 12(b)(5) to dismiss MLW's complaint for lack of personal jurisdiction because neither party is a resident of California, no harm specific to California is alleged, and none of the alleged misconduct took place in California.

1          This Motion is based upon this Notice; the accompanying Memorandum of Points and

2    Authorities; any reply memorandum; the pleadings and files in this action; and such other matters

3    as may be presented at or before the hearing.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2  I.    STATEMENT OF THE ISSUES TO BE DECIDED ................................... 1

3  II.   INTRODUCTION ..................................................................................... 1

4  III.  ARGUMENT AND AUTHORITIES .......................................................... 4

5        A.   MLW FAILS TO PLEAD A PLAUSIBLE CLAIM UNDER SECTION 2 OF THE

6             SHERMAN ACT ........................................................................................ 4

7             i.    MLW FAILS TO ALLEGE A PLAUSIBLE RELEVANT PRODUCT

8                   MARKET ..................................................................................... 5

9             ii.   MLW FAILS TO PLEAD THAT WWE POSSESSES MONOPOLY

10                  POWER OR ENGAGED IN ANTICOMPETITIVE CONDUCT IN THE

11                  PROPOSED RELEVANT PRODUCT MARKET ................................ 7

12                  1.    MLW DOES NOT PLEAD MONOPOLY POWER .................... 7

13                  2.    MLW DOES NOT PLEAD ANTICOMPETITIVE CONDUCT. 12

14            iii.  MLW FAILS TO PLEAD ANTITRUST INJURY ................................. 13

15                  1.    THE SHERMAN ACT PROTECTS COMPETITION, NOT

16                        COMPETITORS ........................................................................ 13

17                  2.    MLW'S CONCLUSORY ALLEGATIONS OF HARM TO

18                        COMPETITION ARE CONTRADICTORY AND

                          INSUFFICIENT ........................................................................ 13

19                  3.    MLW FAILS TO ALLEGE HARM TO COMPETITION .......... 14

20       B.   MLW FAILS TO PLEAD COGNIZABLE STATE LAW CLAIMS ................. 16

21            i.    COUNT I FOR INTENTIONAL INTERFERENCE WITH

22                  CONTRACTUAL RELATIONS FAILS TO STATE A CLAIM ............ 17

23            ii.   COUNT II FOR INTENTIONAL INTERFERENCE WITH

24                  PROSPECTIVE ECONOMIC ADVANTAGE FAILS TO STATE A

25                  CLAIM ........................................................................................ 18

26            iii.  COUNT IV FOR VIOLATION OF CAL. BUS. & PROF. CODE § 17200

27                  ET SEQ. FAILS TO STATE A CLAIM ................................................. 20

28

C.   WWE RESPECTFULLY PRESERVES THE ISSUE OF THIS COURT'S PERSONAL JURISDICTION OVER WWE ........................................................ 22

IV.   CONCLUSION ............................................................................................................. 22

1

## <u>TABLE OF AUTHORITIES</u>

2

3    **Cases**                                                                    **Page(s)**

4    *2Die4Kourt v. Hillair Cap. Mgmt., LLC,*
5        No. SACV 16-01304 JVS (DFMx) 2016 WL 4487895 (C.D. Cal. Aug. 23,
         2016) ...................................................................................................... 19
6
     *Action Embroidery Corp. v. Atl. Embroidery, Inc.,*
7        368 F.3d 1174 (9th Cir. 2004)...................................................................... 22

8    *Aerotec Intern., Inc. v. Honeywell Intern., Inc.,*
9        4 F. Supp. 3d 1123 (D. Ariz. 2014)............................................................... 12

10   *Aghaji v. Bank of Am., N.A.,*
         247 Cal. App. 4th 1110 (2016)...................................................................... 21
11
     *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.,*
12       190 F.3d 1051 (9th Cir. 1999)................................................................. 13, 14

13   *Bates v. United Parcel Service, Inc.,*
         511 F.3d 974 (9th Cir. 2007)........................................................................ 21
14
     *Bell Atlantic Corp. v. Twombly,*
15       550 U.S. 544 (2007).......................................................................................4

16   *BNSF Ry. Co. v. Tyrrell,*
17       137 S. Ct. 1549 (2017) ................................................................................. 22

18   *Brantley v. NBC Universal, Inc.,*
19       675 F.3d 1192 (9th Cir. 2012)...................................................................... 15

20   *Bristol-Myers Squibb v. Superior Court,*
         37 S. Ct. 1773 (2017) ................................................................................... 22
21
     *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
22       429 U.S. 477 (1977)..................................................................................... 13

23   *CDC Techs. v. IDEXX Labs.,*
         186 F.3d 74 (2d Cir. 1999) ........................................................................... 16
24
     *Church & Dwight Co. v. Mayer Labs., Inc.,*
25       868 F. Supp. 2d 876 (N.D. Cal. 2012) .......................................................... 11

26   *Colonial Med. Group, Inc. v. Catholic Healthcare West,*
27       No. C-09-2192 MMC, 2010 WL 2108123 ......................................................7

28   *Coronavirus Reporter v. Apple, Inc.,*
         No. 21-CV-05567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021)................................. 5

MOTION TO DISMISS COMPLAINT; CASE NO. 5:22-CV-00179-EJD
- iii -

*Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*,
  99 F.3d 937 (9th Cir.1996)................................................................................................ 7

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014)........................................................................................... 4

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020)........................................................................................... 5

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal. 2015) ...................................................................... 4, 16

*Gregory v. Albertson's, Inc.*,
  104 Cal. App. 4th 845 (2002)..................................................................................... 20, 21

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997)................................................................................... 5, 7, 8

*Ixchel Pharma, LLC v. Biogen, Inc.*,
  9 Cal.5th 1130 (2020) ...................................................................................................... 17

*Kaplan v. Burroughs Corp.*,
  611 F.2d 286 (9th Cir. 1979).......................................................................................... 5

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008)........................................................................................ 4

*Kinderstart.com LLC v. Google, Inc.*,
  No. C 06-2057 JF (RS), 2007 WL 831806 (N.D. Cal. Mar. 16, 2007)...................................... 8

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal.4th 1134 (2003) ............................................................................................... 18, 20

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008)........................................................................................ 5

*In re NFL's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019)......................................................................................... 14

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
  305 F. Supp. 3d 1065 (N.D. Cal. 2018) ................................................................................ 15

*Norwest Mortg., Inc. v. Superior Ct.*,
  72 Cal. App. 4th 214 (1999).......................................................................................... 21

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) ....................................................................................................... 13

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ....................................................................................................... 21

*Ohio v. American Express Co.*,
  138 S. Ct. 2274 (2018) ........................................................................... 5

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  No. 5:16-CV-06370-EJD, 2017 WL 4310767 (N.D. Cal. Sept. 28, 2017) ............................ 10

*Pistacchio v. Apple, Inc.*,
  No. 4:20-cv-07034-YGR, 2021 WL 949422 (N.D. Cal. Mar. 11, 2021) ................................. 5

*Rebel Oil Co., Inc. v. Atlantic Richfield, Co.*,
  51 F.3d 1421 (9th Cir.) ................................................................. 7, 10, 12, 13

*Reilly v. Apple Inc.*,
  2022 WL 74162 (N.D. Cal. Jan. 7, 2022) ....................................................... 5, 6, 7

