Jason S. Takenouchi (CBN 234835)
**Kasowitz Benson Torres LLP**
101 California Street, Suite 3000
San Francisco, California 94111
Telephone: (415) 421-6140
Fax: (415) 398-5030
JTakenouchi@kasowitz.com

Marc E. Kasowitz (*pro hac vice*)
Christine A. Montenegro (*pro hac vice*)
Nicholas A. Rendino (*pro hac vice*)
**Kasowitz Benson Torres LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Fax: (212) 506-1800
mkasowitz@kasowitz.com
cmontenegro@kasowitz.com
nrendino@kasowitz.com

*Attorneys for Plaintiff MLW Media LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MLW MEDIA LLC,<br><br>              Plaintiff,<br><br>       v.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>              Defendant. | Case No: 5:22-cv-00179-EJD<br><br>**PLAINTIFF MLW MEDIA LLC's OPPOSITION TO DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MOTION TO DISMISS** |

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

# TABLE OF CONTENTS

Page(s)

I.  STATEMENT OF THE ISSUE TO BE DECIDED ............................................1

II.  INTRODUCTION AND SUMMARY OF ARGUMENT ....................................1

III.  FACTS ...........................................................................................................3

    A.  The Professional Wrestling Market ......................................................3

    B.  WWE's Anticompetitive Scheme to Exclude Competitors ...................4

    C.  WWE's Scheme Caused Antitrust and Other Injury to MLW ...............6

IV.  ARGUMENT .................................................................................................6

    A.  Legal Standard .....................................................................................6

    B.  MLW has Sufficiently Pleaded a Claim Under Section 2 of the Sherman Act .........7

        1.  MLW has Plausibly Alleged a Relevant Market .......................7

        2.  MLW has Plausibly Alleged that WWE has Monopoly Power ..................10

            a.  MLW Has Sufficiently Pleaded Direct Evidence of Monopoly Power ...................10

            b.  MLW has Sufficiently Pleaded Circumstantial Evidence of Monopoly Power ....................12

        3.  MLW has Plausibly Alleged Willful Acquisition or Maintenance of Monopoly Power ...................15

        4.  MLW has Plausibly Alleged Antitrust Injury .............................18

    C.  MLW's Intentional Interference with Contractual Relations Claim.......................20

    D.  MLW's Intentional Interference with Prospective Economic Advantage Claim....................21

    E.  MLW's Unfair Competition Law Claim....................................................23

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

i

F.      Should the Court Find That Additional Factual Allegations Are Necessary To

Sustain Any Of MLW's Claims, Leave To Amend Should Be Granted .................25

V.      CONCLUSION .........................................................................................................25

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*2Die4Kourt v. Hillair Cap. Mgmt., LLC*,
    No. SACV 16-01304 (C.D. Cal. Aug. 23, 2016) ............................................22

*Aghaji v. Bank of Am., N.A.*,
    202 Cal. Rptr. 3d 619 (Ct. App. 2016) ..................................................24

*al-Kidd v. Ashcroft*,
    580 F.3d 949 (9th Cir. 2009) ......................................................6, 10, 18

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
    No. 14-CV-3053-MWF(VBKx) (C.D. Cal. Feb. 12, 2015)....................................25

*Am. Tobacco Co. v. United States*,
    328 U.S. 781 (1946)..................................................................12

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1997) ........................................................19

*Americopters, LLC v. FAA*,
    441 F.3d 726 (9th Cir. 2006) ......................................................7, 18

*Apple Inc. v. Samsung Elecs. Co.*,
    No. 11-CV-01846 (N.D. Cal. May 14, 2012) ............................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................6

*Barnes & Noble, Inc. v. LSI Corp.*,
    849 F. Supp. 2d 925 (N.D. Cal. 2012) ................................................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................6, 14, 20

*Bly-Magee v. California*,
    236 F.3d 1014 (9th Cir. 2001) ......................................................25

*Brader v. Allegheny Gen. Hosp.*,
    64 F.3d 869 (3d Cir. 1995)............................................................18

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ......................................................19

*Brantley v. NBC Universal, Inc.*,
    No. CV 07–6101 CAS (C.D. Cal. June 25, 2008) ......................................13

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

iii

*Chaquico v. Freiberg*,
    No. 17-CV-02423-MEJ (N.D. Cal. July 10, 2018) ........................................................22

*Chavez v. Whirlpool Corp.*,
    113 Cal. Rptr. 2d 175 (Ct. App. 2001) ........................................................................23

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
    868 F. Supp. 2d 876 (N.D. Cal. 2012) ........................................................................15

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
    No. 10-CV-4429 EMC, (N.D. Cal. Apr. 1, 2011) ........................................................17

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992) ....................................................................................15

*Colonial Med. Grp., Inc. v. Cath. Healthcare W.*,
    No. 09-CV-2192-MMC (N.D. Cal. May 25, 2010) ........................................................8

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*,
    411 F.3d 1030 (9th Cir. 2005) ....................................................................................12

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*,
    99 F.3d 937 (9th Cir. 1996) ................................................................................10, 18

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
    479 F.3d 1099 (9th Cir. 2007) ....................................................................................23

*In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*,
    No. CIV. 12-711 (D.N.J. Mar. 5, 2013) ......................................................................14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ....................................................................................................7

*Eastman v. Quest Diagnostics Inc.*,
    108 F. Supp. 3d 827 (N.D. Cal. 2015) ..................................................................15, 17

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
    771 F.3d 1119 (9th Cir. 2014) ....................................................................................20

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
    386 F.3d 485 (2d Cir. 2004) ....................................................................................7, 9

*In re Gilead Sciences Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ......................................................................................6

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
    No. 11-CV-03613-EJD (N.D. Cal. July 6, 2012) ..................................................13, 19

*Jackson v. Carey*,
    353 F.3d 750 (9th Cir. 2003) ....................................................................................25

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

*Kaplan v. Burroughs Corp.*,
   611 F.2d 286 (9th Cir. 1979) ........................................................................................9

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................................................17

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ......................................................................................22

*Klein v. Facebook, Inc.*,
   No. 20-CV-08570-LHK (N.D. Cal. Jan. 14, 2022) .....................................................13

*Laumann v. Nat'l Hockey League*,
   907 F. Supp. 2d 465 (S.D.N.Y. 2012) ..........................................................................8

*Le v. Zuffa, LLC*,
   216 F. Supp. 3d 1154 (D. Nev. 2016) ...........................................................................8

*LePage's, Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ................................................................................11, 19

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
   468 U.S. 85 (1984) ........................................................................................................9

*Nestle USA, Inc. v. Crest Foods, Inc.*,
   No. 16-CV-07519 (C.D. Cal. Mar. 8, 2019) ...............................................................24

*New Box Sols., LLC v. Davis*,
   No. 18-CV-5324-RSWL-KSx (C.D. Cal. Sept. 18, 2018) .....................................20, 21

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) .................................................................................7, 22

*In re NFL Sunday Ticket Antitrust Litig.*,
   No. 15-CV-02668 (C.D. Cal. June 30, 2017) ...............................................................8

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns., Inc.*,
   311 F. Supp. 2d 1048 (D. Colo. 2004) .........................................................................9

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
   305 F. Supp. 3d 1065 (N.D. Cal. 2018) .....................................................................19

