Daniel W. Fox (SBN 268757)
K&L GATES LLP
Four Embarcadero Center
Suite 1200
San Francisco, CA  94103
Telephone: (415) 882-8200
Facsimile:  (415) 882-8220
daniel.fox@klgates.com

Jerry S. McDevitt
K&L GATES LLP
210 Sixth Ave.
Pittsburgh, PA 15222
Telephone:  (412) 355-8608
jerry.mcdevitt@klgates.com

Christopher S. Finnerty
Morgan T. Nickerson
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone:  (617) 261-3123
christopher.finnerty@klgates.com

Derek W. Kelley
K&L GATES LLP
K&L Gates LLP
1601 K St. NW #1
Washington, D.C. 20006
Telephone: (202) 778-9467
derek.kelley@klgates.com

*Counsel for Defendant*
World Wrestling Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MLW MEDIA LLC, | **Case No. 5:22-cv-00179-EJD** |
| Plaintiff, | **DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS** |
| v. | |
| WORLD WRESTLING ENTERTAINMENT, INC., | Hearing Date: September 29, 2022 Time: 9:00 AM |
| Defendant. | Place: Courtroom 4 or videoconference Judge:    Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.   MLW FAILS TO ALLEGE A PLAUSIBLE SECTION 2 CLAIM AGAINST
     WWE............................................................................................................................ 2

     A.   MLW's Market Definition Remains Factually Unsupported.................................. 2

     B.   MLW Did Not Plead Direct or Circumstantial Evidence of Monopoly
          Power ................................................................................................................ 4

          1.   MLW Did Not Plead Direct Evidence of Monopoly Power....................... 4

          2.   MLW Did Not Plead Circumstantial Evidence of Monopoly Power ......... 5

     C.   MLW Failed to Plead Monopoly Maintenance ....................................................... 8

          1.   MLW Did Not Allege Exclusive Contracts ............................................... 8

          2.   MLW Has Not Plausibly Alleged Other Exclusionary Conduct .............. 10

     D.   MLW Fails to Plead Antitrust Injury .................................................................... 11

II.  MLW HAS NOT SALVAGED ITS STATE LAW CLAIMS........................................... 12

     A.   The Intentional Interference with Contract Claim is Implausible and
          Unsupported with Factual Allegations .................................................................. 12

     B.   The Intentional Interference with Prospective Economic Advantage Claim
          Lacks Allegations of Knowledge, Actual Disruption, and Causation .................. 14

     C.   MLW Lacks Standing to Bring a UCL Claim ........................................................ 14

III. THE COURT SHOULD DENY LEAVE TO AMEND ..................................................... 15

CONCLUSION ...................................................................................................................... 15

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir.2010) ............................................................................................... 9

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ......................................................................................... 11

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1996) ......................................................................................... 12

*Brantley v. NBC Universal, Inc.*,
    2008 WL 11357958 (C.D. Cal. Jun. 25, 2008) .................................................................. 6

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ........................................................................................... 6

*Cargill Inc. v. Budine*,
    2007 WL 2506451 (E.D.Cal. Aug.30, 2007) .................................................................... 6

*Chaquico v. Freiberg*,
    2018 WL 3368733 (N.D. Cal. Jul. 10, 2018) .................................................................. 14

*Colonial Med. Group, Inc. v. Catholic Healthcare West*,
    No. C-09-2192 MMC, 2010 WL 2108123 (N.D. Cal. May 25, 2010) ................................ 3

*DeSoto Cab Co., Inc. v. Uber Techs., Inc.*,
    2018 WL 10247483 (N.D. Cal. Sept. 24, 2018) ................................................................ 7

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ....................................................................................... 2, 11

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ............................................................................ 10

*GSI Tech., Inc. v. Cyrpess Semiconductor Corp.*,
    2012 WL 2711040 (N.D. Cal. Jul. 6, 2012) .................................................................... 12

*Klein v. Facebook, Inc.*,
    2022 WL 141561 (N.D. Cal. Jan. 14, 2022) ...................................................................... 6

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
    2008 WL 686834 (N.D.Cal. Mar.11, 2008) ...................................................................... 6

*Le v. Zuffa, LLC*,
    No. 2:15-cv-01045-RFB-BNW, Doc. 1 (N.D. Ca. Dec. 16, 2014) .................................... 4

*LePage's, Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ........................................................................................ 12

*Nestle USA, Inc. v. Crest Foods, Inc.*,
    2019 WL 2619635 (C.D. Cal. Mar. 8, 2019) ................................................................ 15

*New Box Sols., LLC v. Davis*,
    2018 WL 4562764 (C.D. Cal. Sept. 18, 2018) ............................................................. 13

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    2017 WL 4310767 (N.D. Cal. Sept. 28, 2017) ............................................................... 7

*Payment Logistics Limited v. Lighthouse Net., LLC*,
    2020 WL 7024647 (S.D. Cal. Nov. 30, 2020) .............................................................. 12

*Rebel Oil Co. v. Atl. Richfiedl Co.*,
    51 F.3d 1421 (9th Cir. 1995) ......................................................................................... 7