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
  471 F. Supp. 3d 981 (N.D. Cal. 2020) .............................................................. 15

*Roy Allan Slurry Seal, Inc. v. Amer. Asphalt South*,
  2 Cal.5th 505 (2017) ................................................................................ 18

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
  983 F. Supp. 1303 (N.D. Cal. 1997) ................................................................ 19

*Somers v. Apple*,
  729 F.3d 953 (9th Cir. 2013) ...................................................................... 16

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
  376 F.3d 1065 (11th Cir. 2004) .................................................................... 15

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ................................................................................ 13

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................................ 21

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ................................................................................ 16

*Tanaka v. Univ. of S. California*,
  252 F.3d 1059 (9th Cir.2001) ....................................................................... 5

*Tops Mkts. v. Quality Mkts.*,
  142 F.3d 90 (2d Cir. 1998) ........................................................................ 11

*United States v. Archer-Daniels-Midland Co.*,
  781 F. Supp. 1400 (S.D. Iowa 1991) ............................................................... 10

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ...................................................................... 11

**MOTION TO DISMISS COMPLAINT; CASE NO. 5:22-CV-00179-EJD**

*Unsworth v. Musk*,
    No. 19-mc-80224-JSC, 2019 WL 5550060 (N.D. Cal. Oct. 28, 2019) .................................. 20

*Verizon Commc'ns Inc. v. Law offices of Curts V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................................................................ 7

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998) ................................................................................. 11

*W. Parcel Exp. v. UPS*,
    190 F.3d 974 (9th Cir. 1999)................................................................................................... 9

*Watershed Asset Mgmt., L.L.C. v. Watershed Capital*,
    LLC, No. C 13–03852 WHA, 2014 WL 785847 (N.D. Cal. Feb. 25, 2014)......................... 18

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009)............................................................................................... 4, 9

**Statutes**

Cal. Bus & Prof. Code § 17200 *et seq.* ............................................................................. 1, 20-22

Clayton Act, 15 U.S.C. § 22 ................................................................................................... 22

Sherman Act § 2, 15 U.S.C. § 2 .................................................................................... *passim*

U.S. Constitution, Article III.................................................................................................. 4, 21

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    STATEMENT OF THE ISSUES TO BE DECIDED**

3        1.    Whether the Court should dismiss the entire complaint for failure to state a claim

4    and lack of subject matter jurisdiction, where plaintiff fails to plausibly allege a violation of

5    Sherman Act § 2, and this Court thus has no supplemental jurisdiction over state law claims asserted

6    against a non-diverse defendant.

7        2.    Whether the Court should separately dismiss state law claims for intentional

8    interference with contractual relations, intentional interference with prospective economic

9    advantage, and a violation of California's Unfair Competition Law, where plaintiff failed to

10   plausibly allege such conduct by defendant.

11       3.    Whether the Court should dismiss the complaint for lack of personal jurisdiction,

12   where neither party is a resident of California, no harm specific to California is alleged, and none

13   of the alleged misconduct took place in California.

14   **II.    INTRODUCTION**

15       MLW styles itself to be an "innovative startup" in the professional wrestling world with

16   "cutting-edge storylines," but the complaint tells a very different story.  Since 2017, MLW has

17   attempted to sell "broadcast rights" for professional wrestling content to television broadcast

18   networks, cable networks, and streaming services.[1]  In that time, MLW alleges that a new entrant,

19

20   ───────────────────

21   [1] MLW attempts to define the relevant product as "broadcast rights" for professional wrestling sold

22   to "national networks, cable, and streaming services."  This proposed market does not remotely

23   represent the television and streaming industries.  WWE does not sell content that networks then

24   own.  WWE sells a license to air content, the copyright to which remains with WWE.  The

25   networks' rights under the license vary contract to contract.  In exchange for the license, WWE

26   receives rights fees.  Other forms of payment for a license could include a share of advertising

27   revenue, or a right to sell advertising.  MLW further conflates all customers for licenses as

28   "networks, cable, and streaming services."  Networks include free, over-the-air broadcast networks

or paid cable networks.  Although their business models are not identical, both derive revenue from

**MOTION TO DISMISS COMPLAINT; CASE NO. 5:22-CV-00179-EJD**

All Elite Wrestling, exploded onto the scene and quickly captured a contract to sell broadcast rights for its professional wrestling program, Dynamite, to WarnerMedia for $43.8 million annually.  Doc. No. 1, Complaint ("Compl.") ¶ 22.  Further in that same time, MLW alleges that market incumbents WWE secured contracts with NBCUniversal and Fox to sell its US broadcast rights for two of its programs for a combined average annual value of $470 million, and Impact Wrestling ("Impact") secured a contract to air on the cable channel AXS.  *Id*. at ¶¶ 20, 22.  But not MLW.  Despite some potential opportunities with the cable channel VICE TV ("VICE") and streaming service Tubi, MLW is yet to sell broadcast rights for its wrestling program.  Hundreds if not thousands of other potential buyers of broadcast rights exist, but MLW does not allege that it attempted to sell its content to any of them.  MLW could start its own streaming service and reach consumers directly— as it acknowledges that WWE and Impact have done—but it does not allege to have tried that, either.

MLW has given up competing in the ring and chosen instead to compete in the courtroom. MLW brought claims for monopolization, intentional interference with contractual relations, intentional interference with prospective economic advantage, and unfair competition against WWE in a vain hope to shift blame for its failures away from itself.  But MLW's failings are its own.  Its claims are meritless and should be dismissed as a matter of law.

*First*, MLW fails to plausibly allege that WWE violated Section 2 of the Sherman Act. MLW provides no facts to support its naked assertion that there is a relevant product market for the sale of broadcasting rights for professional wrestling programs to national networks, cable, and streaming services.  Even if such a market somehow existed, MLW fails to plausibly allege that WWE possesses monopoly power within it.  To the contrary, its complaint is bereft of any facts suggesting that WWE could possibly hold any power over the dozens, if not hundreds, of networks,

---

advertising and provide content linearly (i.e., the viewer must watch programming when it airs). Streaming services operate a completely different, on-demand delivery model and may generate revenue from subscriptions or selling advertising.  WWE adopts MLW's erroneous terminology in this brief only because it must.

1   cable, and streaming services with which WWE has no commercial relationships.  Indeed, AEW's

2   and Impact's successful sales of broadcast rights show just the opposite.  Finally, MLW's Sherman

3   Act claim fails for lack of antitrust injury.  The antitrust laws protect competition, not competitors,

4   yet MLW fails to allege any plausible facts demonstrating harm to the competitive process.  The

5   failure to plead antitrust injury is absolutely fatal to MLW's complaint and, indeed, independently

6   warrants dismissal.

7       ***Second***, MLW fails to plausibly allege intentional interference with contractual relations.

8   MLW asserts that it had a contract to sell Tubi, a streaming service owned by Fox, "broadcast

9   rights" for its wrestling program, and that WWE forced Tubi to terminate that contract under the

10  threat of pulling all WWE content from Fox.  But MLW alleges no facts explaining how WWE's

11  communication or communications over the course of one day achieved this response from Fox.

12  Moreover, the notion that WWE would jeopardize hundreds of millions of dollars in rights fees and

13  breach its own contract with Fox in order to keep MLW off a streaming service makes no rational

14  sense, just as Fox's capitulation to any such threat is wholly implausible in light of its ability to

15  enforce its contract with WWE.