*Norwest Mortg., Inc. v. Superior Ct.*,
   85 Cal. Rptr. 2d 18 (Ct. App. 1999) ..........................................................................24

*Oahu Gas Serv., Inc. v. Pacific Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988) ......................................................................................14

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   No. 5:16-CV-06370-EJD (N.D. Cal. Sept. 28, 2017) ..............................................7, 15

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

*Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*,
  526 F.2d 1196 (9th Cir. 1975) ............................................................................13

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...........................................................10, 12, 14, 16

*Reilly v. Apple Inc.*,
  No. 21-CV-04601-EMC (N.D. Cal. Jan. 7, 2022) ..................................................9

*Retrophin, Inc. v. Questcor Pharms., Inc.*,
  41 F. Supp. 3d 906 (C.D. Cal. 2014) .................................................................13

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
  471 F. Supp. 3d 981 (N.D. Cal. 2020) ..........................................................8, 19

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
  388 P.3d 800 (Cal. 2017) ..................................................................................21

*Safeway Inc. v. Abbott Labs.*,
  761 F. Supp. 2d 874 (N.D. Cal. 2011) ...............................................................15

*San Miguel v. HP Inc.*,
  317 F. Supp. 3d 1075 (N.D. Cal. 2018) .............................................................23

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) ..............................................................................17

*Simon & Simon, PC v. Align Tech., Inc.*,
  533 F. Supp. 3d 904 (N.D. Cal. 2021) ...................................................15, 16, 17

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
  376 F.3d 1065 (11th Cir. 2004) .........................................................................19

*Stamas v. Cty. of Madera*,
  No. 09-CV-0753 (E.D. Cal. June 21, 2010) ........................................................10

*Syufy Enter. v. Am. Multicinema, Inc.*,
  793 F.2d 990 (9th Cir. 1986) .......................................................................12, 14

*Teradata Corp. v. SAP SE*,
  No. 18-CV-03670-WHO (N.D. Cal. Nov. 8, 2021) ..............................................9

*Theme Promotions, Inc. v. News Am. FSI*,
  35 F. App'x 463 (9th Cir. 2002) ........................................................................18

*Tops Markets v. Quality Markets*,
  142 F.3d 90 (2d Cir. 1998) ................................................................................14

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) ......................................................................7, 16

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) .................................................................................14

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
  200 F. Supp. 3d 1012 (N.D. Cal. 2016) ...............................................................18

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ............................................................................*passim*

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ...............................................................11, 16, 17

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
  914 F.2d 1256 (9th Cir. 1990) ...............................................................................19

*Unsworth v. Musk*,
  No. 19-mc-80224-JSC (N.D. Cal. 2019) ...............................................................23

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir 2003) ...............................................................................25

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
  865 F. Supp. 2d 1002 (C.D. Cal. 2011) ...............................................................23

*In re: Zinc Antitrust Litig.*,
  No. 14-CV-3728 (KBF) (S.D.N.Y. June 6, 2016) .................................................12

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th and 5th Editions 2015-2021) ............................................................20

Fed. R. Civ. P. 8(a) ...............................................................................................2, 6

Fed. R. Civ. P. 12(b)(6).........................................................................................6, 22

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

MLW Media LLC ("MLW") submits this memorandum of law in opposition to World Wrestling Entertainment, Inc.'s ("WWE") motion to dismiss (ECF No. 19) ("Mem.") MLW's complaint (ECF No. 1) (the "Complaint" or "Compl.").

## I.    STATEMENT OF THE ISSUE TO BE DECIDED

Whether MLW has sufficiently pleaded claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, violation of Section 2 of the Sherman Act, and violations of Section 17200 of California's Business and Professions Code ("UCL") and California common law.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

This action arises out of WWE's egregious efforts to destroy its competitor MLW's business as part of WWE's scheme to maintain its 85% share of the U.S. market for the sale of broadcasting rights for professional wrestling programs.  As alleged in the complaint, WWE's misconduct has included, among other things, locking up critical inputs (*i.e.*, wrestlers and venues) for wrestling programs and preventing downstream distributors (*i.e.*, broadcast platforms) from airing its competitors' programming.  As part of this years-long scheme, WWE pressured one broadcast platform—California-based Tubi—into severing its relationship with MLW, and pressured another platform into cutting off negotiations for the airing of new MLW programming.

WWE's motion to dismiss should be denied.  WWE impermissibly relies on factual assertions—many provably false—that may not be considered on this motion, and, contrary to WWE's contentions, MLW has properly pleaded all of its claims for relief.

On the antitrust claim under Section 2 of the Sherman Act, MLW need only allege that the defendant (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power.  Here, MLW unquestionably properly alleges both elements.  First, MLW has pleaded the relevant market—broadcast rights for professional wrestling programs (Compl.

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

¶¶ 17-18, 24)—and such a single professional sport or form of entertainment can, as courts have repeatedly recognized, constitute a market where, as alleged here, it attracts a unique audience limiting the number of economic substitutes.  MLW also alleges that WWE has monopoly power because, among other things, it holds 85% of the relevant market and has reduced the output of professional wrestling broadcasts.  Second, MLW has pleaded that WWE has willfully acquired and maintained that monopoly power by preventing MLW from distributing its programs through Tubi and VICE, by locking up wrestling talent and key networks with exclusivity agreements, and by other conduct to constrain competitors and competition.

WWE argues that MLW's claim is insufficient because, WWE contends, it does not allege facts "suggesting that WWE could possibly hold any power over the dozens, if not hundreds, of networks, cable, and streaming services with which WWE has no commercial relationships." (Mem. 2-3.)  However, a Section 2 claim is viable, where, as here, the monopolist "ties up the *key dealers*." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190 (3d Cir. 2005) (emphasis added).  And contrary to WWE's assertion, the antitrust laws are designed precisely to protect against WWE's predatory acts preventing MLW from gaining a foothold in the market because those acts clearly injure competition in general.

On MLW's intentional interference with contractual relations claim, MLW alleges that it lost its Tubi contract as a result of Stephanie McMahon of WWE pressuring Tubi and Fox executives "to deny MLW a time slot that would compete head-to-head with WWE's NXT programs" and "to terminate the agreement [with MLW] in its entirety."  (Compl. ¶ 45.)  Contrary to WWE's assertion, Rule 8(a) of the Federal Rules of Civil Procedure does not require MLW to detail, before discovery, WWE's threats that led to the termination of the Tubi contract, particularly given that many of those details are peculiarly within WWE's knowledge.  While WWE claims that it is not plausible that it would threaten Fox because Fox is its principal distributor, that is not so

2

and at most raises a factual issue precluding dismissal.  In fact, courts regularly uphold as plausible claims based on defendants threatening their principal distributors, *see, e.g., Dentsply*, 399 F.3d at 190, 194, and MLW alleges conduct by WWE no different from and no less plausible than that of those other defendants.

MLW has also properly alleged that WWE intentionally interfered with prospective economic relations by alleging that WWE's threats to VICE led that company to abandon its negotiations with MLW to air new MLW content.  WWE incorrectly contends that MLW must also allege that WWE knew specifically that the parties were negotiating the airing of MLW's new content.  Under California law, however that is not so—MLW need only plead, as it clearly does, that WWE knew that its actions would interfere with VICE and MLW's economic relationship.