*Reilly v. Apple Inc.*,
    2022 WL 74162 (N.D. Cal. Jan. 7, 2022) .................................................................. 2, 3

*Retrophin, Inc. v. Questcor Pharma., Inc.*,
    41 F. Supp.3d 906 (C.D. Cal. Aug. 8, 2014) ................................................................. 7

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp.3d 981 (N.D. Cal. 2929) ........................................................................ 2, 3

*Rodriguez v. Kwok*,
    2014 WL 889570 (N.D. Cal. Mar. 3, 2014) ............................................................... 1, 3

*Roy Allan Slurry Seal, Inc. v. Amer. Asphalt South*,
    2 Cal.5th 505 (2017) ................................................................................................... 14

*Schneider v. Cal. Dept. of Corrections*,
    151 F.3d 1194 (9th Cir. 1998) .................................................................................... 1, 3

*Teradata Corp. v. SAP SE*,
    2021 WL 5178828 (N.D. Cal. Nov. 8, 2021) ................................................................. 3

*Twin City Sportservice, Inc. v. Charles O. Finley & Co. Inc.*,
    676 F.2d 1291, 1302 (9th Cir. 1982) ............................................................................ 9

*United States v. Davita, Inc.*,
    No. 1:21-cr-00229-RBJ (D. Colo. Jul. 14, 2021) ......................................................... 10

*Unites States. v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ........................................................................ 4, 5, 8, 9, 13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ............................................................................. 8, 9, 10

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990)................................................................................. 6, 7

**Other Authorities**

Fed. R. Civ. P. 7(a)................................................................................................... 1

**PRELIMINARY STATEMENT**

Defendant World Wrestling Entertainment, Inc. ("WWE") submits this reply memorandum in support of its motion to dismiss the Complaint filed by MLW Media LLC ("MLW").

As WWE explained in its moving brief ("Mem."), MLW failed to plead a violation of Section 2 of the Sherman Act, intentional interference with contract, intentional interference with prospective economic advantage, and a violation of California's unfair competition law ("UCL").[1] Now MLW is attempting to resurrect its case by asserting facts never alleged in the four corners of its Complaint. But, of course, "[s]tatements made in an opposition brief cannot amend the complaint." *Rodriguez v. Kwok*, 2014 WL 889570, at *6 (N.D. Cal. Mar. 3, 2014). Indeed, "a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)." *Schneider v. Cal. Dept. of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (emphasis in original).

*First*, MLW's monopolization claim(s) remain unviable. MLW has not and cannot plead the core elements of a monopolization claim: (1) a relevant product market, (2) monopoly power, (3) anticompetitive conduct, and (4) antitrust injury. Confronted with WWE's motion to dismiss and the deficiencies of its own Complaint, MLW now tries to reframe its Complaint through its opposition (Opp.), asserting that WWE's exclusive contracts with Fox and NBCUniversal foreclose MLW from the "market" by cutting off its access to key distributors or purchasers. However, MLW's complaint is silent on (1) WWE's use of exclusive contracts, (2) whether these exclusive contracts substantially foreclose the proposed market, or (3) the existence of "key" networks, cable, and streaming services that control access to this proposed marketplace.

---

[1] MLW asserts that WWE did not challenge its claim of attempted monopolization. MLW did not allege separate claims for monopolization or attempted monopolization. However, as WWE noted, the elements of the two claims overlap, and a claim based on attempted monopolization would fail for the same reasons as MLW's monopolization claim fails. Mem. at 7.

***Second***, MLW's various state law claims should be dismissed for lack of diversity and/or supplemental jurisdiction.  Even if this Court could continue to exercise jurisdiction, MLW fails to respond to WWE's arguments in its moving brief.  The intentional interference claims are not plausibly pled, and MLW has no standing to bring a UCL claim.

For these reasons, WWE respectfully requests that the Court dismiss MLW's Complaint with prejudice and deny its request to amend the Complaint as futile.

## ARGUMENT

## I.   MLW FAILS TO ALLEGE A PLAUSIBLE SECTION 2 CLAIM AGAINST WWE

### A.   MLW's Market Definition Remains Factually Unsupported

As WWE explained, defining a plausible relevant product market is the "threshold step in any antitrust analysis . . . ." *Fed. Trade Comm'n v. Qualcomm Inc.,* 969 F.3d 974, 992 (9th Cir. 2020).  It is not enough just to assert that a product market exists; MLW must allege facts that "justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Reilly v. Apple Inc.*, 2022 WL 74162, at *4 (N.D. Cal. Jan. 7, 2022) (internal citations omitted).  MLW's product market definition consists of a conclusory statement that the relevant market is the "national market for the sale of broadcasting rights for professional wrestling programs to networks, cable and streaming services."  Compl. ¶ 17.[2]  MLW states the outline of a proposed market, but that is not enough.