16      ***Third***, MLW fails to plausibly allege intentional interference with prospective economic

17  advantage.  MLW asserts that it had a contract with VICE to air archival (*i.e.*, old) content and was

18  negotiating to sell broadcast rights for first-run (*i.e.*, new) content.  MLW postulates that WWE,

19  through a single phone call in June 2021, forced VICE to abandon those negotiations for first-run

20  content months later.  But MLW fails to plead that WWE even knew that MLW was negotiating to

21  sell VICE broadcast rights for first-run content.  Moreover, MLW admits that VICE aired one

22  episode of first-run MLW content months after the alleged WWE phone call, demonstrating that

23  the conversation had zero influence on VICE.  Finally, MLW fails to plead that WWE was the

24  proximate cause for VICE's decision to abandon negotiations, rather than some other intervening

25  fact, such as the first-run episode of MLW drawing a disappointing number of viewers.

26      ***Fourth***, MLW fails to allege that WWE engaged in unfair competition.  Unfair competition

27  claims must be tethered to some other antitrust violation or tort, and MLW has alleged none.

28

1   Moreover, MLW's unfair competition claim fails because it lacks Article III or statutory standing
2   even if other claims survive.

3        For these reasons addressed more fully below, WWE respectfully requests that this Court
4   dismiss MLW's complaint with prejudice.

5   **III.**   **ARGUMENT AND AUTHORITIES**

6        To survive a Rule 12(b)(6) motion, MLW's factual allegations must be sufficient "to state
7   a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558,
8   570 (2007). "However, as the Supreme Court has noted precisely in the context of private antitrust
9   litigation, 'it is one thing to be cautious before dismissing an antitrust complaint in advance of
10  discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.'"
11  *Feitelson v. Google Inc*., 80 F. Supp. 3d 1019, 1025 (N.D. Cal. 2015) (quoting *Twombly*, 550 U.S.
12  at 558-59). "As such, 'a district court must retain the power to insist upon some specificity in
13  pleading before allowing a potentially massive factual controversy to proceed.'" *Id.* at 1025–26
14  (quoting *Assoc.'d Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983),
15  quoted with approval in *Twombly*, 550 U.S. at 559). Thus, "[a]llegations of facts that could just as
16  easily suggest rational, legal business behavior" are insufficient to plead an antitrust case. *Kendall*
17  *v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008). Indeed, allegations of wrongdoing must
18  be "plausible in light of basic economic principles." *William O. Gilley Enters., Inc. v. Atl. Richfield*
19  *Co.*, 588 F.3d 659, 662 (9th Cir. 2009). And, "[w]hen considering plausibility, courts must also
20  consider an 'obvious alternative explanation[]' for defendant's behavior." *Eclectic Props. E., LLC*
21  *v. Marcus & Millichap Co.,* 751 F.3d 990, 996 (9th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S.
22  662, 682 (2008)).

23        **A.  MLW Fails to Plead a Plausible Claim under Section 2 of the Sherman Act**

24        MLW's claim under Section 2 of the Sherman Act fails for three reasons. First, MLW fails
25  to allege a plausible marketplace. Second, MLW fails to allege that WWE has or is likely to acquire
26  monopoly power within the marketplace. Third, MLW fails to plead antitrust injury. Each of these
27  deficiencies alone requires dismissal of MLW's Sherman Act claim. Taken together, these
28

1    deficiencies reveal that MLW's theory of antitrust liability is hopelessly flawed and must be

2    dismissed for failure to state a claim upon which relief can be granted.

3                         **i.   MLW Fails to Allege a Plausible Relevant Product Market**

4            The first step with any antitrust claim is to define a relevant market so that a defendant is

5    on notice of where exactly it is alleged to have lessened competition.  Indeed, the Ninth Circuit

6    states that the "threshold step in any antitrust case is to accurately define the relevant market." *Fed.*

7    *Trade Comm'n v. Qualcomm Inc.,* 969 F.3d 974, 992 (9th Cir. 2020); *see also Image Tech. Servs.,*

8    *Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir. 1997) ("The relevant market is the field

9    in which meaningful competition is said to exist.").  Market definition is an essential predicate to

10   the entire case, for "[w]ithout a definition of [the] market there is no way to measure [the

11   defendant's] ability to lessen or destroy competition." *Ohio v. American Express Co.,* 138 S. Ct.

12   2274, 2285 (2018).  "Accordingly, an antitrust plaintiff must plead a plausible relevant market—

13   including 'both a geographic market and a product market'— to state a claim." *Reilly v. Apple Inc.*,

14   2022 WL 74162, *4 (N.D. Cal. Jan. 7, 2022) (citing *Hicks v. PGA Tour, Inc.,* 897 F.3d 1109, 1120

15   (9th Cir. 2018)).  "Failure to identify a relevant market is a proper ground for dismissing a Sherman

16   Act claim." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir.2001); *Pistacchio v.*

17   *Apple,  Inc.,* No.  4:20-cv-07034-YGR,  2021  WL  949422,  at  *2  (N.D.  Cal.  Mar.  11,

18   2021); *Coronavirus Reporter v. Apple, Inc.,* No. 21-CV-05567-EMC, 2021 WL 5936910, at *7

19   (N.D. Cal. Nov. 30, 2021).

20           In order to plead a viable product market, the Ninth Circuit *requires* that it "encompass the

21   product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon*

22   *Office Sol.,* 513 F.3d 1038, 1045 (9th Cir. 2008).  "The principle most fundamental to product

23   market definition is 'cross-elasticity of demand' for certain products or services." *Kaplan v.*

24   *Burroughs Corp.,* 611 F.2d 286, 291-92 (9th Cir. 1979).  "Authorities far too numerous to cite or

25   discuss in detail have established" that "[t]he principle most fundamental to product market

26   definition is 'cross-elasticity of demand.'" *Id*.  "In defining the relevant market, the court must

27   look beyond the particular commodity produced by an alleged monopolist because the relevant

28   product market for determining monopoly power, or the threat of monopoly control, depends upon

the availability of alternative commodities for buyers." *Id.* at 292 (citing *Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296, 1301 (9th Cir. 1978)).  "A plaintiff cannot ignore economic reality and 'arbitrarily choose the product market relevant to its claims'; rather, the plaintiff must 'justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand.'" *Reilly*, 2022 WL 74162, at *4 (citing *Buccaneer Energy (USA) v. Gunnison Energy Corp.,* 846 F.3d 1297, 1313 (10th Cir. 2017)).

MLW alleges that the relevant product market is "the national market for the sale of broadcasting rights for professional wrestling programs to networks, cable[,] and streaming services." Compl. ¶ 17.  However, MLW provides scant facts supporting this proposed market.  MLW includes no allegations about the structure of the television and streaming industries; no allegations about how or why networks, cable, or streaming services purchase broadcast rights; no allegations about the factors that networks, cable, or streaming services consider when purchasing those rights; no allegations about various potential fee structures used in the industry; no allegations even about the production of professional wrestling programming; and no allegations that foreign, regional, or local channels or streaming services could not purchase professional wrestling broadcast rights.