As to MLW's UCL claim, MLW has statutory and Article III standing because it alleges that WWE's conduct was directed at harming MLW's relationship with Tubi, a California resident, and MLW seeks to enjoin WWE from continuing to undermine MLW's business.

Accordingly, and as shown further below, the motion should be denied in its entirety.[1]

## III.   FACTS

### A.   The Professional Wrestling Market

MLW is in the business of promoting professional wrestling sporting events and selling broadcasting rights to its professional wrestling content.  (Compl. ¶ 13.)  MLW competes with WWE in the United States market for the sale of broadcasting rights for professional wrestling programs to networks, cable and streaming services (the "Relevant Market").  (*Id.* ¶¶ 17, 24.)

---

[1] In the alternative, MLW should be granted leave to amend to address any purported deficiencies in the Complaint.

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

There are a limited number of media distribution channels that currently purchase broadcasting rights for professional wrestling content, including NBCUniversal, WarnerMedia and the Fox media companies.  (*Id.* ¶¶ 19-20.)

WWE holds approximately 85% of the market share of the Relevant Market.  (*Id.* ¶¶ 17, 24.)[2]  WWE's market dominance gives it the ability to raise prices for consumers of professional wrestling entertainment and lower the quality of goods in the market.  (*Id.* ¶ 25.)  WWE's monopoly position is protected by high barriers to entry, including production costs for professional wrestling shows; exclusive contracts controlling wrestling talent; and the importance of brand recognition to attract the talent necessary to produce content and entice potential new business partners to enter into distribution deals.  (*Id.* ¶ 26.)

**B.** **WWE's Anticompetitive Scheme to Exclude Competitors**

As alleged in the Complaint, WWE engaged in an anticompetitive scheme designed to restrict competitors' access to the necessary inputs and outputs for the Relevant Market, all with the goal of protecting WWE's profits and maintaining its monopoly position.  That scheme included:

***Input Restraints***:  WWE sought to restrict MLW's access to professional wrestlers by:  (i) poaching MLW's wrestlers who were under exclusive contracts and airing MLW's talent (without consent) on its platform; (ii) attempting to induce MLW's wrestlers to breach their contracts by revealing confidential information about its business; (iii) threatening to refuse to hire wrestlers who had worked for MLW; (iv) controlling the supply of professional wrestlers by forcing them to

---

[2] WWE's estimated annual total revenue for 2020 in North America was over $764 million, and the combined average annual value of WWE's U.S. TV rights for its programs WWE Raw and WWE Smackdown alone is $470 million.  (*Id.* ¶¶ 21-22.)  By contrast, WWE's largest competitor, All Elite Wrestling ("AEW"), had estimated revenue of $64 million that year.  (*Id.* ¶ 21.)

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1    enter into exclusive contracts; and (v) interfering with MLW's Tubi contract so that MLW could

2    not attract new talent.  (*Id.* ¶¶ 26, 30, 32-33.)  WWE also leveraged its decades-long relationships

3    with virtually every major sports arena in the United States to make it harder for WWE's

4    competitors to book arenas, which are critical for wrestling promotions and the production of

5    weekly programming.  For example, WWE blocked competitor AEW from hosting an event in two

6    arenas.  (*Id.* ¶ 28.)

7

8        ***Output Restraints***:  WWE locked up key distribution channels (output) by preventing

9    broadcast platforms from airing MLW's content.  For example, in early 2021 WWE pressured

10   VICE to end negotiations with MLW for a deal to air new MLW programs on VICE platforms.  (*Id.*

11   ¶ 35.)  After WWE learned that MLW and VICE were working on a deal, WWE Senior Vice

12   President Susan Levison ("Levison") warned a VICE executive to stop airing MLW programs,

13   saying that WWE owner Vince McMahon ("McMahon") was "pissed" that VICE was airing MLW

14   content.  (*Id.* ¶¶ 5-6, 35-36.)  The VICE executive responded to Levison that, "I think this is illegal

15   what you're doing" and that it was probably an antitrust violation, to which Levison responded that

16   she could not control McMahon.  (*Id.* ¶¶ 6, 36.)

17

18       A few months later, WWE upended an MLW broadcasting deal with Tubi, a Fox-affiliated

19   streaming service with millions of subscribers.  (*Id.* ¶¶ 38-40.)  Shortly after WWE learned about

20   the MLW-Tubi deal—which had the potential to greatly improve MLW's brand recognition and

21   attractiveness to new wrestling talent—WWE executive Stephanie McMahon pressured a Tubi

22   executive located in California to end the arrangement.  (*Id.* ¶ 45.)  WWE's interference and

23   intimidation tactics succeeded, and Tubi terminated its contract with MLW.  (*Id.*)[3]

24

25   _____

26   [3] Wrestling industry publications reported on WWE's misconduct with one report noting that

27   "shortly before the [Tubi-MLW] deal was to be announced publicly in August, WWE was made

28

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

16

17

18

19

20

21

22

23

24

25

26

27

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

**C.     WWE's Scheme Caused Antitrust and Other Injury to MLW**

WWE's anticompetitive scheme has suppressed and continues to suppress competition in the Relevant Market, including by causing competitors to lose profitable contracts and critical platforms to air their content; depriving customers of content; and artificially inflating prices. WWE's scheme has also caused MLW to lose future profits and business opportunities, decreased its ticket sales and brand recognition, decreased the company's valuation, and impaired its ability to recruit and keep wrestling talent.  (*Id.* ¶¶ 10-12, 48-52, 57-58, 64-65, 71-74, 79-80.)

**IV.     ARGUMENT**

**A.     Legal Standard**

Fed. R. Civ. P. 8(a) requires a plaintiff to plead a claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face."  *Id*. at 555, 570.  To withstand a Rule 12(b)(6) motion, a plaintiff need only allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In the Ninth Circuit, Rule 12(b)(6) motions are disfavored except in exceptional cases; a complaint satisfies *Twombly* if the allegations, taken as a whole, are facially plausible.  *See In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).  On a motion to dismiss for failure to state a claim, the Court must presume all factual allegations of the complaint to be true, is confined to the facts of the complaint, and must draw all reasonable inferences in favor of the nonmoving party.  *See, e.g.*, *al-*

aware of it.  A source close to Fox . . . indicated that WWE did not respond favorably to the deal, which was to be announced imminently after WWE was made aware."  (*Id.* ¶ 47.)

1   *Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009), *rev'd on other grounds*, 563 U.S. 731, 734

2   (2011); *Americopters, LLC v. FAA*, 441 F.3d 726, 732 n.4 (9th Cir. 2006).

### B.       MLW has Sufficiently Pleaded a Claim Under Section 2 of the Sherman Act

4          The Sherman Act makes it unlawful to "monopolize, or attempt to monopolize . . . any part

5   of the trade or commerce among the several States . . . ."[4]  15 U.S.C. § 2.  "A monopoly claim has

6   two elements, aside from antitrust injury:  (1) defendant possessed monopoly power in the relevant

7   market and (2) defendant willfully acquired or maintained that power."  *Optronic Techs., Inc. v.*

8   *Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2017 WL 4310767, at *3 (N.D. Cal. Sept. 28,

9   2017) (Davila, J.) (citation omitted).