WWE agrees that the proposed market need not be defined to an economic certainty at the pleading stage but, at the same time, it must be more than a blindfolded toss at a dartboard.  *See*, *e.g.*, *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp.3d 981, 998 (N.D. Cal. 2019).  MLW offers no allegations about potential substitutes, interchangeability, or cross-elasticity of demand.  Plainly put, the Complaint fails to tell the Court and Defendant whether or not the purchasers in

---

[2] MLW cannot defeat a motion to dismiss by theorizing that scripted professional wrestling could be a "sub-market" of some other relevant product market.  Opp. at 9.  Although complaints may define relevant sub-markets, the Complaint does not allege any sub-markets.

this proposed market could substitute any other form of programing for scripted professional wrestling.

Contrary to MLW's contentions, Courts routinely dismiss complaints for failure to provide an adequate factual basis for a proposed market. *See, e.g.*, *Colonial Med. Group, Inc. v. Catholic Healthcare West*, No. C-09-2192 MMC, 2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010); *Reilly*, 2022 WL 74162, at *5-6 (granting motion to dismiss for failure to explain "why the products *included* in the market *are substitutes* for one another" and why "seemingly similar products *excluded* from the market *are not substitutes* for those in the market.").

In its Opposition, MLW cites *Reveal Chat* to argue that dismissal is inappropriate if any factual issues surrounding market definition exist. *Reveal Chat*, 471 F. Supp.3d at 999. However, in *Reveal Chat* there were allegations *in the complaint* that created an issue of fact, whereas MLW's Complaint is void of *any* factual support for its market. *Reveal Chat* is not on point, and MLW's attempt to distinguish its own conclusory statements from those in *Colonial Medical* and *Reilly* likewise fall flat.[3]

Likely recognizing this deficiency, MLW improperly inserts new, unpled factual assertions in its Opposition. MLW now argues that the sale of scripted professional wrestling broadcast rights *must* be a distinct product market because professional wrestling is a "sport". *See* Opp. at 8. MLW further argues that scripted professional wrestling "attracts a unique audience that limits the number of economic substitutes." Opp. at 8. As a preliminary matter, the Court should disregard these freshly articulated "facts." The Complaint did not as much as hint at either assertion. MLW has already charted its course in the Complaint and may not use its Opposition to change tack. *See Rodriguez*, 2014 WL 889570, at *6 (citing *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 (9th Cir. 1998)).

---

[3] MLW also cites *Teradata Corp. v. SAP SE*, 2021 WL 5178828, at *13 (N.D. Cal. Nov. 8, 2021) to argue that market definition need not reference cross-elasticity of demand. That is wrong. *Teradata* held that, on summary judgment, a plaintiff may establish a relevant product market through evidence other than detailed economic studies.

MLW's attempt to cast professional wrestling as a "sport" is not only clearly outside the four corners of its own Complaint; it is also wholly inaccurate. First, plaintiffs that define a relevant market around sports and sport leagues do so by alleging *facts* demonstrating that the sport product has no adequate substitutes through references to cross-elasticity of demand. *See, e.g.*, Complaint. ¶¶ 55-62, *Le v. Zuffa, LLC*, No. 2:15-cv-01045-RFB-BNW, Doc. 1 (N.D. Ca. Dec. 16, 2014) (plaintiff alleged, with factual support, that professional wrestling, boxing, kickboxing, and other forms of entertainment are not substitutes for mixed martial arts).

Second, and more importantly, MLW fails to allege facts to support its assertion that scripted professional wrestling is a sport because no such facts exist. Professional wrestling is a scripted drama, not a sport. It has as much in common with an actual sport as the *Rocky* films have with actual boxing. Indeed, based on the facts alleged in the Complaint alone, the market dynamics of professional wrestling are fundamentally different from those of a sport. For example, the US has only one professional basketball league, the NBA. Although the NBA generates tremendous revenues, no other league even attempts to compete. Here, MLW alleges that multiple companies, such as WWE, MLW, AEW, and Impact Wrestling, all compete to sell broadcast rights to the same group of purchasers. This dynamic is consistent with the sale of general entertainment programming, not sports programming.

**B.    MLW Did Not Plead Direct or Circumstantial Evidence of Monopoly Power**

**1.    MLW Did Not Plead Direct Evidence of Monopoly Power**

MLW fails to allege direct evidence of WWE's monopoly power in its purported relevant product market. MLW relies almost exclusively on the Third Circuit case, *United States v. Dentsply*.[4] There, the market was for artificial teeth sold to dental dealers. *United States v.*

---

[4] MLW also argues that it pled direct evidence of monopoly power by alleging reduced output and supracompetitive prices. Opp. at 11. However, MLW never alleged that WWE or any other purported competitor reduced its output of scripted professional wrestling, nor did it allege that WWE charges supracompetitive prices for its content. MLW cannot rely on an undefined or

*Dentsply, Int'l, Inc.* 399 F.3d 181, 184 (3d Cir. 2005). The court held that a manufacturer in that market could only viably compete if it could sell teeth to dealers rather than directly to their customers. *Id.* at 193. The court further held that, although other dealers existed, Dentsply had exclusive contracts with the "key" dealers that constituted the "real market". *Id*. at 189. Further, Dentsply teeth accounted for the vast majority of the key dealer's revenue. *Id.* at 185 (top five dealers derived on average 83% of their revenue from Dentsply). This gave Dentsply the power to force the "key" dealers to maintain near total exclusivity. *Id.* at 194. Thus, Dentsply could exert monopoly power controlling the "key" dealers and thereby improperly manipulate the marketplace.