Importantly, MLW fails to allege that customers – here, alleged to be national networks, cable, and streaming services – do not have reasonably interchangeable alternatives to broadcast rights for scripted professional wrestling programming.  Obviously, the vast majority of content aired by national networks, cable, and streaming services is not professional wrestling.  MLW cannot explain why other content (such as *The Walking Dead*, *Survivor*, *90 Day Fiancé*, UFC, or NASCAR) is not a reasonably interchangeable substitute for scripted professional wrestling.  To say that no reasonably interchangeable alternatives to professional wrestling broadcast rights exist is akin to saying no reasonably interchangeable alternatives to broadcast rights for zombie shows exist.  It is, of course, absurd, and purchasers of broadcast rights for zombie shows would consider other programming as alternatives.  "In short, a plausible market requires alleged facts explaining why the products *included* in the market *are substitutes* for one another as well as alleged facts explaining why seemingly similar products *excluded* from the market *are not substitutes* for those

1    in the market." *Reilly*, 2022 WL 74162, *6 (emphasis in original).  MLW's complaint falls

2    woefully short of alleging these critical facts and is subject to dismissal for this reason alone.  *See,*

3    *e.g.*, *Colonial Med. Group, Inc. v. Catholic Healthcare West*, No. C-09-2192 MMC, 2010 WL

4    2108123, at *3 (When a plaintiff "fails to define its proposed relevant market with reference to the

5    rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant

6    market that clearly does not encompass all interchangeable substitute products even when all

7    factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a

8    motion to dismiss may be granted.");  *see also Reilly*, 2022 WL 74162, *6 (dismissing complaint

9    that failed to discuss cross-elasticity of demand).

10          **ii.  MLW Fails to Plead that WWE Possesses Monopoly Power or**

11          **Engaged in Anticompetitive Conduct in the Proposed Relevant**

12          **Product Market**

13        Regardless of whether a plaintiff asserts a claim for monopolization or attempted

14    monopolization, Section 2 of the Sherman Act requires a plaintiff to plead that the defendant

15    possess monopoly power or that there exists a dangerous probability of the defendant achieving

16    monopoly power.  *See Image Tech. Servs.*, 125 F.3d at 1202; *Rebel Oil Co., Inc. v. Atlantic*

17    *Richfield, Co.,* 51 F.3d 1421, 1434 (9th Cir.).  And even if monopoly power is properly pled, mere

18    "possession of monopoly power will not be found unlawful unless it is accompanied by an element

19    of anticompetitive *conduct*."  *Verizon Commc'ns Inc. v. Law offices of Curts V. Trinko, LLP*, 540

20    U.S. 398, 407 (2004) (emphasis in original).  MLW fails to plead either monopoly power or actual

21    anticompetitive conduct.

22               ***1.  MLW Does Not Plead Monopoly Power***

23        "Monopoly power is the power to control prices or exclude competition."  *Image Tech.*

24    *Servs., Inc.*, 125 F.3d at 1202.  "Market power[2] can be proven by either direct or circumstantial

25

26    _____

27    [2] The terms "market power" and "monopoly power" are interchangeable.  *See Cost Mgmt. Servs.,*
    *Inc. v. Washington Nat. Gas Co.,* 99 F.3d 937, 950 n. 15 (9th Cir.1996); *Image Tech. Servs., Inc.*,

28    125 F.3d at 1202.

evidence." *Id*.  To demonstrate monopoly power by circumstantial evidence, a plaintiff must: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id*.

As an initial matter, because MLW fails to plead a relevant product market, the Court need not resolve whether MLW has pled monopoly power.  *See Kinderstart.com LLC v. Google, Inc.*, No. C 06-2057 JF (RS), 2007 WL 831806, at *10 (N.D. Cal. Mar. 16, 2007).  But even if the Court were to accept MLW's relevant market as adequately pled, MLW fails to allege sufficient direct or circumstantial evidence that WWE possesses monopoly power within it.

To plausibly allege direct evidence of monopoly power, MLW must allege specific facts showing that WWE has the power to force networks, cable, and streaming services (which include some of the world's largest companies) to exclude MLW from their platforms.  MLW ignores that there are thousands of content providers (of which the WWE is but one) that sell programming to networks, cable, and streaming services.  MLW further ignores that, in these countless transactions, the *purchasers* of content wield predominately all the power, not the content providers, and MLW pleads no facts to suggest otherwise.  Indeed, claiming that WWE – one of the thousands of content providers – has the ability to control what networks, cable, and streaming services purchase is as improbable as the author of one book controlling what Amazon, Barnes & Noble, and local used bookshops purchase and re-sell.  Obviously, neither WWE nor any other content provider wields such power over networks, cable, and streaming services.  Indeed, quite the opposite is true.  Given the obvious realities of which entities wield power, it is not surprising that MLW fails to plead *any* facts to support WWE's alleged monopoly power over networks, cable, and streaming services.  Nor is it surprising that the complaint contains no specific factual allegation that WWE reduced its output of professional wrestling programming or raised market prices beyond a competitive level.

Without any direct evidence of monopoly power, MLW relies entirely on allegations of circumstantial evidence of WWE's monopoly power.  However, even the circumstantial evidence provided quickly demonstrates WWE's *lack* of monopoly power.  MLW alleges nothing more than an unexplained allegation that WWE controls 85% of the "market" and concludes, without specific

examples, that significant barriers to enter this "market" exist.  Compl. at ¶¶ 25-27.  These allegations, however, are nothing more than the conclusory allegations eschewed by the Supreme Court.

**First**, MLW does not explain how WWE has 85% market share in the proposed market. MLW concludes that WWE possesses such market share based on some unexplained amalgamation of uncited 2020 viewership data for three wrestling promotions on cable and network television. As a starting point, the complaint discusses <u>four</u> competitors but includes data for only three of the four.  MLW provides no explanation as to why 3/4 of the data is the relevant barometer.  Further, this unexplained and selective use of data belies the fact that there are more than four wrestling promotions in the market.  Putting that initial flaw aside, MLW fails to take the crucial next step and explain how 2020 *viewership data* for just network and cable programming gives WWE the power to deprive networks, cable, and streaming services the choice of whether to purchase MLW programming.  Still worse, even if such data were potentially relevant to the purchasing decisions of broadcast and cable networks, MLW fails to explain how *television* ratings connect in any way to streaming services.

Indeed, it is an absurd proposition that WWE, with its viewership for three weekly wrestling programs on two specific networks, can *force* dozens (if not hundreds) of networks, cable, and streaming services with which it has no relationship not to purchase other professional wrestling content.  This is not "plausible in light of basic economic principles."  *Atl. Richfield Co.*, 588 F.3d at 662.  The Ninth Circuit is clear that high market share alone does not demonstrate monopoly power when defendants cannot "control prices or exclude competitors."[3]  *See W. Parcel Exp. v. UPS*, 190 F.3d 974, 977 (9th Cir. 1999).  MLW alleges that WWE depends on its "media rights agreements with media distribution channels such as NBCUniversal and Fox" for "almost 90%" of its revenue. Compl. ¶ 18.  Basic economic principles thus dictate that the content purchasers—not

---

[3] MLW, of course, asserts (however implausibly) that WWE interfered with two distributors; however, as explained *infra*, MLW fails to allege *exclusion* from even a significant number of networks, cable, or streaming services, nor that WWE excluded AEW or Impact in any way.