### 1.       MLW has Plausibly Alleged a Relevant Market

11         MLW's Complaint sufficiently alleges the relevant market for antitrust purposes.  (Compl.

12  ¶¶ 1-4, 17-28, 68.)  WWE's assertions to the contrary (Mem. 6-7) fail.  A complaint is *not* required

13  to allege a relevant market with specificity; in fact, an alleged market is sufficiently pleaded

14  "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal

15  defect."  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Moreover, the

16  "definition of the relevant market is basically a fact question dependent upon the special

17  characteristics of the industry involved,  *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,

18  676 F.2d 1291, 1299 (9th Cir. 1982), and where the definition depends on "factual inquiry into the

19  'commercial realities' faced by consumers," it is an issue for the jury to decide.  *Eastman Kodak*

20  *Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (citation omitted); *Geneva Pharms.*

21  *Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("Defining a submarket requires

22  a fact-intensive inquiry . . . .")

---

[4] WWE does not challenge MLW's allegations of attempted monopolization (Compl. ¶ 29).

7

1    Here, MLW alleges that the Relevant Market is one for the broadcast rights of

2  "professional wrestling," a form of "sports entertainment" (Compl. ¶¶ 17-18, 24), which, like

3  professional sports, attracts a unique audience that limits the number of economic substitutes.  *See,*

4  *e.g.*, *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 491-92 (S.D.N.Y. 2012) (finding that

5  MLB and NHL have monopolies in the broadcast rights for their respective sports given the

6  "peculiar and unique characteristics" that distinguish these sports from "other sports or leisure

7  activities").[5]

8

9    WWE's claim that programs such as *90 Day Fiancé* and *The Walking Dead* are reasonably

10  interchangeable substitutes for professional wrestling (Mem. 6) is contrary to common sense and

11  the law.  *See In re NFL Sunday Ticket Antitrust Litig.*, No. 15-CV-02668, 2017 WL 3084276, at

12  *17 (C.D. Cal. June 30, 2017), *rev'd on other grounds*, 933 F.3d 1136 (9th Cir. 2019) ("[A]

13  market may be limited to one professional sport" and "many viewers would not believe a Sunday

14  afternoon marathon of NCIS, a syndicated drama, or the live broadcast of a tennis tournament to

15  be a viable alternative to a Denver Broncos football game); *Le v. Zuffa*, *LLC*, 216 F. Supp. 3d

16  1154, 1165 (D. Nev. 2016) (recognizing professional mixed martial arts as a relevant market for

17  antitrust purposes); *Laumann*, 907 F. Supp. 2d at 491-92.  In any event, WWE's argument at most

18  raises factual issues that cannot be decided on a motion to dismiss.  *See Reveal Chat Holdco, LLC

19  v. Facebook, Inc.*, 471 F. Supp. 3d 981, 999 (N.D. Cal. 2020) (argument that a market is

20

21

22

23  [5] WWE's reliance on *Colonial Med. Grp., Inc. v. Cath. Healthcare W.*, No. 09-CV-2192-MMC,

24  2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010), is misplaced because the plaintiff had "no

25  allegations to support a finding" that the market did not include obvious identical substitutes.

26  Even there, however, the court permitted plaintiff a *third* opportunity to amend its pleadings to

27  allege a market.  *Id.* at *5.  Here, as alleged, there are no substitutes.

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

8

1    insufficiently pled because "it does not encompass all economic substitutes" raises factual issue

2    that "should be resolved on a more developed factual record").

3    　　　WWE's assertion that MLW must allege cross-elasticity of demand and the absence of

4    "reasonably interchangeable alternatives" to professional wrestling programming (Mem. 6) is

5    wrong.  *See Teradata Corp. v. SAP SE*, No. 18-CV-03670-WHO, 2021 WL 5178828, at *13 (N.D.

6    Cal. Nov. 8, 2021) (collecting cases and noting that a plaintiff may "define a relevant market

7    without economic study of cross-elasticity of demand"); *see also Nat'l Collegiate Athletic Ass'n v.*

8    *Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 111 (1984) (affirming relevant product market

9    of televised intercollegiate football where the complaint did not allege "cross elasticity" or

10   "reasonable interchangeability").  WWE's reliance on *Kaplan v. Burroughs Corp.*, 611 F.2d 286,

11   291-92 (9th Cir. 1979), is misplaced because *Kaplan* (decided after trial) did not analyze the

12   sufficiency of the pleadings.  *See id.* at 290.[6]  Further, even if interchangeability were a proper

13   focus on a motion to dismiss, which it is not, courts recognize that potentially interchangeable

14   products can still constitute viable sub-markets for antitrust purposes.  *See, e.g.*, *Nobody in*

15   *Particular Presents, Inc. v. Clear Channel Commc'ns., Inc.*, 311 F. Supp. 2d 1048, 1090 (D. Colo.

16   2004) (holding that "rock" music may be a distinct market from other live music); *Geneva*

17   *Pharms.*, 386 F.3d at 496 (holding that the relevant market included only generic versions of

18   blood thinner medication and not the chemically-equivalent branded product).

---

[6] *Reilly v. Apple Inc.*, No. 21-CV-04601-EMC, 2022 WL 74162, at *5 (N.D. Cal. Jan. 7, 2022)
(Mem. 6), is likewise distinguishable because the *Reilly* plaintiff asserted a "single-brand market."
MLW does not allege a single-brand market.

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

**2.      MLW has Plausibly Alleged that WWE has Monopoly Power**

"Monopoly power is defined as the power to control prices or exclude competition." *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 WL 1672493, at *6 (N.D. Cal. May 14, 2012) (citation omitted).[7] Monopoly or market power may be demonstrated through direct evidence (*"restricted output and supracompetitive prices"*) or circumstantial evidence. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). "The more common type of proof is circumstantial evidence pertaining to the structure of the market." *Id.*

**a.      MLW Has Sufficiently Pleaded Direct Evidence of Monopoly Power**

WWE asserts, without any legal support, that to plausibly allege direct evidence of market power, MLW must allege that WWE has the power to force "dozens (if not hundreds) of networks, cable, and streaming services" to "exclude MLW from their platforms." (Mem. 8-9.)  This is not the law; to the contrary, the existence of alternative comparable platforms cannot be considered on a motion to dismiss. *See al-Kidd*, 580 F.3d at 956 (the Court must presume all factual allegations of the complaint to be true and draw "all reasonable inferences in favor of the plaintiff"); *Stamas v. Cty. of Madera*, No. 09-CV-0753, 2010 WL 2556560, at *5 (E.D. Cal. June 21, 2010) ("[F]actual arguments . . . are improper for decision on a motion to dismiss.").  And a plaintiff *is not* required to allege foreclosure from *all* platforms in order to properly plead market power.  *See Dentsply*, 399 F.3d at 184, 191 ("The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit.").

In *Dentsply*, which is directly on point, the Third Circuit found that a manufacturer of artificial teeth violated Section 2 by preventing its rivals from selling their products through

---

[7] The terms "market power" and "monopoly power" are interchangeable.  *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950 n.15 (9th Cir. 1996).

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

10

preferred dealers, *id.* at 184, 196, including by refusing to sell its products and threatening to sever access to its dealers who purchased or considered purchasing competing products.  *See id.* at 190.