MLW has not and cannot plead facts similar to those in *Dentsply*. There is no allegation, nor could there be, that all networks, cable, and streaming services derive 83%, 8.3%, or 0.83% of their revenue from WWE content. NBCUniversal and Fox, combined, only purchase three WWE television programs out of the presumably hundreds (if not thousands) of programs that their networks air per week. Critically, it is never alleged that, if the WWE were to withhold its product, the television networks would stop broadcasting or "go dark." Instead, and logically, they would fill that "dark time" with alternative programming over whose production WWE has no control. The notion that WWE has monopoly power over some of the largest companies on earth is an economic absurdity, is not supported by allegations in the Complaint, and could *never* be supported by good faith allegations.[5]

### 2.    MLW Did Not Plead Circumstantial Evidence of Monopoly Power

***First***, MLW argues that it sufficiently pled WWE's market share in the purported relevant market merely by alleging a figure – 85% – without further explanation. But, "[a]lthough Plaintiff need not necessarily quantify [Defendant's] market share with precision, Plaintiff must assert some facts in support of its assertions of market power that suggest those assertions are plausible." *Korea*

---

uncited "fundamental principle of supply and demand," Opp. at 11 n.9, to remedy its failure to allege supracompetitive prices.

[5] As discussed *infra* in the context of monopoly maintenance, MLW also cannot rely on *Dentsply* because it never alleged that WWE controls any "key" networks, cable, and streaming services.

*Kumho Petrochem. v. Flexsys Am. LP*, 2008 WL 686834, at *9 (N.D.Cal. Mar.11, 2008); *see also Cargill Inc. v. Budine*, 2007 WL 2506451, at *8 (E.D.Cal. Aug.30, 2007) (plaintiff failed to assert facts supporting defendant's alleged market share and, thus, did not satisfy the plausibility requirement).  MLW never stated why this 85% figure reflects WWE's market share.  MLW's reliance on *Klein* is misplaced.  There, the plaintiff provided "additional evidence to bolster their market share calculations" with allegations such as "Facebook's products include three of the seven most popular mobile apps," and that Facebook reached "74% of smartphone users."  *Klein v. Facebook, Inc.*, 2022 WL 141561, at *16 (N.D. Cal. Jan. 14, 2022).

MLW cannot rely on *Brantley v. NBC Universal, Inc.*, 2008 WL 11357958, at *3 (C.D. Cal. Jun. 25, 2008), to argue that Nielsen television ratings ("Ratings") are, as a matter of law, an appropriate measure of market share.[6]  *Brantley* merely stated that Ratings (i.e., viewership) were a potential measure of television networks' market share because, it was alleged, Ratings measure how many viewers watch a channel, and a highly viewed channel was more valuable to cable providers than lower-rated channels.  *See Brantley v NBC Universal, Inc.*, 675 F.3d 1192, 1195 (9th Cir. 2012).  However, MLW never alleges that WWE is a television network or a cable provider. Instead, MLW alleges that WWE sells its programming to television networks, cable, and streaming services.  Nowhere does MLW attempt to explain how a potential measure of market share for television networks is in any way applicable to the WWE.  Accordingly, MLW's use of Ratings as a proxy for market share remains untethered to its alleged marketplace.

Even if MLW alleged that WWE has a high market share, it is a "basic fact of economic life" that market share does not raise an "inference" of monopoly power if there is evidence of low entry barriers or a defendant's inability to control prices.  *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990).  Indeed, "market share is just the starting point for assessing market power," and "[b]lind reliance upon market share, divorced from commercial reality, could give a misleading picture of a firm's actual ability to control prices or exclude competition."  *Id.* (internal

---

[6] The complaint in *Brantley* alleged direct proof of market power, and so there was "no need for the indirect proof provided by market share."  *Id.*

1    citations omitted).  As discussed above, MLW fails to plead facts demonstrating how an alleged

2    market share of 85% allows WWE to dictate prices to networks, cable, and streaming services or

3    to control what programming they purchase.  Without such allegations, the claim is deficient.

4         **Second**, MLW's argument that it pled barriers to entry is similarly without support in the

5    Complaint. This Court previously has held that "references [to barriers] are a start, but they are not

6    enough," and a plaintiff must plead "supporting facts" describing those barriers.  *Optronic Techs.,*

7    *Inc. v. Ningbo Sunny Elec. Co.*, 2017 WL 4310767, at *9 (N.D. Cal. Sept. 28, 2017); Mem. at 10-

8    11.  MLW fails to support or describe its alleged barriers to entry with any factual allegations.