1   WWE—predominately hold the power.    If media rights distribution channels such as

2   NBCUniversal or Fox refused to purchase WWE's broadcast rights, assuming plaintiff's own

3   allegations are true, WWE would lose almost 90% of its annual revenue.  And even if WWE were

4   the only active wrestling promotion selling broadcast rights, nothing in the complaint suggests that

5   these purchasers could not sponsor a new promotion and create its own alternative.  *See United*

6   *States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1416 (S.D. Iowa 1991) ("The existence

7   of large, powerful buyers of a product mitigates against the ability of sellers to raise prices."); *see*

8   *also* Dep't of Justice and Fed. Trade Comm'n Horizontal Merger Guidelines (Aug. 19, 2010) at §

9   8 (when evaluating mergers, "[t]he Agencies consider the possibility that powerful buyers may

10  constrain the ability of the [ ] parties to raise prices.  This can occur, for example, if powerful buyers

11  have the ability and incentive to . . . sponsor entry . . . .").

12          **Second**, MLW does not plausibly allege that barriers to entry exist.  "Entry barriers are

13  *additional* long-run costs that were not incurred by incumbent firms but must be incurred by new

14  entrants, or factors in the market that deter entry while permitting incumbent firms to earn

15  monopoly returns."   *Rebel Oil Co.*, 51 F.3d at 1439 (emphasis added).  MLW pleads (without

16  factual support) that barriers to entry include "production costs for professional wrestling shows;

17  exclusive contracts controlling wrestling talent; and the importance of brand recognition to attract

18  the talent necessary to produce content and entice potential new business partners to enter into

19  distribution deals."  Compl. ¶ 26.  "These references are a start, but they are not enough."  *Optronic*

20  *Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2017 WL 4310767, at *9 (N.D.

21  Cal. Sept. 28, 2017).  "Missing are any supporting facts taking the allegations from possible to

22  plausible."  *Id.*  MLW must, at minimum, allege *how much* it costs to produce professional wrestling

23  programming, *how* exclusive contracts (which MLW admits to using) reduce the talent pool, and

24  *what* factors are relevant to attract business partners and talent.  "Without a better description of

25  the purported entry barriers, the allegations are too conclusory to be entitled to an assumption of

26  truth."  *Id.*

27          Even if MLW pled sufficient facts to support these allegations, they still would not

28  constitute barriers to entry in the antitrust sense.  "The mere fact that entry [would require] a large

absolute expenditure of funds does not constitute a 'barrier to entry;' a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm." *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1062 (N.D. Cal. 1998) (quoting *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993)). Yet the costs MLW purports to face are costs that WWE, AEW, and Impact also face; MLW does not allege that it must pay more. At most, MLW pleads that it is expensive to compete. But the Ninth Circuit has rejected the premise that "competition is itself a structural barrier to entry." *United States v. Syufy Enters.*, 903 F.2d 659, 667 (9th Cir. 1990).

AEW's success further undercuts MLW's unsupported assertion that substantial barriers to entry exist. The complaint alleges that WWE's popularity has "declined" over the last five years. Compl. ¶¶ 3-4. It goes on to say that, during the same period, AEW entered the proposed market and successfully sold broadcast rights to WarnerMedia. Subsequently, AEW managed to capture an average 2020 rating of 0.344 compared to WWE Raw's 0.5075 in the key 18-to-49 demographic. *Id.* at ¶ 23. This successful entry and expansion refutes the existence of substantial barriers to entry. *See Tops Mkts. v. Quality Mkts.*, 142 F.3d 90, 99 (2d Cir. 1998) (finding no monopoly power given successful entry of competitor); *Syufy*, 903 F.2d at 665-67 (concluding that entry is easy because entrants reduced incumbent's market share from 100 to 75 percent in four years).

***Third***, MLW fails to allege that WWE's competitors, including AEW and Impact, could not increase their output.[4] Nor does MLW allege that a network, cable, or streaming service could not develop or purchase its own professional wrestling promotion if it felt that insufficient output exists or that it required an alternative to WWE. MLW cannot plead this because, with adequate funding and acumen, any content creator could create and distribute professional wrestling content. This pleading failure *alone* is fatal to MLW's allegation of monopoly power. *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 899-900 (N.D. Cal. 2012) (finding no market power

---

[4] This has in fact occurred. AEW began airing an additional, one-hour program, Rampage, on TNT on Friday nights before the complaint was filed. AEW also recently purchased another promotion, Ring of Honor, from Sinclair Broadcast Group, to operate as a secondary business.

1   despite 75 percent share and barriers to entry where no showing that "rivals lack the capacity to

2   expand output").

3                    **2.   *MLW Does Not Plead Anticompetitive Conduct***

4          While WWE has no monopoly power and is unlikely to obtain monopoly power for the

5   reasons explained above, even if monopoly power were properly pled, MLW must also plead an

6   "element of anticompetitive *conduct*."  *Trinko, LLP*, 540 U.S. at 407; *see also Aerotec Intern., Inc.*

7   *v. Honeywell Intern., Inc.*, 4 F. Supp. 3d 1123, 1136-37 (D. Ariz. 2014).  MLW purports to allege

8   that WWE excluded it from participating in the "market" for professional wrestling broadcasting

9   rights sold to national networks, cable, and streaming services.  But MLW does not allege that this

10  exclusion constituted substantial foreclosure from that market.

11         It is not enough for MLW to allege that WWE excluded it from *some* of the relevant market;

12  MLW must plead that WWE *substantially foreclosed* MLW from the market by excluding it from

13  *at least* 30% or more of those outlets.  *Rebel Oil*, 51 F.3d at 1438.  MLW does not even attempt to

14  plead substantial foreclosure: it offers not even an unfounded guess as to how much of the market

15  is foreclosed by WWE.  Nor could it.  MLW does not allege that WWE in any way prevented it

16  from selling programming to Disney networks (including ABC), Paramount networks (including

17  CBS, MTV, and Nickelodeon), WarnerMedia networks (including TNT and TBS), Discovery

18  networks (including Discovery and TLC), AMC Networks, Netflix, Amazon, Apple TV, PlutoTV,

19  Roku, Pay-Per-View, or the hundreds (if not thousands) of other networks, cable, and streaming

20  services.  Nor does MLW allege that WWE prevented it from launching its own over-the-top

21  streaming service, as both WWE and Impact have done.  MLW is complaining about the shadows

22  cast by the boughs of a lone tree, while it stands in an otherwise open and extending field.

23         The complaint in fact establishes that WWE cannot plausibly foreclose the purported

24  market.  Clearly, AEW and Impact sell their programming to WarnerMedia and AXS, respectively.

25  Compl. ¶ 20.  And MLW alleges that it distributes through YouTube and discussed distribution

26  agreements of some kind with "potential partners" other than Tubi, none of which WWE is alleged

27  to have any relationship.  *Id*. at ¶ 49.  MLW cannot blame WWE if those partners do not purchase

28

MLW broadcasting rights.  Without plausible factual allegations of substantial foreclosure, MLW fails to plead facts to demonstrate that WWE exercises or is likely to exercise monopoly power.

### iii.   MLW Fails to Plead Antitrust Injury

#### 1.   The Sherman Act Protects Competition, Not Competitors

It is axiomatic that the antitrust laws "were enacted for the protection of *competition*, not *competitors*." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  Indeed, "[t]he law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  Thus, a "plaintiff . . . must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998).