The court held that the manufacturer could have market power even if competitors' products could be sold via alternative means, *id.* at 189, because it had "supremacy over the dealer network" and "the firm that ties up the key dealers rules the market."  *Id.* at 190.  Therefore, even though the competitors had access to laboratories and "hundreds of dealers" and the manufacturer only sold its products to 23 dealers, there was sufficient evidence that it exercised control over the key distribution channels.[8]  *Id.* at 185, 193; *see also LePage's, Inc. v. 3M*, 324 F.3d 141, 159-60 (3d Cir. 2003) (defendant's foreclosure of high-volume distribution channels to the detriment of a rival violated Section 2); *United States v. Microsoft Corp.*, 253 F.3d 34, 70-71 (D.C. Cir. 2001) (a "monopolist's use of exclusive contracts, in certain circumstances, may give rise to a [Section] 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required" for a Section 1 violation).

As did the plaintiff in *Dentsply*, MLW has alleged direct evidence of monopoly power by the defendant's restrictions on output and increased prices.  WWE has restricted output by maintaining exclusive agreements with the key distributors of professional wrestling shows, such as Fox TV, USA Network and Peacock, and has prevented MLW from airing its content on favored platforms, such as Tubi and VICE.  WWE has also increased prices.[9]  (*See* Compl. ¶¶ 10,

---

[8] WWE asserts that "[b]asic economic principles thus dictate that the content purchasers—not WWE—predominately hold the power."  (Mem. 10.)  WWE provides no citation for this supposed "basic economic principle."  And in fact, markets may—as MLW alleges (Compl. ¶¶ 24-25, 34-37, 44-47, 70)—allow content providers to exercise market power over distributors.

[9] It is a fundamental principle of supply and demand that decreased output leads to increased price.

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1   25, 52, 71-73.)  Such allegations are sufficient at the pleading stage.  *See In re: Zinc Antitrust*

2   *Litig.*, No. 14-CV-3728 (KBF), 2016 WL 3167192, at *2, 15-17 (S.D.N.Y. June 6, 2016) (denying

3   motion to dismiss and finding plaintiffs plausibly allege market power based on control over

4   price); *see also Rebel Oil*, 51 F.3d at 1434 (direct allegations of monopoly power sufficient); *cf.*

5   *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1043 (9th Cir.

6   2005) (defendant's employees' testimony that it had power to influence prices and used that power

7   in the relevant market was sufficient direct evidence).

8   **b.   MLW has Sufficiently Pleaded Circumstantial Evidence of Monopoly Power**

9       MLW has also sufficiently pleaded circumstantial evidence of market power.  (Compl.

10  ¶¶ 1-4, 17-28, 68.)  To do so, a plaintiff must: (1) define the relevant market, (2) show that the

11  defendant owns a dominant share of that market, and (3) show that there are significant barriers to

12  entry and that existing competitors lack capacity to increase their output in the short run."  *Rebel*

13  *Oil*, 51 F.3d at 1434.  As discussed above, *supra* at 7-9, MLW satisfies the first prong.

14      MLW also satisfies the second prong by alleging that WWE holds approximately 85% of

15  the market share and attracts the vast majority of viewer time, as well as the vast majority of the

16  media rights deals, and the resulting vast majority of broadcast and media revenue.  (Compl.

17  ¶¶ 17, 21-24.)[10]  MLW need not allege the precise size of the market or otherwise plead market

---

22  *See Rebel Oil*, 51 F.3d at 1434 ("Prices increase marketwide in response to the reduced output

23  because consumers bid more in competing against one another to obtain the smaller quantity

24  available.").

25  [10]*See Am. Tobacco Co. v. United States*, 328 U.S. 781, 797-98 (1946) (firm with 2/3 of market is

26  monopoly); *Syufy Enter. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995-96 (9th Cir. 1986) (60-69%

27  market share and competition fragmentation sufficient to show "monopoly power" under Section

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

share with specificity.  *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 11–cv–03613-EJD, 2012 WL 2711040, at *5 (N.D. Cal. July 6, 2012) (citing *Newcal Indus.*, 513 F.3d at 1045). Nevertheless, MLW has alleged facts to support WWE's 85% market share based on WWE's estimated total revenues, viewership and ratings as compared to those of its competitors.  (Compl. ¶¶ 21-23.)  *Klein v. Facebook, Inc.*, No. 20-CV-08570-LHK, 2022 WL 141561, at *15-17 (N.D. Cal. Jan. 14, 2022) ("courts have repeatedly held that a rough estimation of the defendant's market share, with no explanation of how that estimation was made, is sufficient at the pleading stage," and market share allegations supported by revenue and social media use time sufficient); *Brantley v. NBC Universal, Inc.*, No. CV 07–6101 CAS, 2008 WL 11357958, at *3 (C.D. Cal. June 25, 2008) (market power may be established by "market share criteria such as ratings and revenue").

MLW also meets the third prong by alleging that significant barriers to entry exist, including "production costs for professional wrestling shows; exclusive contracts controlling wrestling talent; and the importance of brand recognition to attract the talent necessary to produce content and entice potential new business partners to enter into distribution deals  (Compl. ¶ 26) and that WWE increased these already-high barriers by entering into media rights contracts with major networks and distribution channels locking up networks (including streaming networks) and other partners into only WWE content or giving WWE content more favorable time slots and marketing opportunities.  (*Id.* at ¶ 27.)

"Whether there are in fact significant barriers to entry is not an issue appropriately decided" on a motion to dismiss.  *Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906, 917 (C.D. Cal. 2014).  Nevertheless, WWE asserts that MLW is required to allege in detail the

2); *Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975) (45-70% share of the market sufficient to show monopoly power where no competitor had over 12%).

relevant production costs or otherwise explain how WWE's acts of acquiring and retaining talent impacts the market. (Mem. 10.) There is no such requirement. *Twombly*, 550 U.S. at 555 (plaintiff need only plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."). And WWE cannot dispute such barriers exist given its 2021 10-K stating that: "[a]s of December 31, 2021 and 2020, [WWE] had $13.8 million and $15.4 million, respectively, in capitalized content production costs" and "failure to retain or continue to recruit key performers . . . could adversely affect [WWE's] operating results." (Kasowitz Decl., Ex. A, at 12, 30.) *See Barnes & Noble, Inc. v. LSI Corp.*, 849 F. Supp. 2d 925, 930-31 (N.D. Cal. 2012) (taking judicial notice of 10-K on a motion to dismiss).

WWE's assertion that AEW's "successful entry and expansion refutes the existence of substantial barriers to entry"[11] (Mem. 10-11) is also flawed. As the Ninth Circuit has recognized, the fact that another competitor has entered the market "does not necessarily preclude the existence of 'significant' entry barriers." *Rebel Oil*, 51 F.3d at 1440. This is especially true where, as here, "output or capacity of the new entrant is insufficient to take significant business away" from the alleged monopolist, and any potential competitor is "unlikely to represent a challenge [to the monopolist's] market power." *Id.*; *Oahu Gas Serv., Inc. v. Pacific Res., Inc.*, 838 F.2d 360, 367 (9th Cir. 1988) ("evidence that the [rival] firm remained very small could reasonably preclude a decision that [the rival's] entry reflected a breakdown of barriers to entry.");

---

[11]WWE cites *Tops Markets v. Quality Markets*, 142 F.3d 90, 99 (2d Cir. 1998) and *United States v. Syufy Enters.*, 903 F.2d 659, 665-67 (9th Cir. 1990), but neither was decided on a motion to dismiss. *In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, No. CIV. 12-711, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013). Moreover, unlike here, there were effectively "no barriers to entry" in *Tops* and *Syufy*. *Tops*, 142 F.3d at 99; *Syufy*, 903 F.2d at 661.