9    MLW cites *Retrophin*; however, that plaintiff actually pled *twelve* paragraphs describing the

10   barriers to entry faced by pharmaceutical companies.  *Retrophin, Inc. v. Questcor Pharma., Inc.*,

11   41 F. Supp.3d 906, 916 (C.D. Cal. Aug. 8, 2014).  Thus, in *Retrophin* the plaintiff had *pled in its*

12   *complaint* specific facts to support the existence of barriers to entry, which the plaintiff failed to do

13   in *Optronic* and which MLW failed to do here.

14        MLW incorrectly argues that *costs* to compete are a barrier to entry.  *See* Mem. at 10 (citing

15   *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995); *W. Parcel Exp. v. United*

16   *Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1062 (N.D. Cal. 1998); *Syufy.*, 903 F.2d at 667).  MLW

17   failed to allege what these various costs are or how they are relevant to a company's ability to sell

18   broadcast rights.  As has become routine, MLW again attempts to introduce new, unpled facts, this

19   time by attaching WWE's 2021 10-K to its Opposition.  MLW in no way included or referenced

20   this document in its Complaint (as it could have done), and the Court should strike its improper

21   introduction.  However, even this improper document provides MLW no safe harbor, as MLW has

22   not alleged facts demonstrating that WWE's costs reflect "additional long-run costs" that a nascent

23   competitor must pay to enter this supposed market.  *Rebel Oil*, 51 F.3d at 1438.  *See also DeSoto*

24   *Cab Co., Inc. v. Uber Techs., Inc.*, 2018 WL 10247483, at *8 (N.D. Cal. Sept. 24, 2018) (Uber's

25   large capital venture backing and investments "not a barrier to entry" because not every entrant

26   requires them).  Moreover, one of the primary ways a new competitor takes market share is by

27   developing cheaper, more efficient cost structures. MLW alleges that it generates "cutting-edge

28

professional wrestling content" and competes with WWE, presumably with far fewer expenses –
surely its costs better represent those faced by a new, innovative competitor than do WWE's.

Perhaps most importantly, MLW alleges that other competitors have successfully entered
the market.  MLW cannot now distance itself from its own allegations of successful entry.
Specifically, the Complaint alleged that MLW and AEW both entered the market and produced
programming that networks, cable, and streaming services could purchase.  Compl. ¶¶ 20, 31.
Further, the Complaint alleged that AEW, within a year of entering, sold its broadcast rights for
tens of millions of dollars and captured an average 2020 rating of 0.344 compared to WWE Raw's
0.5075 in the key 18-to-49 demographic.  Compl. ¶ 23. MLW's own Complaint thus depicts a
market with aggressive players vying for market share and finding successes.  These allegations
alone undercut MLW's conclusory allegations of monopoly power. *Cf. Dentsply*, 399 F.3d at 189
(monopoly power evidenced by "lack of aggressiveness by competitors").

### C.     MLW Failed to Plead Monopoly Maintenance

#### 1.     MLW Did Not Allege Exclusive Contracts

In its Opposition, MLW argues, again without a modicum of support in its Complaint, that
WWE has exclusive contracts with NBCUniversal and Fox, and that these contracts prevent MLW
or other wrestling promotions from selling broadcast rights to two of the yet-to-be-alleged number
of networks, cable, and streaming services.  This reframing of the Complaint completely fails.  The
Complaint itself contains no allegation about WWE's use of exclusive contracts or *de facto*
exclusive contracts with NBCUniversal or Fox.  Further, MLW failed to allege that these exclusive
contracts resulted in substantial foreclosure or foreclosure from "key" purchasers of broadcast
rights. Indeed, the words "substantial", "foreclosure", or "key" fail to appear at any point in MLW's
Complaint.

MLW is incorrect that a Section 2 challenge of an exclusive contract does not need to plead
substantial foreclosure.  *Dentsply* – a Section 2 case – required a plaintiff to establish that "the
challenged practices bar a substantial number of rivals or severely restrict the market's ambit."
*Dentsply*, 399 F.3d at 191; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir.
2001) (exclusive contracts foreclosed competition by "closing to rivals a *substantial percentage* of

the available opportunities for browser distribution.") (emphasis added).  MLW never even attempted to allege any facts of this nature.[7]

MLW cannot rely on *Dentsply* or *Microsoft* to argue foreclosure from "key" purchasers of broadcast rights.  These cases stand for the proposition that control over a limited number of distributors can entrench a monopolist if access to those distributors is necessary to viable competition. MLW never alleged any facts supporting that Fox, NBCUniversal, VICE, or Tubi are necessary purchasers of broadcast rights.  Nor did MLW allege that only a limited number of networks, cable, or streaming services will purchase professional wrestling.  Opp. at 4.  To the contrary, MLW alleged that all networks, cable, and streaming services are potential purchasers of this product.  Compl. ¶ 17.  In fact, MLW alleged that the other two competitors in this purported market, AEW and Impact Wrestling, have successfully sold their broadcast rights.  Compl. ¶¶ 20-22.  MLW has not alleged that WWE in any way substantially foreclosed it or any competitor from selling its broadcast rights to those purchasers.[8]  *See* Mem. at 12-13.