With this in mind, "antitrust injury[] is an element of all antitrust suits brought by private parties seeking damages…" *Rebel Oil*, 51 F.3d at 1433.  Antitrust injury requires "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

As discussed above, MLW does not plausibly allege a proper market or that WWE possess monopoly power.  But even if it had, its antitrust claim still fails because it has not alleged that WWE damaged the competitive process in any way.  Stripped of unsupported conclusions and antitrust buzzwords, MLW's allegations in fact suggest robust competition within its proposed market.

#### 2.   MLW's Conclusory Allegations of Harm to Competition are Contradictory and Insufficient

MLW's catch-all paragraph purporting to allege monopolization is conclusory and contradictory.  MLW states that WWE (i) sought to poach MLW wrestlers under exclusive contract; (ii) aired footage of a single MLW wrestler without MLW's consent; (iii) attempted to induce a MLW wrestler to breach their contract with MLW; (iv) and refused to hire wrestlers that previously worked for MLW.  Compl. ¶ 33.  But MLW does not plead who any of these wrestlers were, the

1    terms of the supposedly exclusive contract, whether WWE had a legal right to air this footage, or

2    which MLW talent WWE refused to hire.   Still worse, it does not explain the contradictory

3    allegations that WWE, on one hand, "poaches" (*i.e.*, competes to hire) MLW talent but, on the other

4    hand, refuses to hire MLW talent.

5         Most relevant to an antitrust injury analysis, MLW does not explain how these alleged

6    wrongs injured competition in the proposed marketplace and not just MLW.   The Ninth Circuit is

7    clear that an antitrust injury must occur "in the market where competition is being restrained."   *Am.*

8    *Ad Mgmt.*, 190 F.3d at 1057.   To state a claim, the alleged harm must be "attributable to an

9    anticompetitive aspect of the practice under scrutiny," harm that could have occurred under the

10   normal circumstances of free competition does not suffice.   *In re NFL's Sunday Ticket Antitrust*

11   *Litig.,* 933 F.3d 1136, 1150 (9th Cir. 2019) (citing *Atl. Richfield Co. v. USA Petroleum Co.,* 495

12   U.S. 328, 334 (1990)).   MLW's allegations of harm are untethered to any harm to competition.

13   MLW does not, and cannot, allege that it was unable to book a sufficient number of wrestlers in

14   order to promote events and film television.   Indeed, MLW pleads the opposite: it produces "cutting

15   edge" content with "up-and-coming" talent sufficient to attract potential deals with media partners.

16   Thus, even if the Court found these conclusory allegations of harm to be plausible, once again,

17   there is no alleged harm to the competition within MLW's defined marketplace.

### 3.   *MLW Fails to Allege Harm to Competition*

19        MLW's complaint is devoid of any specific factual allegation demonstrating harm to the

20   competitive process in its purported market.   It does not contain a single factual allegation showing

21   that WWE has ever locked up all networks, cable, and streaming services that purchase rights to

22   air content from content creators.   Nor does it contain any allegations of predatory pricing, reduced

23   output, or any other harm to the competitive process whatsoever.

24        MLW instead relies on the conclusory epithets of anticompetitive harm eschewed by the

25   Supreme Court.   MLW recites that, but for WWE's conduct, "consumers [i.e., networks, cable, and

26   streaming services] would have increased access to professional wrestling entertainment at lower

27   prices . . . and they would have access to and enjoy a greater variety of . . . content with higher

28   quality."   Compl. ¶ 52.   Such conclusory allegations are insufficient to plead harm to competition

1    as a plaintiff cannot "merely recite the bare legal conclusion that competition has been restrained

2    unreasonably" but must instead "at a minimum, sketch the outline of [the injury to competition]

3    with allegations of supporting factual detail." *Brantley v. NBC Universal, Inc.,* 675 F.3d 1192,

4    1198 (9th Cir. 2012) (quotation marks omitted; alteration in original); *see also Reveal Chat Holdco,*

5    *LLC v. Facebook, Inc.,* 471 F. Supp. 3d 981, 998 (N.D. Cal. 2020) (rejecting as "nothing more than

6    conclusory" allegations that plaintiffs "had their business and assets destroyed by Facebook's

7    anticompetitive scheme, and are prevented from entry or reentry into the relevant markets because

8    of Facebook's exclusionary conduct"); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health*

9    *Plan, Inc.,* 305 F. Supp. 3d 1065, 1074 (N.D. Cal. 2018) (dismissing antitrust claims because "there

10   are no non-conclusory allegations that [defendant's] actions restrained trade in the relevant market

11   or injured overall competition" and the allegations "lack factual enhancement and are

12   conclusory."); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065,

13   1078-79 (11th Cir. 2004) (allegations regarding harm to competition held to be conclusory where

14   the complaint alleged that the defendant's conduct "caused injury to competition by limiting

15   alternatives available to advertisers, performers and the listening audience" and "will continue to

16   affect prices for advertisements, the quality of programming, and the prices for advertisers'

17   products").

18        MLW alleges no specific harms to competition because it cannot do so in good faith.

19   Indeed, the complaint depicts a market with multiple wrestling promotions competing to sell

20   broadcasting rights.  MLW alleges that four competitors are in the market, and each has secured

21   separate and distinct distribution and revenue sources.  Compl. ¶ 17.  Specifically, MLW distributes

22   its content and secures revenue from YouTube (*id*. at ¶ 50); WWE distributes content and earns

23   revenue from Fox and NBCUniversal (*id*. at ¶ 20); AEW distributes content and earns revenue from

24   WarnerMedia (*id*. at ¶ 20); and Impact distributes content and earns revenue from AXS TV, a

25   Twitch channel, and its own subscription-based streaming service, Impact Plus (*id*. at ¶ 20).

26        MLW alleges that "professional wrestling companies need fair, competitive access to media

27   rights partners" (Compl. ¶ 51), but it provides no facts plausibly suggesting that it (or any of the

28   four market participants) cannot compete to sell broadcast rights to any of the remaining hundreds

of networks, cable, and streaming services in MLW's proposed market.  Even if WWE interfered with MLW's VICE and Tubi deals (which is alleged but denied), and even if WWE had exclusive control over all channels and streaming services affiliated with NBCUniversal, Fox, A&E, and VICE (which is not alleged), WWE defending its own, hard-earned distribution relationships would not violate the Sherman Act when there are so many other media partners within the proposed marketplace.  *See Feitelson*, 80 F. Supp. 3d at 1030 (noting "well-recognized economic benefits to exclusive dealing arrangements"); *CDC Techs. v. IDEXX Labs.*, 186 F.3d 74, 80-81 (2d Cir. 1999) (upholding exclusive dealing arrangements by firm with 80 percent market share); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (exclusive dealing arrangement does not violate antitrust laws unless its probable effect is to "foreclose competition in a substantial share of the line of commerce affected").  The defense of one's own distribution channels is exactly the "competition" that the antitrust laws are designed to protect.