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

*Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 889 (N.D. Cal. 2011) (denying summary judgment although competitors' share of the market was expanding).  Indeed, MLW has alleged that competitors, like AEW and Impact, lag far behind WWE in revenue and viewership and have not taken significant business away from WWE.  (Compl. ¶¶ 21-23.)

WWE's reliance on *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 868 F. Supp. 2d 876, 915 (N.D. Cal. 2012), *order vacated in part on reconsideration*, No. 10-CV-4429 EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012) (Mem. 11), is misplaced.  *Church* was decided on summary judgment, and in fact supports MLW; the *Church* court held that "evidence of the ability to exclude some competitors from the market, even in the absence of market-wide restricted output or supracompetitive prices, could suffice to demonstrate market power." *Id.* at 900.

**3.      MLW has Plausibly Alleged Willful Acquisition or Maintenance of Monopoly Power**

MLW sufficiently pleads the second element of a monopolization claim: that the defendant willfully acquired or maintained monopoly power.  *Optronic*, 2017 WL 4310767, at *3.  "To violate the second element, a defendant must use its monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 834 (N.D. Cal. 2015) (citation omitted).  "Sometimes, a monopolist's singular activity will amount to an antitrust violation on its own.  But other times, a series of activities will combine to create an antitrust violation even if no one activity is sufficiently 'anticompetitive' in isolation." *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 913 (N.D. Cal. 2021); *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("It would not be proper to focus on specific individual acts of an accused monopolist while refusing to *consider their overall combined effect* . . . We are dealing with what has been called the 'synergistic effect' of the mixture of the elements." (emphasis in original)).

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

Here, MLW's allegations are based on a broad anticompetitive scheme:  WWE willfully acquired and maintained its monopoly power by encouraging wrestlers to breach their contracts with MLW and divulge confidential and proprietary information about MLW's business (Compl. ¶ 33), as well as by locking up key inputs needed to compete, such as wrestler talent (*id.* ¶¶ 4, 26, 33), and arena facilities necessary for wrestling promotions and the production of weekly programming (*id.* ¶ 28).  WWE also attempted to lock up the output market for wrestling broadcasting by blocking rivals from accessing downstream cable, network and streaming distribution partners.  (*See id.* ¶¶ 27, 34-47, 57-58, 62-65, 79-80.)

WWE's assertion that, under *Rebel Oil*, MLW must allege that "WWE *substantially foreclosed* MLW from the market by excluding it from at least 30% or more of those [distribution] outlets" (Mem. 12) is unsupported.  *Rebel Oil* did not address what constitutes substantial foreclosure, but rather the market share required to establish *market power*.  *See Rebel Oil*, 51 F.3d at 1438.  And in any event the foreclosure test applies in the exclusive dealing context (*see, e.g., Simon & Simon, PC*, 533 F. Supp. 3d at 914 (considering different criteria when evaluating a refusal to deal claim)), and "[t]he test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."[12]  *Dentsply*, 399 F.3d at 191.

_____

[12]  Contrary to WWE's assertion, substantial foreclosure may occur when a competitor is excluded from less than 30% of the market.  *See Twin City*, 676 F.2d at 1298, 1304 (contract restricting as little as 24% of the relevant market resulted in a cognizable foreclosure under Section 1, which typically requires a higher level of foreclosure than Section 2); *cf. Microsoft*, 253 F.3d at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a [Section 1] violation.")

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

MLW alleges a series of anticompetitive acts that include much more than just exclusive dealing.  (*See* Compl. ¶¶ 3, 28, 33, 45 (alleging anticompetitive practices such as "poaching talent, misappropriating confidential information, interfering with competitors' contracts and cutting off competitors' access to their viewing audiences"); *id.* ¶¶ 3, 11, 46, 48-51, 72-74 (alleging WWE has obtained "entrenched domination" and the "ability to control prices and exclude competition").)  In such circumstances, the substantial foreclosure test is not applied to MLW's non-exclusive dealing claims and MLW has adequately alleged a Section 2 violation because it has demonstrated that WWE possesses monopoly power in the relevant market and willfully acquired or maintained that power.  *Eastman*, 108 F. Supp. 3d at 834; *Simon & Simon*, 533 F. Supp. 3d at 913-17 (denying motion to dismiss a "multifaceted scheme to stifle competition" and applying the "substantial foreclosure" test only to exclusive dealing claims, but concluding that other allegation in the complaint "amounts to a section 2 violation *on its own*.").

And for those exclusive dealing portions of WWE's anticompetitive scheme where a foreclosure analysis may apply, MLW's allegations that WWE precluded MLW's chosen distribution relationships (Compl. ¶¶ 33-37, 44-47, 57-58, 62-64) are sufficient.  "There is no hard-and-fast rule for determining the point at which market foreclosure becomes 'substantial.'" *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, No. 10-CV-4429 EMC, 2011 WL 1225912, at *6 (N.D. Cal. Apr. 1, 2011).  A monopolist's anticompetitive exclusion of a rival can be unlawful even if rivals are not "completely blocked."  *Microsoft*, 253 F.3d at 64; *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 237 (S.D.N.Y. 2019) (plaintiff need not allege a "numerator and denominator" for foreclosure to state exclusive dealing claim).  "For there to be an antitrust violation, [competitors] need not be barred 'from all means of distribution' if they are 'bar[red] . . . from the cost-efficient ones."  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 656 (2d Cir. 2015) (citation omitted).

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

WWE speculates that MLW could have simply given up on its relationships with its chosen distributors—relationships which WWE interfered with—and instead used alternative and inferior or more burdensome distribution channels. (Mem. 12.) Such speculative theories cannot be considered on a motion to dismiss, where all reasonable inferences must be drawn in MLW's favor. *See al-Kidd,* 580 F.3d at 956; *Americopters*, 441 F.3d at 732 n.4. WWE's theories also run counter to WWE's own SEC filings in which it states the "failure to maintain or renew key agreements could adversely affect [WWE's] ability to distribute [WWE's] media content . . . which could adversely affect [its] operating results." (Kasowitz Decl. Ex. A at 9.)

### 4. MLW has Plausibly Alleged Antitrust Injury

At the pleading stage, the Court need only find that the plaintiff has "allege[d] sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996). To show antitrust injury, a plaintiff must demonstrate that the loss flows from an anticompetitive aspect or effect of the defendant's behavior that is of the type the antitrust laws were intended to prevent. *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d 1012, 1024 (N.D. Cal. 2016). Moreover, "the existence of an 'antitrust injury' is not typically resolved through motions to dismiss." *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995); *Theme Promotions, Inc. v. News Am. FSI*, 35 F. App'x 463, 466 (9th Cir. 2002) (same).