---

[7] Reliance on *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.* is similarly misplaced. That case makes clear that finding a Section 1 exclusive-dealing violation involves "assess[ing] whether competition has been foreclosed in a substantial share of the relevant market."  676 F.2d 1291, 1302 (9th Cir. 1982).  There, the unreasonableness of the defendant's exclusive contracts was evidenced from a "pattern of obtaining contracts of unreasonable length, often coupled with the use of 'follow-the-franchise' clauses and, in many cases, the predatory use of its financial strength to obtain its favorable concession franchise agreements."  *Id.* at 1301.  No similar allegations exist here.

[8] MLW provides no legal support for its "right" to relationships with its "chosen distributors."  Opp. at 18.  Obviously, any contract that arises from a competitive process results in one seller securing a customer and other sellers losing that customer.  MLW's argument would make exclusive contracts illegal *per se* (they are not).  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir.2010).

Nothing in MLW's Complaint or its Opposition overcomes the simple fact that exclusive contracts are "commonplace," and "imposing upon a firm with market power the risk of an antitrust suit every time it enters into such a contract, no matter how small the effect, would create an unacceptable and unjustified burden upon any such firm." *Microsoft*, 253 F.3d at 70; *see also Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015) (noting "well-recognized economic benefits to exclusive dealing arrangements"). By failing to plead foreclosure, MLW failed to plead any unreasonable exclusive contracts.

### 2.      MLW Has Not Plausibly Alleged Other Exclusionary Conduct

Perhaps acknowledging that it did not plead unlawful exclusive contracts or exclusive dealing, MLW now contends that it really meant to allege a "broad anticompetitive scheme" by WWE. This is a distraction, and MLW's Complaint again offers no support for this argument.

MLW asserts that WWE "encourage[ed] wrestlers to breach their contracts with MLW and divulge confidential and proprietary information about MLW's business;" that it "lock[ed] up key inputs needed to compete, such as wrestler talent and arena facilities;" and that it "decreas[ed] competitors' ticket sales and brand recognition." Opp. at 16, 18. But MLW never alleged who these wrestlers were, how their contracts were breached, what confidential information was disclosed, or which wrestlers or arenas were "locked up."[9] *See* Mem. at 13-14. Still worse, MLW never articulates how any of these actions would violate the antitrust laws. For example, stripped of labels, MLW simply asserts that WWE and MLW compete to hire talent.[10]

---

[9] MLW attacks WWE for having exclusive contracts with talent, *see* Opp. at 4 and Compl. ¶ 26, but MLW pleads that it enters into exclusive contracts with talent as well. Compl. ¶ 33. Tellingly, MLW fails to plead which talent WWE has "locked up." As MLW is well aware, WWE released over 80 talents in 2021, including former world champions and headliners. *See* Exhibit A. This naked allegation teeters on running afoul of Fed. R. Civ. P. 11.

[10] It would be a potential *criminal* antitrust violation for WWE to agree with MLW *not* to compete for talent. *See*, *e.g.*, Indictment, *United States v. Davita, Inc.*, No. 1:21-cr-00229-RBJ, Doc. 1 (D. Colo. Jul. 14, 2021).

1    These conclusory allegations do not provide the framework for a monopolization claim.

2    Simply put, MLW has not pled how these actions relate to the purported relevant market, here the

3    sale of national broadcast rights to networks, cable, and streaming services.  Without more, we are

4    all left wondering how hiring wrestlers, booking arenas for live events, and selling tickets to fans

5    are somehow relevant to the sale of national broadcast rights to networks, cable, and streaming

6    services.  "[C]ourts must focus on anticompetitive effects 'in the market where competition is

7    [allegedly] being restrained.'"  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057

8    (9th Cir. 1999).  "[E]ven if [WWE's] practices are interrelated, actual or alleged harms to customers

9    and consumers outside the relevant markets are beyond the scope of antitrust law."  *Fed. Trade*

10   *Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).

11        **D.        MLW Fails to Plead Antitrust Injury**

12       Contrary to MLW's argument, antitrust injury must be adequately pled, and courts routinely

13   dismiss antitrust actions unless competitors plausibly plead how the alleged violation harmed not

14   just the competitor-plaintiff, but competition in the relevant market.[11]  Mem. at 14-15.

15       The Complaint is entirely devoid of any factual allegations demonstrating harm to

16   competition rather than alleged harm to MLW.  MLW does not allege that any network, cable, or

17   streaming service paid inflated, supracompetitive prices for scripted professional wrestling

18   broadcast rights.  Nor does it allege that WWE prevents competitors from increasing their own

19   output of scripted professional wrestling or prevents networks, cable, and streaming services from

20   producing their own scripted wrestling program.  To the contrary, as WWE explained (and which

21   MLW does not appear to contest), the Complaint alleges that WWE, AEW, Impact Wrestling, and

22   MLW all continue to produce content, the broadcast rights to which are available for networks,

23   cable, and streaming services to purchase. Compl. ¶¶ 2, 20, 50. Moreover, nothing in the Complaint

24   suggests that these companies cannot produce even *more* content if the demand exists.  Without

25

26

27   [11] MLW relies exclusively on cases pre-dating *Twombly* to argue that antitrust injury is not typically

28   resolved on a motion to dismiss. The post-*Twombly* cases cited by WWE are controlling.