Based on MLW's allegations alone, the proposed market is highly competitive and unharmed.  All four market participants compete to sell broadcasting rights to the hundreds of available networks, cable, and streaming services.  Those same networks, cable, and streaming services are not alleged to have actually paid higher prices or to have actually been denied the ability to purchase professional wrestling broadcasting rights because of WWE's purported conduct.  MLW's complaint is thus devoid of any allegation that WWE's conduct harmed this market.  Without allegations of harm to competition, there is no antitrust injury, and MLW's Sherman Act claim is improperly plead and must be dismissed.  *Somers v. Apple*, 729 F.3d 953, 96-64 (9th Cir. 2013) (affirming the dismissal of Sherman Act Section 2 claims for lack of antitrust injury); *McGlinchy.*, 845 F.2d at 813 (allowing Rule 12(c) motion to dismiss for failure to plead antitrust injury).

### B.    MLW Fails to Plead Cognizable State Law Claims

Counts I, II, and IV assert California state law claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and unfair competition.  The Court should dismiss the state claims for lack of subject matter jurisdiction upon dismissing the federal monopolization claim without further inquiry into the pleadings.  The Court

1    would lack supplemental jurisdiction, and it would further lack diversity jurisdiction because the

2    parties are both Delaware corporations.  Nonetheless, each of these claims also fails as a matter of

3    law and should be dismissed.

4                    **i.  Count I for Intentional Interference with Contractual Relations Fails**

5                        **to State a Claim**

6            To state a claim for intentional interference with contractual relations, MLW must allege

7    "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's

8    knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or

9    disruption of the contractual relationship; (4) actual breach or disruption of the contractual

10   relationship; and (5) resulting damage."  *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal.5th 1130, 1141

11   (2020) (citation omitted).  This claim trips at the starting line because MLW fails to plausibly allege

12   any intentional acts by WWE designed to interfere with the Tubi contract.

13           ***First***, MLW's allegations surrounding the Tubi contract are too bereft of factual detail to

14   plead intentional interference.  At the start of the complaint, MLW states that a WWE executive,

15   Stephanie McMahon, had a single communication with an unnamed Tubi executive in which she

16   "threatened" to pull all WWE content from Fox and (presumably) breach the WWE/Fox contract

17   unless Tubi terminated its own contract with MLW.  Compl. ¶ 8.  Later, MLW claims that the

18   alleged communication was an August 9, 2021 discussion, and that Ms. McMahon merely

19   "pressured the Tubi executive to deny MLW a time slot that would compete head-to-head with

20   WWE's NXT programs on Tuesday night."  *Id.* at ¶ 45.  MLW then claims that Ms. McMahon, at

21   some unspecified date or time, somehow "ultimately pressured the Tubi executive and other senior

22   executives at Fox to terminate the agreement in its entirety."  *Id.*  The reference to discussions not

23   just with the unnamed Tubi executive, but with "other senior executives at Fox" as well, suggests

24   multiple communications, not a single discussion.  MLW fails to allege (i) who at Tubi and Fox

25   Ms. McMahon supposedly pressured; (ii) what Ms. McMahon supposedly said; or (iii) when Ms.

26   McMahon supposedly had these additional communications with the Tubi executive and other

27   senior executives at Fox.  Moreover, MLW pleads that it "received a letter purporting to terminate"

28   its License Agreement with Tubi.  Compl. ¶ 45.  MLW fails, however, to plead the contents of that

letter, the grounds for termination, whether termination was unilateral or by mutual consent, or whether Tubi paid MLW in connection with the termination.  MLW's failure to plead these missing facts alone warrants dismissal of Count I.  *See Watershed Asset Mgmt., L.L.C. v. Watershed Capital*, LLC, No. C 13–03852 WHA, 2014 WL 785847, at *3 (N.D. Cal. Feb. 25, 2014) (dismissing claims lacking "factual allegations to support an inference" of interference).

  ***Second***, and more fatal to MLW's claim, these allegations defy all economic reality and are not remotely plausible.  According to MLW, WWE depends highly on its broadcast rights deals with NBCUniversal and Fox for hundreds of millions of dollars annually, and "the combined average value of WWE's US TV rights for its programs WWE RAW and WWE Smackdown alone is $470 million".  Compl. ¶¶ 18, 22.  MLW implausibly asks this Court to accept that WWE, a public company, would terminate its contract with Fox, forgoing substantial revenues and risking breach of contract litigation with Fox just to keep MLW off Tubi.  Even more ridiculously, MLW asks this Court to accept that Fox would submit to such a threat rather than utilize the full panoply of rights at its disposal under the WWE/Fox contract.  As noted above, courts must reject allegations that make "no economic sense."  MLW fails to plead any facts to move these claims from the realm of absurd to the realm of possible, much less from the realm of possible to that of plausible.

### ii.  Count II for Intentional Interference with Prospective Economic Advantage Fails to State A Claim

  To state a claim for intentional interference with prospective economic advantage, MLW must allege "(1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action."  *Roy Allan Slurry Seal, Inc. v. Amer. Asphalt South,* 2 Cal.5th 505, 512 (2017).  Further, an act constitutes tortious interference only if it is independently wrongful.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153 (2003).  MLW's Count II fails for numerous reasons.

1    ***First***, MLW fails to allege facts showing that WWE even knew of VICE's negotiations to

2    purchase broadcast rights for first-run MLW content.   MLW claims that a WWE employee

3    "warned" a senior VICE executive in June 2021 that WWE's "owner" (in reality, its Chairman and

4    CEO) was "pissed" that VICE was airing *archival* MLW content and wanted VICE to stop doing

5    so.  Compl. at ¶¶ 6, 35, 62.  But MLW fails to plead that this call touched on any negotiations for

6    *new*, first-run MLW content or that MLW or VICE ever disclosed those negotiations publicly or to

7    WWE prior to the June 2021 call.  Thus, MLW pled no facts to establish that WWE ever knew that

8    MLW was attempting to sell broadcast rights for first-run programming at the time of the supposed

9    "interference."

10    ***Second***, MLW fails to plausibly allege any actual disruption in its negotiations with VICE.

11    MLW's sole allegation involving WWE is the June 2021 phone call, but MLW fatally admits that

12    "***VICE subsequently aired one MLW program in the fall of 2021***."  Compl. ¶ 64 (emphasis added).

13    Thus, negotiations clearly continued for months after the June 2021 call, and MLW pleads no facts

14    sufficient to suggest that WWE impacted MLW's negotiations in the slightest.  *See Silicon Knights,*

15    *Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1311-12 (N.D. Cal. 1997) (granting dismissal

16    because "the complaint fails to assert facts sufficient to support a claim for intentional interference

17    with prospective economic advantage with Activision since there is no factual allegation in the

18    complaint that Silicon Knights' relationship with Activision was actually disrupted").

19    ***Third***, MLW has not plausibly alleged that WWE is the proximate cause for VICE

20    terminating any negotiations to purchase broadcast rights for new MLW content.  As noted above,

21    VICE aired a single episode of first-run MLW content in the fall of 2021.  MLW pleads no facts to

22    exclude the strong likelihood that some other intervening events after the June 2021 call caused

23    VICE to abandon the negotiations.  For example, MLW does not address news reports that the one

24    episode of first-run MLW content drew only a disappointing 40,000 viewers. [5]  Instead, MLW asks

---

[5] *See* Ex. 1 (MLW's October 7, 2021 program was a "disappointment" with only 40,000 viewers).

The Court can take judicial notice of online news articles "for their existence and content."