The Complaint details how WWE suppressed competition by, among other things, causing competitors to lose profitable contracts and critical platforms to air content, decreasing competitors' ticket sales and brand recognition; reducing the output of programming; and impairing competitors' access to talent. (Compl. ¶¶ 47-52, 54-58, 64-65, 71-74, 79-80.) Courts have consistently held that where, as here, "a monopolist's actions are designed to prevent one" competitor "from gaining a foothold in the market," that "is not only injurious to the potential

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

competitor but also to competition in general."  *LePage's*, 324 F.3d at 159; *see also Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1997) (noting that a competitor of a monopolist suffers an antitrust injury when "it was either driven out of business or suffered reduced profits because of the alleged anticompetitive acts of the attempted monopolist" (citation omitted)); *GSI Tech.*, 2012 WL 2711040, at *7 (holding antitrust injury includes "lost revenues, lost profits and market share, and stifling of product innovation").  By contrast, none of the cases WWE cites warrant dismissal of the Complaint in light of its detailed allegations.[13]

WWE also advances fundamentally flawed factual arguments.  For example, WWE claims that it is "contradictory" for WWE to both poach MLW talent and refuse to hire MLW talent (Mem. 14).  To the contrary, WWE sought to deprive MLW of the wrestling talent it needed to compete by both poaching its wrestlers and threatening any wrestlers who chose to work for MLW with the prospect of limited future employment opportunities.  WWE thus concludes that such harm is "untethered to any harm to competition" (Mem. 14); however, a monopolist's acquisition of talent from a competitor may violate Section 2 if the monopolist acquires talent "not for purposes of using that talent but for purposes of denying it to a competitor."  *Universal Analytics,*

---

[13]   In *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198-1201 (9th Cir. 2012), plaintiff did not allege that the arrangements excluded other sellers, created barriers to entry, or caused consumers to forego the purchase of substitutes.  In *Reveal Chat Holdco*, 471 F. Supp. 3d at 998, it was unclear whether plaintiffs were competitors or whether they participated in the relevant market.  In *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d 1065, 1074-76 (N.D. Cal. 2018), the plaintiff pled "no facts to support [its allegations]," including injury. In *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1079 (11th Cir. 2004), the anticompetitive conduct was *not* alleged to have increased prices or decreased output.

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

19

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

*Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990); Areeda & Hovenkamp

¶ 702c ("Acquiring talent might nevertheless be exclusionary in certain cases where the

monopolist's behavior is 'malicious' and totally without redeeming virtue.").

## C.      MLW's Intentional Interference with Contractual Relations Claim

Under California law, the elements of intentional interference with contractual relations

are: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this

contract; (3) defendant's intentional acts designed to induce a breach or disruption of the

contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5)

resulting damage." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th

Cir. 2014) (citation omitted).  As set forth in detail above, *supra* at 5, Plaintiffs have adequately

alleged these elements.  (Comp. ¶¶ 38-59.)

WWE contends that MLW is also required to plead the names of the Tubi executives

whom Ms. McMahon pressured, and provide a verbatim account of what Ms. McMahon told

them.  (Mem. 17-18.)  That is not the law; rather, MLW is required to "give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555

(citation omitted); *New Box Sols., LLC v. Davis*, No. 18-CV-5324-RSWL-KSx, 2018 WL

4562764, at *7 (C.D. Cal. Sept. 18, 2018) (tortious interference claim sufficiently pleaded where

plaintiff alleged that defendant "called" the contracting party to cancel these contracts.)[14]

---

[14] MLW's allegations are even more detailed than those in *New Box*.  As alleged, Ms. McMahon

communicated with a Tubi executive on August 9, 2021 about MLW's Tubi contract; Ms.

McMahon pressured Tubi and Fox executives "to deny MLW a time slot that would compete

head-to-head with WWE's NXT programs" and "to terminate the agreement [with MLW] in its

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1    WWE next argues that MLW's allegations are deficient for failing to "plead the contents of

2    [Tubi's termination letter]."  (Mem. at 18).  MLW need only allege, as it has, that Tubi did

3    terminate the License Agreement because of WWE's interference.  *See New Box*, 2018 WL

4    4562764, at *7.  WWE's assertion that it is "implausibl[e]" that WWE "would terminate its

5    contract with Fox, forgoing substantial revenues and risking breach of contract litigation with Fox

6    just to keep MLW off Tubi," and that Fox would never accede to WWE's threats (Mem. 18), is a

7    *non sequitur*.  MLW does not allege that WWE breached its contract with Fox, but rather that Fox

8    could "lose WWE's business or preferred content" if it did not acquiesce.  WWE's conduct is

9    plausible as courts have found in other cases where defendants threatened key distributors.  *See,*

10   *e.g.*, *Dentsply*, 399 F.3d at 190, 194.  (Compl. ¶ 45.)  At most, this is a factual issue.

11   **D.    MLW's Intentional Interference with Prospective Economic Advantage Claim**

12         Under California law, a plaintiff must allege five elements for an intentional interference

13   with prospective economic advantage claim:  (1) the existence, between the plaintiff and some

14   third party, of an economic relationship that contains the probability of future economic benefit to

15   the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts

16   designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic

17   harm proximately caused by the defendant's action.  *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S.,*

18   *Inc.*, 388 P.3d 800, 803 (Cal. 2017).

19         MLW was not, as WWE asserts, required "to allege facts showing that WWE even knew

20   of VICE's negotiations to purchase broadcast rights for first-run MLW content" (Mem. 19).

21   Rather, MLW need only plead that WWE knew that its actions would interfere with VICE and

22   _____

23   entirety," and MLW received a letter purporting to terminate the License Agreement that same

24   day.  (Compl. ¶ 45.)

25
26
27
28

21

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MLW's economic relationship," which MLW clearly did by alleging that "[w]hen WWE found out about [MLW's television broadcasting agreement with VICE], its Senior Vice President, Susan Levison, called a VICE executive to tell him that WWE's owner, Vince McMahon . . . was 'pissed' that VICE was airing MLW content and wanted VICE to stop doing so." (Compl. ¶¶ 5-6.) *See Chaquico v. Freiberg*, No. 17-CV-02423-MEJ, 2018 WL 3368733, at *5 (N.D. Cal. July 10, 2018) (denying motion to strike and holding that counterclaim-defendant "need not have known about a specific agreement with a particular venue" and that "general awareness that his actions would interfere" with "economic relationships is sufficient").

WWE's assertions that MLW failed to plead interference or proximate cause (Mem. 19) are similarly flawed. The Complaint alleges that "WWE's interference resulted in VICE withdrawing from negotiations over airing new MLW content and in VICE airing only a single MLW program." (Compl. ¶ 6.) There is no requirement that MLW plead the absence of other potential reasons for VICE's conduct, as "[proximate cause] questions are all factual questions, which [courts] cannot resolve on a Rule 12(b)(6) motion." *Newcal Indus.*, 513 F.3d at 1055. [15]

---

[15] Unlike MLW's request to take judicial notice of WWE's 10-K's to demonstrate the inconsistency in WWE's statements, WWE improperly asks the court to take judicial notice of an online news article *for the truth of its content* to support WWE's competing factual argument. (Mem. 19.) However, courts generally "may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (citation omitted). Indeed, "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Id.* WWE's citations (Mem. 19 n.5) are not contrary. *See 2Die4Kourt v. Hillair Cap. Mgmt., LLC*, No. SACV 16-01304 JVS(DFMx), 2016 WL 4487895, at *1 n.1 (C.D. Cal. Aug. 23, 2016) (noting "Court takes

1

**E.      MLW's Unfair Competition Law Claim**

2           MLW's claim under the UCL is also sufficiently pleaded.  The Complaint alleges

3   underlying "unfair" or "unlawful" conduct by WWE, including torts under California law and

4   antitrust violations under federal law.  (Compl. ¶¶ 1-8, 17-28, 33-37, 44-47, 57-58, 62-64, 68-70.)