1  actual allegations of reduced output and supracompetitive prices, antitrust injury is not properly

2  pled, and the claim must be dismissed.

3      MLW's reliance on *LePage's* and *GSI* to establish antitrust injury is wholly misplaced.

4  They held that harm to a competitor also harms competition when an alleged monopolist cuts off

5  access to key purchasers in an alleged product market in order to operate unchallenged and free of

6  competition.  *LePage's, Inc. v. 3M*, 324 F.3d 141, 159-60 (3d Cir. 2003) (a jury could have

7  reasonably found that 3M's exclusionary conduct "cut LePage's off from key retail pipelines

8  *necessary to permit it to compete profitably*," and that this conduct allowed 3M to "exercise its

9  monopoly power unchallenged, as Tesa Tuck was no longer in the market.") (emphasis added);

10 *GSI Tech., Inc. v. Cyrpess Semiconductor Corp.*, 2012 WL 2711040, at *6 (N.D. Cal. Jul. 6, 2012)

11 (antitrust injury pled because standard setting body eliminated "ability to market competitive

12 products and to lock in key customers."). But, as explained above, MLW never articulated that

13 there are any "key" distributers in the proposed market, let alone alleged that WWE restricted

14 access to them.  Meanwhile, MLW's reliance on *Amarel v. Connell* is irrelevant because it is held

15 that antitrust injury was adequately pled for reasons unique to a predatory pricing claim. 102 F.3d

16 1494 (9th Cir. 1996); *see Payment Logistics Limited v. Lighthouse Net., LLC*, 2020 WL 7024647

17 (S.D. Cal. Nov. 30, 2020), at *5 (limiting *Amarel* only to predatory pricing claims).[12]

18 **II.    MLW HAS NOT SALVAGED ITS STATE LAW CLAIMS**

19     MLW's failure to adequately allege a federal cause of action means this Court *must* dismiss

20 the remaining state law claims for lack of subject matter jurisdiction.  *See* Mem. at 17.  But even if

21 the monopolization claim survives, MLW fails to muster arguments to save its state law claims.

22     **A.    The Intentional Interference with Contract Claim is Implausible and**

23         **Unsupported with Factual Allegations**

24     MLW alleges inadequate facts about WWE's purported interference with the Tubi contract

25 to plead intentional interference.  Mem. at 17.  MLW failed to allege who at Tubi spoke to Ms.

26

27 ───────────────

28 [12] MLW's does not meaningfully distinguish cases cited by WWE.  Mem. at 15; Opp. at 19 n.13.
   These cases held that a competitor must allege more than conclusory harm to competition.

McMahon, what Ms. McMahon said to force Tubi to terminate its contract with MLW, or how frequently Ms. McMahon spoke to unnamed individuals at Tubi. As WWE noted previously, MLW also alleged that it received a letter terminating its contract with Tubi but it failed to plead the letter's contents or the grounds for termination.[13]

MLW cites one tortious interference case to support its claim, *New Box*, but MLW completely misreads the case. *New Box Sols., LLC v. Davis*, 2018 WL 4562764, at *5 (C.D. Cal. Sept. 18, 2018). It does not hold that allegations of a "call" by a defendant to a third party, with nothing more alleged, establish an intentional interference claim. There, defendants, previously employees of the plaintiff, solicited a third-party, Legendary Pictures, to cancel its contracts with the plaintiff and do business with them instead. *New Box*, 2018 WL 4562764, at *5. The solicitation and interference were demonstrated by (i) Legendary Pictures cancelling the plaintiff's contracts in order to obtain the same services from the defendants, and (ii) defendants working for Legendary Pictures prior to the cancellation. *Id.* at *7. Here, MLW did not allege that Tubi switched from MLW to WWE or that WWE obtained any beneficial commercial relationship with Tubi. The "call" in *New Box* was Legendary Pictures' call to the plaintiff to cancel its contracts, which had zero connection to the conduct by defendants constituting intentional interference with contract. *See New Box*, 2018 WL 4562764, at *7. *New Box* similarly does not support MLW's argument that it can avoid pleading the contents of the termination letter. There, the court held that the plaintiff did not need to plead the exact terms of the contract with which defendants purportedly interfered. *New Box,* 2018 WL 4562764, at *7. The termination letter, by contrast, is vital to understand the facts surrounding the termination and the plausibility of MLW's version of events.

---

[13] *Dentsply* does not help MLW's argument. There, Dentsply had agreements with the 23 top distributors of artificial dental teeth; thus, it is plausible that Dentsply could threaten one distributor to force it to accept exclusive terms. According to MLW, WWE has only two contracts to sell broadcast rights, and breaching the Fox contract would have exposed WWE to losing as much as (again, according to MLW) half its yearly revenue. That is entirely implausible, and MLW could plead no facts to make that fanciful allegation plausible.