*2Die4Kourt v. Hillair Cap. Mgmt., LLC*, No. SACV 16-01304 JVS (DFMx), 2016 WL 4487895,

1   the Court to accept as plausible (i) that a VICE executive received a phone call from WWE in June

2   2021 demanding VICE not air archival MLW content, (ii) that VICE nonetheless continued to air

3   that content, (iii) that VICE decided to air *new* MLW content months after the WWE call, and (iv)

4   that VICE only then felt so threatened by WWE that it abandoned negotiations with MLW.  Such

5   a proposition defies all logic.

6         **Finally**, the alleged conduct is not "wrongful by some legal measure other than the fact of

7   interference itself."  *Korea Supply*, 29 Cal.4th at 1153.  The only independently wrongful conduct

8   asserted in the complaint is WWE's supposed violation of Section 2 of the Sherman Act and Cal.

9   Bus & Prof. Code § 17200 *et seq.*  Because these claims should be dismissed for the reasons

10  described in Sections III.A and III.B herein, MLW's interference with prospective economic

11  advantage claim likewise must be dismissed as a matter of law.

12              **iii.  Count IV for Violation of Cal. Bus. & Prof. Code § 17200 *et seq*. Fails**

13                      **to State A Claim**

14        MLW's claim under the California Unfair Competition Law ("UCL") fails for two

15  independent reasons.

16        **First**, the UCL requires that "unfair" conduct by a competitor be "tethered" to some other

17  violation of law.  *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (2002) ("UCL "unfair"

18  claims must be tethered to specific constitutional, statutory, or regulatory provisions).  Because

19  MLW's UCL claim is based on deficient claims of monopolization, intentional interference with

20  contractual relations, and intentional interference with prospective economic advantage, MLW also

21  fails to plead unfair conduct under the UCL.

22        **Second**, even if MLW had pled "unfair" conduct, MLW has no Article III standing or

23  statutory standing to bring a claim under the UCL.  Article III standing requires that the Plaintiff

24  "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

25  _____

26  at *1 n.1 (C.D. Cal. Aug. 23, 2016); *see also Unsworth v. Musk*, No. 19-mc-80224-JSC, 2019 WL

27  5550060, at *4 (N.D. Cal. Oct. 28, 2019) ("judicial notice is proper because the existence of the

28  publicly-available articles . . . cannot reasonably be questioned").

1   and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578

2   U.S. 330, 338 (2016).  The UCL only provides for injunctive relief, and thus to possess Article III

3   standing an injunction must provide MLW redress.  *Gregory*, 104 Cal. App. 4th at 851.  An

4   injunction is appropriate if a plaintiff "has suffered or is threatened with a concrete and

5   particularized legal harm coupled with 'a sufficient likelihood that [it] will again be wronged in a

6   similar way.'" *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (citation and

7   internal quotation marks omitted).  The risk of further injury, moreover, must be "real and

8   immediate." *Id.*  "Past exposure to illegal conduct does not in itself show a present case or

9   controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse

10  effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).  MLW pleads no facts suggesting that

11  it is in real and immediate danger from further conduct by WWE.  Thus, there is no ongoing or

12  repeated conduct to enjoin, and the UCL cannot offer MLW any redress as required under Article

13  III.

14          Separate from Article III standing, MLW lacks statutory standing because neither it nor

15  WWE is a citizen of California, and no "unfair" conduct emanated from California.  "[P]laintiffs

16  who are not California residents must also allege facts to show that the alleged violations occurred

17  within California, because California's unfair competition law does not apply extraterritorially."

18  *Aghaji v. Bank of Am., N.A.*, 247 Cal. App. 4th 1110, 1119 (2016).  MLW alleges that it is a

19  Delaware corporation headquartered in New York, and WWE is a Delaware corporation

20  headquartered in Connecticut.  Compl. ¶¶ 13-14.  MLW and the purported unfair conduct have only

21  one alleged connection to California: MLW states that a WWE executive located in Connecticut

22  spoke over the telephone to an unnamed Tubi executive in California, and that Tubi terminated its

23  contract with MLW sometime after the conversation.  *Id.* at ¶ 45.  To subject WWE to the UCL

24  based on the allegation's flimsy connection to California would be "arbitrary and unfair and

25  transgress due process limitations." *Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal. App. 4th 214,

26  227 (1999) (UCL inapplicable against defendant incorporated in California because its

27  "headquarters and principal place of business, the place [plaintiffs] were injured, and the place the

28  injury-producing conduct occurred are outside California . . . .").  Any conduct by WWE

overwhelmingly emanated from Connecticut and was felt in New York, and consequently it cannot support a UCL claim.

### C. WWE Respectfully Preserves the Issue of this Court's Personal Jurisdiction over WWE

WWE recognizes that Ninth Circuit precedent, binding on this Court, interprets the Clayton Act, 15 U.S.C. § 22, to allow a plaintiff to file an antitrust suit against a domestic corporation in any federal court. *See Action Embroidery Corp. v. Atl. Embroidery, Inc.,* 368 F.3d 1174 (9th Cir. 2004). However, recent Supreme Court decisions draw into question the power of a federal statute to confer general jurisdiction over a corporation not incorporated in the forum state absent sufficient conduct occurring in that state. *See BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549 (2017); *Bristol-Myers Squibb v. Superior Court*, 37 S. Ct. 1773, 1780 (2017). Here, as discussed above, neither party is a resident of California, no harm specific to California is alleged, and none of the alleged misconduct took place in California. As such, WWE believes that the Ninth Circuit would reconsider its holding in *Action Embroidery* and rule that this Court lacks personal jurisdiction. WWE respectfully preserves that issue.

## IV. CONCLUSION

WHEREFORE, for each of the reasons explained above, World Wrestling Entertainment, Inc. respectfully requests that the Court dismiss MLW Media LLC's complaint with prejudice for failure to state a claim upon which relief can be granted and for whatever other relief the Court deems just and equitable.

1

2
Dated: March 15, 2022     K&L GATES LLP

3
           By: *Christopher S. Finnerty*

4
           Daniel W. Fox (SBN 268757)

5
           K&L GATES LLP
           Four Embarcadero Center
           Suite 1200

6
           San Francisco, CA  94103
           Telephone: (415) 882-8200

7
           Facsimile:  (415) 882-8220
           daniel.fox@klgates.com

8

9
           Jerry S. McDevitt (*pro hac vice pending*)
           K&L GATES LLP

10
           210 Sixth Ave.
           Pittsburgh, PA 15222

11
           Telephone:  (412) 355-8608
           jerry.mcdevitt@klgates.com

12
           Christopher S. Finnerty (*pro hac vice pending*)

13
           K&L GATES LLP
           State Street Financial Center
           One Lincoln Street

14
           Boston, MA 02111
           Telephone:  (617) 261-3123

15
           christopher.finnerty@klgates.com

16
           Derek W. Kelley (*pro hac vice pending*)

17
           K&L GATES LLP
           K&L Gates LLP
           1601 K St. NW #1

18
           Washington, D.C. 20006
           Telephone: (202) 778-9467

19
           derek.kelley@klgates.com

20

21
           *Counsel for Defendant*
           World Wrestling Entertainment, Inc.

22

23

24

25

26

27

28

**MOTION TO DISMISS COMPLAINT; CASE NO. 5:22-CV-00179-EJD**