5   These suffice to support a UCL claim.  *See CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479

6   F.3d 1099, 1107 (9th Cir. 2007) (plaintiff "adequately alleged a violation . . . of the UCL by

7   alleging [defendant] engaged in an 'unlawful' business practice, to wit, intentional interference with

8   existing contracts"); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002,

9   1049 (C.D. Cal. 2011) ("Because Plaintiffs have adequately stated a claim under the Sherman Act,

10  Plaintiffs have also stated a claim under the UCL's unfair and unlawful prongs.").  In fact, WWE's

11  monopolistic conduct could violate the UCL even if it did not violate Section 2.  *See San Miguel v.*

12  *HP Inc.*, 317 F. Supp. 3d 1075, 1090-93 (N.D. Cal. 2018) (Davila, J.) (allegations of monopolistic

13  conduct that threatens competition may be sufficient to state unfair UCL claim); *see also Chavez v.*

14

15  *Whirlpool Corp.*, 113 Cal. Rptr. 2d 175, 183-84 (Ct. App. 2001).

16

17          Contrary to WWE's assertions, MLW alleges sufficient standing to bring its UCL claim.

18  (Mem. 20-21.)  The Complaint alleges that a senior WWE executive spoke with an executive of

19  Tubi (a California company) located in California about the License Agreement—which was a

20  California contract governed by California law.  (Compl. ¶¶ 40, 54.)  The Complaint further alleges

21  that "California is also home to two of the largest national media markets" (*id.* ¶ 40), that "WWE

22

23  judicial notice of these documents solely for their existence and content, *and not for the truth of*

24  *any statements in the documents*" (emphasis added)); *Unsworth v. Musk*, No. 19-mc-80224-JSC,

25  2019 WL 5550060, at *4 (N.D. Cal. 2019) (concerning a non-party motion to quash and noting

26  neither party objected to the non-party's "request for judicial notice").

27

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1

2

3

4

5

6

7

purposefully directed its communications to Tubi in California in order to disrupt MLW's

relationship with Tubi and to cut off MLW's access to and competition in major national media

markets" (*id.* ¶ 46), and that, as a result, MLW "lost a profitable contract with Tubi" and also "lost

the momentum it had built with fans, including a major fan base in California" (*id.* ¶ 48).  And

while WWE is not headquartered in California, "WWE is registered and transacts business in the

State of California."  *Id.* ¶ 14.

8

9

10

11

12

13

14

15

16

WWE's reliance on cases in which the conduct at issue occurred *wholly outside* California[16]

is misplaced.  In contrast, *Nestle USA, Inc. v. Crest Foods, Inc.*, No. LA CV16-07519 JAK(AFMx),

2019 WL 2619635, at *11-12 (C.D. Cal. Mar. 8, 2019), is on point.  In that case the court denied a

motion to dismiss where the out-of-state counterclaim-defendants "engaged in improper

communications with [counterclaimant's franchisees] in California, which harmed

[counterclaimant]'s relationship with California franchisees—both existing and prospective."  *Id.* at

*11.  Here, as in *Nestle*, MLW has statutory standing by alleging sufficient California contacts that

harmed its relationship with a California company.

17

18

19

20

21

WWE also incorrectly asserts that MLW has no Article III standing because "there is no

ongoing or repeated conduct to enjoin, and the UCL cannot offer MLW any redress as required

under Article III."  (Mem. 20-21.)  In fact, MLW "seeks to enjoin further unfair business practices

by [WWE]," *Nestle*, 2019 WL 2619635, including WWE's ongoing anticompetitive scheme to

22

23

24

25

26

27

[16] *See Aghaji v. Bank of Am., N.A.*, 202 Cal. Rptr. 3d 619, 627 (Ct. App. 2016) (dismissing claims

against out-of-state servicer defendants with no California contacts absent any factual allegations

concerning violations in California); *Norwest Mortg., Inc. v. Superior Ct.*, 85 Cal. Rptr. 2d 18, 23

n.10 (Ct. App. 1999) (holding UCL did not apply to claim alleging only "out-of-state conduct

causing out-of-state injury").

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

24

restrict competitors' access to wrestlers, venues and broadcast platforms.[17]  (Compl. ¶¶ 11-12, 24-25, 34-37, 44-47, 70, 76, 81.)  This is a sufficient, independent basis for standing under the UCL. *Id.* at *12; *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, No. CV 14-3053-MWF(VBKx), 2015 WL 12777091, at *14 (C.D. Cal. Feb. 12, 2015) (denying motion to dismiss UCL claim for lack of standing where claim "specifically requests 'injunctive relief'").

**F.     Should the Court Find That Additional Factual Allegations Are Necessary To Sustain Any Of MLW's Claims, Leave To Amend Should Be Granted**

Consistent with well-established Ninth Circuit authority, if the Court determines that any of the challenged claims are insufficiently pled, MLW requests leave to amend to add factual allegations to cure its pleading.  *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003); *see also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107-08 (9th Cir 2003); *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001).

**V.     <u>CONCLUSION</u>**

Because MLW has properly pleaded all of its claims, the Court should deny WWE's motion to dismiss in its entirety or, in the alternative, grant MLW leave to amend to cure any pleading issue.

---

[17] Because WWE does not challenge personal jurisdiction here (Mem. 22), and because binding Ninth Circuit authority clearly confers such jurisdiction, MLW does not address that issue.

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1

2   Dated:  April 22, 2022

3                                              Respectfully submitted,

4

5                                              /s/ Marc E. Kasowitz

6                                              MARC E. KASOWITZ (*pro hac vice*)
                                               CHRISTINE A. MONTENEGRO (*pro hac vice*)
7                                              NICHOLAS A. RENDINO (*pro hac vice*)
                                               KASOWITZ, BENSON TORRES LLP
8                                              1633 Broadway
                                               New York, New York 10019
9                                              Telephone:    (212) 506-1700
                                               Facsimile:    (212) 506-1800
10                                             mkasowitz@kasowitz.com
                                               cmontenegro@kasowitz.com
11                                             nrendino@kasowitz.com

12

13                                             JASON S. TAKENOUCHI (SBN 234835)
                                               KASOWITZ BENSON TORRES LLP
14                                             101 California Street, Suite 3000
                                               San Francisco, California 94111
15                                             Telephone:    (415) 421-6140
                                               Facsimile:    (415) 398-5030
16                                             jtakenouchi@kasowitz.com

17                                             *Attorneys for Plaintiff MLW Media LLC*

18

19

20

21

22

23

24

25

26

27

28

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 22nd day of April, 2022, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

/s/ Marc E. Kasowitz
Marc E. Kasowitz

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS
Case No. 5:22-cv-00179-EJD