1     **B.      The Intentional Interference with Prospective Economic Advantage Claim**

2             **Lacks Allegations of Knowledge, Actual Disruption, and Causation**

3             Knowledge that MLW was negotiating a contract to air first-run content on VICE is a

4     threshold pleading requirement that MLW has not satisfied.  *See* Mem. at 18-19; *Roy Allan Slurry*

5     *Seal, Inc. v. Amer. Asphalt South,* 2 Cal.5th 505, 512 (2017).  MLW relies wholly on one case,

6     *Chaquico v. Freiberg*, 2018 WL 3368733 (N.D. Cal. Jul. 10, 2018).  It involved the contentious

7     relationship of members of the rock band Jefferson Airplane/Starship, with various band members

8     touring under similar names and accusing one another of being "fake" versions of the band.  *Id.* at

9     *2.  The "knowledge" element of the claim was pled because the counterclaim-defendant knew that

10    the counterclaimants were touring as Jefferson Starship, and counterclaimants did not need to plead

11    that the counterclaim-defendant knew specifically which venues or fans he discouraged from

12    engaging commercially with them.  *Id.* at *5-6.  Here, however, MLW failed to allege that WWE

13    even knew of the negotiations with VICE, which would be akin to the counterclaim-defendant not

14    knowing that Jefferson Starship was on tour.

15            Actual disruption of the prospective economic advantage is another threshold element that

16    MLW fails to allege, and which MLW does not address in its Opposition.  *See* Mem. at 19.  Based

17    on the Complaint, VICE aired a first-run episode of MLW content, thus showing (i) that

18    negotiations continued for months after the supposed call between a WWE employee and VICE

19    executive, and (ii) that they were not remotely disrupted by WWE.

20            Finally, MLW does not allege causation and misunderstands WWE's argument on this

21    point.  WWE is not suggesting that one potential cause for the supposed disruption of the VICE

22    negotiations (the single communication with WWE) should be disregarded for another (MLW's

23    reportedly disappointing viewership).  Rather, WWE argues that MLW must allege more facts to

24    plausibly suggest that a call from a WWE employee in June is what caused VICE to terminate its

25    negotiations with MLW many months later, not any number of other intervening events.

26    **C.     MLW Lacks Standing to Bring a UCL Claim**

27            MLW has not alleged a UCL claim because it did not allege antitrust or tortious interference

28    claims, nor did it come close to doing so.  *See* Mem. at *passim*.  But MLW's UCL claim also fails

regardless of all other claims because MLW lacks standing to bring it.  All purportedly unfair conduct is alleged to have emanated in Connecticut (WWE's place of business) and to have been felt in New York (MLW's place of business).  The allegation that a Tubi executive was located in California is not enough to demonstrate standing.  *See* Mem. at 21.  *Nestle* does not support MLW. There, the counterclaim-defendant was headquartered in California, all of the allegedly unfair acts that it committed were in California, the decision to engage in those acts emanated from the California headquarters, and the unfair acts targeted the counterclaimant's franchisees in California. *Nestle USA, Inc. v. Crest Foods, Inc.*, 2019 WL 2619635, at *11 (C.D. Cal. Mar. 8, 2019).  No similar ties to California exist here.[14]

## III.    THE COURT SHOULD DENY LEAVE TO AMEND

MLW requests leave to amend its Complaint if dismissed.  The Court should not grant this request.  Even if MLW could tailor its allegations to address the Complaint's many current deficiencies, MLW can never plausibly plead that WWE has market power over networks, cable, and streaming services, some of the wealthiest and largest corporations on earth, all with the means and ability to produce their own professional wrestling content or buy it from the myriad or other content creators.  Accordingly, any amendment to the federal antitrust claim is futile and, as explained, the Court lacks subject matter jurisdiction over the remaining state law claims.

## CONCLUSION

WHEREFORE, for each of the reasons explained above, World Wrestling Entertainment, Inc. respectfully requests that the Court dismiss MLW Media LLC's Complaint with prejudice for failure to state a claim upon which relief can be granted and for whatever other relief the Court deems just and equitable.

---

[14] MLW also lacks Article III standing because it failed to plausibly allege any ongoing conduct by WWE to enjoin.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: May 16, 2022

K&L GATES LLP

By: *Christopher S. Finnerty*

Daniel W. Fox (SBN 268757)
K&L GATES LLP
Four Embarcadero Center
Suite 1200
San Francisco, CA  94103
Telephone: (415) 882-8200
Facsimile:  (415) 882-8220
daniel.fox@klgates.com

Jerry S. McDevitt
K&L GATES LLP
210 Sixth Ave.
Pittsburgh, PA 15222
Telephone:  (412) 355-8608
jerry.mcdevitt@klgates.com

Christopher S. Finnerty
Morgan T. Nickerson
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone:  (617) 261-3123
christopher.finnerty@klgates.com
morgan.nickerson@klgate.com

Derek W. Kelley
K&L GATES LLP
K&L Gates LLP
1601 K St. NW #1
Washington, D.C. 20006
Telephone: (202) 778-9467
derek.kelley@klgates.com

*Counsel for Defendant*
World Wrestling Entertainment, Inc.