Jason S. Takenouchi (CBN 234835)
**Kasowitz Benson Torres LLP**
101 California Street, Suite 3000
San Francisco, California 94111
Telephone: (415) 421-6140
Fax: (415) 398-5030
JTakenouchi@kasowitz.com

Marc E. Kasowitz (*pro hac vice*)
Christine A. Montenegro (*pro hac vice*)
Nicholas A. Rendino (*pro hac vice*)
**Kasowitz Benson Torres LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Fax: (212) 506-1800
mkasowitz@kasowitz.com
cmontenegro@kasowitz.com
nrendino@kasowitz.com

*Attorneys for Plaintiff MLW Media LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MLW MEDIA LLC, | ) CASE NO. 5:22-cv-179-EJD |
| | ) |
| Plaintiff, | ) **FIRST AMENDED COMPLAINT FOR:** |
| | ) |
| v. | ) **1) MONOPOLIZATION IN VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2)** |
| | ) **2) ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 2)** |
| WORLD WRESTLING ENTERTAINMENT, INC., | ) **3) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;** |
| Defendant. | ) **4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; AND** |
| | ) **5) BUS. & PROF. CODE §17200 *ET SEQ.*** |
| | ) |
| | ) **REDACTED VERSION** |
| | ) |
| | ) **JURY TRIAL DEMANDED** |

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

Plaintiff MLW Media LLC ("MLW"), for its first amended complaint[1] against defendant World Wrestling Entertainment, Inc. ("WWE"), alleges as follows:

### Preliminary Statement

1.      This action arises from the predatory and unfair conduct of professional wrestling promotion company WWE in the destruction of competition in the national market in the United States for the sale or licensing of media rights for professional wrestling programming (the "Relevant Market").  WWE dominates the Relevant Market -- controlling approximately 92% of the revenues in that market derived from professional wrestling media rights deals.  WWE intends to acquire and has acquired and maintains monopoly power in the Relevant Market by excluding or suppressing competition through exclusivity agreements with key media companies and interfering with its competitors' media rights contracts, resulting in substantial foreclosure of approximately 92% of the Relevant Market as measured by WWE's share of media rights revenue, and through conduct designed to lock up the critical inputs essential for the creation of professional wrestling programming.  WWE has maintained its dominance through predatory, unfair and anti-competitive conduct since at least 2001, when WWE acquired its largest competitor, World Championship Wrestling ("WCW").

2.      The intent and effect of WWE's scheme, as described more fully below, has been to harm competition, destroy or harm competitors, such as MLW, and to maintain supracompetitive pricing on media companies, and ultimately consumers, for professional wrestling programming.  The supracompetitive pricing is exemplified by a 261% increase since 2018 in the average annual value of WWE's TV media rights fees for professional wrestling programming, even as its ratings have declined.

---

[1] Pursuant to the Court's Standing Order, a red-line document showing the changes made to the previously filed complaint is attached hereto as Exhibit A.

3.     Plaintiff MLW, a professional wrestling company that produces professional wrestling programming and sells media rights for that programming to media companies, competes in the Relevant Market with other professional wrestling promotion companies, including WWE.

4.     Despite the declining popularity of WWE's wrestling programs as reflected by, among other things, declining ratings in four of the last five years, WWE has maintained its market dominance and increased its profits and revenues by suppressing competition and targeting MLW and other competitors through its predatory and unlawful conduct.  WWE has systematically raised competitors' costs to enter the Relevant Market and compete, and impaired their ability to increase their market share by tying up the major networks and media companies through agreements to exclusively distribute WWE content, blocking or interfering with competitors' access to arenas where live professional wrestling events are performed and programming is produced, locking up wrestlers through exclusive agreements, predatory hiring, and other predatory conduct such as interfering with competitors' media rights contracts.  By exploiting its market power to raise the cost of access to these critical inputs, WWE harms competition, impairs rivals' ability to compete and inhibits their ability to increase their share in the Relevant Market.

5.     Through its unlawful exclusionary agreements, WWE has also maintained its monopoly power by foreclosing a substantial share of the Relevant Market.  Through its agreements with media companies for media rights deals -- which are priced at supracompetitive levels -- to exclusively distribute WWE content, WWE prevents the expansion of its rivals and their ability to compete in the Relevant Market.  WWE has foreclosed approximately 92% of the Relevant Market as measured by media rights revenue.

6.     WWE also unlawfully and unfairly has exercised its dominant market power to restrict output and restricted consumer choice in the Relevant Market by interfering with MLW's negotiations with one of the fastest growing entertainment cable networks in the United States,

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

VICE TV ("VICE"), and MLW's media rights agreement with Tubi, a California-based streaming service, which is owned by major media company Fox Corporation ("Fox").

7.     In April 2021, MLW succeeded in negotiating an agreement with VICE, pursuant to which VICE agreed to air MLW's archival footage, and the parties were in the process of negotiating a more comprehensive deal.  When WWE learned about this agreement and the ongoing negotiations, WWE immediately deployed its market power to subvert the agreement and negotiations.  WWE's Senior Vice President, Susan Levison, called and informed a VICE executive that WWE's owner, Vince McMahon -- notorious for his aggressive business tactics -- was "pissed" that VICE was airing MLW content and that McMahon wanted VICE to stop doing so.  In response, the VICE executive stated to Levison "I think that this is illegal what you're doing" and informed him that the conduct was probably an antitrust violation.  Levison's response was that she could not control Vince McMahon.  Professional wrestling was an important part of VICE's programming and wrestling viewers were an important part of VICE's audience.  VICE also needed WWE to ensure the success of VICE's wrestling-related programs, which included a series, *Dark Side of the Ring*, often focused on WWE storylines based on input from WWE.  Succumbing to WWE's abusive exercise of its market power, VICE withdrew from the negotiations over the comprehensive agreement to air new MLW content and aired only a single MLW program.

8.     WWE's interference with MLW's business continued in mid-2021 after MLW entered into a lucrative agreement with Tubi.  Under the agreement, ███████████████████ █████████████████████████████████████████████████████████ The agreement would have had a substantially beneficial impact on MLW's business by significantly increasing its programming exposure to Fox's broad television audience, and would have further positioned MLW for future media deals.

9.     When WWE learned about the agreement, WWE once again exploited its market power to suppress competition in the Relevant Market.  WWE contacted a Tubi executive at the

4

company's San Francisco headquarters, threatening that if Tubi did not terminate the MLW contract, WWE would, among other things, pull important WWE programs from Fox platforms.  Soon thereafter, and just days before MLW programming was to begin airing on Tubi, the MLW contract was terminated, resulting in substantial losses to MLW and harm to consumers, including in California.

10.      WWE's unlawful interference with the business relationship between Tubi and MLW, which also resulted in the cancellation of important agreements, reversed the momentum the company had been generating with fans, deprived MLW of access to a broader fan base, and lead to event cancellations and delays, all of which resulted in a 40% decline in MLW's ticket sales and a substantial decline in MLW's valuation.

11.      Most recently, WWE's predatory conduct further impeded MLW in its ability to compete in the licensing of its programming for distribution on streaming services and continues to threaten to deprive MLW of its ability to license its programming for distribution on cable.  As a result of WWE's misconduct, MLW is at risk of its business being irreparably destroyed.  In February 2023, MLW's new media partner -- Reelz -- announced a distribution deal with streaming service Peacock.  But as a direct result of WWE's exclusivity arrangement with NBCUniversal, which prohibits any other professional wrestling programming on Peacock, MLW's programming is excluded from this streaming deal, which further suppresses competition in the Relevant Market. MLW also is reportedly at risk of losing its cable deal with Reelz as a result of WWE's exclusivity with Peacock.

12.      In sum, WWE's predatory and unfair anti-competitive conduct in the Relevant Market is multi-faceted, with the intent and effect of expanding and maintaining its market power. This conduct includes, but is not limited to:  (1) substantially foreclosing the Relevant Market through maintaining exclusivity agreements with major media companies and interfering with competitors' media rights deals; (2) substantially increasing barriers to entry in the Relevant Market

by raising rivals' costs and restricting their access to the critical and scarce inputs required for professional wrestling programming, namely athletic performers with the requisite physical skills, acting talent, and marketability to be professional wrestlers, including by hiring away rivals' wrestlers and not using them and by threatening to never hire talent that previously signed with rivals ("blacklisting"); and (3) blocking and foreclosing the access of rivals to professional wrestling venues, which are necessary for the production of professional wrestling programming.  The combined effect of the conduct is that WWE has maintained its dominant market power.

13.     Through its predatory and exclusionary conduct and abuse of its market power, WWE has substantially harmed competition in the Relevant Market by depriving MLW and other competitors of access to key media distribution platforms.  Its conduct has harmed purchasers of media rights for professional wrestling programming by depriving them of programs and enabled WWE to impose and maintain supracompetitive prices, and in turn has harmed wrestling fans by reducing their choices and quality of professional wrestling programming and increasing their costs of consuming that content.

14.     As a result of WWE's anti-competitive and predatory conduct, MLW and other professional wrestling promotions have suffered and will continue to suffer substantial monetary damages and irreparable harm.

15.     MLW therefore seeks compensatory, treble and exemplary damages arising from WWE's unlawful conduct, and injunctive relief enjoining WWE from inflicting further irreparable harm through its anti-competitive and tortious conduct.

## **PARTIES**

16.     Plaintiff MLW is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Mamaroneck, New York.  MLW is a subsidiary of its holding company MLW LLC.  MLW is a professional wrestling promotion engaged in the business of promoting professional wrestling events, particularly live events, programming, and

digital content related to professional wrestling.  As an innovative startup that relaunched in 2017, MLW caught the attention of consumers by developing cutting-edge storylines and character wrestlers with distinct and unique identities.

17.    Defendant WWE is a corporation organized under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut.  WWE is registered and transacts business in the State of California.  WWE is a professional wrestling promotion that has been in the business of promoting professional wrestling and sports entertainment for decades under various names.

## JURISDICTION AND VENUE

18.    This action seeks damages caused by WWE's violation of, among other things, Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.  This Court therefore has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over MLW's California state law claims.

19.    Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 22, 26, and 28 U.S.C. § 1391(b)(2), inasmuch as WWE transacts business and has an agent in this District, and it is the District where a substantial part of the events or omissions giving rise to the claims occurred.

## BACKGROUND

### I.    INTRODUCTION

20.    MLW, an innovative professional wrestling promotion company, brings this antitrust action for damages and injunctive relief arising out of WWE's overarching anti-competitive scheme to maintain and enhance its monopoly power in the Relevant Market.

21.    Over the course of decades, WWE has maneuvered to obtain and maintain monopoly power in the Relevant Market through a series of acts and conduct intended to suppress competition

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

and foreclose the expansion of its competitors in the Relevant Market.  And it has succeeded -- since 2001, WWE has been synonymous with the promotion of professional wrestling as sports entertainment in the United States.  But WWE's acquisition of monopoly power in the Relevant Market did not happen overnight.

22.     WWE's monopolistic hold over professional wrestling programming in the United States has resulted from years of WWE's predatory and unfair conduct and its ongoing anti-competitive scheme to exclude competition, including by substantially foreclosing the Relevant Market by tying up the major media distribution channels -- which are essential to the business of promoting professional wrestling programming -- by maintaining exclusivity agreements and interfering with its competitors' media rights deals.

23.     WWE's anti-competitive and unfair business practices also include increasing barriers to entry in the Relevant Market through interference with competitors' access to wrestlers and venues, predatory hiring and exclusionary conduct, and tortious interference with its competitors' businesses.  By depriving competitors and consumers of access to these vital inputs, WWE has raised its competitors' production costs and impaired its competitors' ability to compete, further foreclosing or suppressing competition in the Relevant Market.

## II.     THE PROFESSIONAL WRESTLING INDUSTRY

24.     Professional wrestling as a form of sports entertainment is produced by professional wrestling promotion companies such as WWE and MLW.

25.     Wrestling as sports entertainment is a unique spectacle that showcases an ostensibly competitive sports event using a high level of theatrical flourish and creative storytelling for the primary purpose of entertaining an audience.  Unlike competitive sports, the outcomes of these matches are commonly predetermined and scripted.  But unlike other types of entertainment, sports wrestling entertainment is also an athletic performance and requires performers with a high level of

athleticism and specialized skills.  Live audiences also play an active role in the performance, which is responsive to the live audience like no other sport or entertainment.

26.     Throughout the 1990s, WWE and WCW were the two major wrestling promotions competing in the United States.  A third major national promotion at the time, Extreme Championship Wrestling ("ECW"), was much smaller than WWE and WCW.

27.     During this period, competition in the Relevant Market redounded to the benefit of professional wrestling fans and the industry, and the late 1990s became one of the most-watched periods in televised professional wrestling history.  That competitive dynamic changed at the turn of the century, when WWE acquired WCW, after TBS parent company, Time Warner, merged with America Online ("AOL Time Warner") and AOL Time Warner sought to sell its interest in WCW.

28.     In June 2000, WWE entered into an agreement with TNN's parent company, which resulted in WWE's *Raw* program debuting on TNN in September 2000.  TNN subsequently abruptly cancelled its national television deal with ECW, which ceased operations in 2001.  This cancellation of ECW's programming the week of *Raw's* premiere on TNN network occurred despite ECW's high ratings and three-year contract with TNN.  After ECW was unable to secure a new national television contract, WWE purchased ECW's assets and video library.

29.     By 2001, WWE effectively became the sole professional wrestling company operating on the national stage.

### III.     THE RELEVANT MARKET

30.     The Relevant Market in this action is the United States national market for the sale or licensing of media rights for professional wrestling programs, which includes the media rights for professional wrestling TV series and programs that are aired on U.S. national television networks, U.S. cable and satellite television networks, pay-per-views purchased by U.S. households, and U.S. streaming services.  WWE has attempted -- with a dangerous probability of achieving monopoly

power -- to monopolize the Relevant Market, and does maintain monopoly power in the Relevant Market.

31.     Based on revenues, WWE controls approximately 92% of the Relevant Market.  The second largest competitor, All Elite Wrestling ("AEW"), has approximately 6% of the Relevant Market.  MLW and the remaining competitors, collectively, have less than approximately 2% of the Relevant Market.  The other non-party competitors are AEW, Impact Wrestling ("Impact"), New Japan Pro-Wrestling ("NJPW"), Women of Wrestling ("WOW"), Ring of Honor ("ROH"), and National Wrestling Alliance ("NWA").

32.     WWE broadcasts its professional wrestling programming on USA Network and Fox and streams on Peacock, the subscription streaming service owned by NBCUniversal.  WWE also airs programming on A&E Network ("A&E"), which co-owns VICE.  Since launching in 2019, AEW broadcasts on Warner Bros. Discovery's TNT and TBS networks and offers streaming content through subscription streaming services which offer access to the cable TV channels TNT and TBS such as Hulu and Sling TV.  Impact broadcasts on AXS TV since 2019 and also streams its content on its proprietary subscription streaming service, Impact Plus.  NJPW resumed broadcasts in the United States on AXS TV in 2022 and also streams its content through NJPW World, a worldwide streaming site owned jointly with TV Asahi.  WOW, a women's professional wrestling promotion, broadcasts nationally on CBS or The CW affiliates (owned by or in syndication with Paramount Global) and streams on Pluto TV (owned by Paramount Global).  MLW recently began broadcasting on Reelz in February 2023 and streams on Pro Wrestling TV.  ROH previously was broadcast on television stations or media platforms owned by or in syndication with Sinclair Broadcast Group ("Sinclair") until December 2021, and currently streams exclusively on its Honor Club streaming platform since relaunching on March 2, 2023.  NWA streams its first-run content on YouTube and streams pay-per-view events on FITE TV.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

33.     To effectively compete, professional wrestling promotions need to license or sell their media rights to a major network or media distribution channel that can afford them the fees, sponsors, and unique viewership to sign top talent and produce and market their professional wrestling programs.  Indeed, as leading industry analysts have explained "the pro wrestling business is not that viable as just a live event business.  It's more viable if you can sell media."[2]

34.     The competing professional wrestling promotions in the Relevant Market have been aired in recent years on 13 cable television networks and 7 streaming platforms in the United States, representing a tiny fraction of the vast number of U.S. media platforms: USA Network, SYFY and Peacock (all owned by NBCUniversal), Fox, TBS and TNT (both owned by Warner Bros. Discovery), A&E, VICE, Reelz, AXS TV, CBS or The CW affiliates and Pluto TV (owned or syndicated via Paramount Global), Sinclair, beIN Sports USA, YouTube, Hulu, FITE TV, Pro Wrestling TV, and Sling TV.

35.     Despite the growth of streaming, a major television broadcast partner remains critical for professional wrestling promotions to compete in the Relevant Market.  As legendary professional wrestling commentator Jim Ross explains:  "You need that as a foundation, and from that foundation you build everything up to include digital or streaming or things of that nature."

**A.     Structure of Professional Wrestling Media Rights Deals**

36.     The business of promoting professional wrestling as sports entertainment nationally in the United States is fundamentally a media industry, with revenues and business valuation driven largely by fees obtained from media rights deals.  For example, media revenues constitute 85% of the 2021 total net revenues reported by WWE in its 2021 SEC Form 10-K, and the majority of those

---

[2] Jason Ounpraseuth & Brandon Thurston, *Has Game Changer Wrestling become a top three wrestling promotion in the U.S.?*, Wrestlenomics (Nov. 30, 2021), https://wrestlenomics.com/2021/11/30/has-game-changer-wrestling-become-a-top-three-wrestling-promotion-in-the-u-s/.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

media revenues came from WWE's long-standing media rights agreements with major media companies such as NBCUniversal and Fox.

37.     Professional wrestling promotion companies generally sell a license to air programs but maintain the copyright for that programming.  The media companies' rights under licenses can vary from contract to contract, but the professional wrestling promoters, including WWE, generally receive rights fees in exchange for licensing their programming to media companies.  The professional wrestling promoters, including WWE, could also receive other forms of payment, such as a share of advertising revenue or a right to sell advertising.

38.     Major media companies, including NBCUniversal (owned by Comcast), Warner Bros. Discovery, and the Fox media companies, purchase professional wrestling media rights for their various distribution channels, such as broadcast networks, cable and satellite services, streaming networks, and film production companies.  Some of these distribution channels offer content to consumers for free (paid for by advertising), while others, like cable and pay-per-view networks, offer access only through a subscription fee.  Streaming, both free and subscription-based, is becoming increasingly popular with consumers.

39.     These media companies in turn generate advertising revenues from the sale of advertisement slots during professional wrestling programs or from subscriptions.  Some media companies may also generate revenue from carrier fees or retransmission consent fees that they charge cable or satellite companies and broadcast networks, affiliates or other pay TV operators to carry or show their programming.

40.     As detailed below, media rights for professional wrestling programming present a unique value proposition unlike any other media rights because, among other things, such programming caters to the sought-after demographics of the advertisers.  Media companies earn advertising revenue tied to the number of viewers that watch a certain program, and particularly for

hard-to reach viewers in the age 18-to-49 years, which makes professional wrestling programming valuable given its ability to reach that demographic.

**B.   There is no Meaningful Substitute for Professional Wrestling Programming**

41.     There is no meaningful substitute for professional wrestling programming, and other sports or television programs are not reasonably interchangeable.  As detailed below, professional wrestling programming -- as a form of sports entertainment -- is a distinct and unique form of programming, as the media companies and viewing audience to whom they cater recognize.  As a form of sports entertainment, professional wrestling presents scripted athletic performances featuring theatrical gimmicks and creative storylines unlike any other sport or form of entertainment.  As WWE's former co-CEO Stephanie McMahon described it further:  "It really is both. It's like athletic theater."[3]

42.     Media companies do not view other sports or entertainment programming as a substitute for their professional wrestling programs even though there is some crossover between professional wrestling fans and live sports fans.  In designing their media rights or programming portfolios, media companies seek to appeal to the full spectrum of their subscribers' interests, and any overlap in the television audience for professional wrestling programming and the television audience for other programming may at most achieve some cross-promotion, but the programs are not viewed as meaningful substitutes for one another by media companies.

43.     Media companies recognize that different channels and platforms cater to the preferences of different audiences.  For example, media companies would not consider programming on the Cooking Channel or Nickelodeon or MSNBC as substitutes for professional wrestling

---

[3] *See* Dade Hayes, *WWE Poised To Jump Off Top Rope At NBCUniversal & Fox Upfront Pitches To Advertisers: "We Can Script The Buzzer-Beater Moments"*, Deadline (May 14, 2022, 8:30 AM), https://deadline.com/2022/05/wwwe-nbcuniversal-fox-upfronts-advertisers-streaming-1235023355/.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

programming because the viewers of those channels and programs have different interests and desires than the viewers of professional wrestling programs.

44.     Moreover, viewership diverges as to different programs even within networks.  For example, a study of consumers of WWE and professional wrestling programs found that the audience for WWE and professional wrestling programming skews male in the 35-44 years age range and is distinctive.[4]  This is consistent with, for example, television ratings for *WWE Smackdown*.  By contrast, television ratings also show that other broadcast programs have demographic profiles that differ from professional wrestling.  For example, viewers of Dateline NBC skew female in the 18-49 age range, while viewers of MacGyver and Magnum P.I skew adult over the age of 50.[5]  Further, a study of consumers watching linear (prescheduled) television shows on national channels more broadly found that this audience demographic skews female and over the age of 65.[6]

45.     Industry insiders and experts also agree that professional wrestling is a very niche market segment for producers and consumers alike.[7]  As former WCW Executive Producer and Senior Vice President Eric Bischoff described professional wrestling: "It's not comedy, it's not

---

[4] *WWE and Pro Wrestling Fans*, Dstillery, https://audiences.dstillery.com/explore/interest/WWE-and-Pro-Wrestling-Fans-40186#demographics [https://web.archive.org/web/20221004031011/https://audiences.dstillery.com/explore/interest/WWE-and-Pro-Wrestling-Fans-40186] (last visited March 2, 2023).

[5] *Friday Network Scorecard*, ShowBuzzDaily (Jul. 10, 2020), https://showbuzzdaily.com/articles/the-sked-friday-network-scorecard-7-10-2020.html.

[6] *Streaming Linear TV Watchers (National Channels)*, Dstillery, https://audiences.dstillery.com/explore/interest/Streaming-Linear-TV-Watchers-National-Channels-57155 [https://web.archive.org/web/20220528155556/https://audiences.dstillery.com/explore/interest/Streaming-Linear-TV-Watchers-National-Channels-57155] (last visited March 2, 2023).

[7] *See* Claire Schaeperkoetter et al., *Wrestling to Understand Fan Motivations: Examining the MSSC within the WWE*, 2 J. ENT. & MEDIA STUD. 111 (2016).

drama, it's not reality in the broader sense of the term.  It's not news."  Also, Stephanie McMahon remarked, "the company's trademark blend of sports entertainment offers distinct advantages."[8]

46.     There is a strong demand for professional wrestling programming by professional wrestling fans, who are loyal television viewers that are unlikely to substitute away from professional wrestling programming.  Wrestling viewers have traditionally tuned in to their favored wrestling program but may not tune in earlier or later to watch other programming on the same network.  For example, the Tuesday night WWE television series "NXT" went head-to-head with the President's State of the Union address on Tuesday, February 7, 2023.  Relative to the viewership one week prior and one week after, the "NXT" program on February 7 lost only 8% of its viewership despite going head-to-head with a program watched by more than 27 million U.S. households.[9]  The number of viewers watching the State of the Union, although lower than in previous years, is still roughly 50% larger than the average number of viewers that watch Sunday Night Football on NBC, which is the most watched television show in the United States with more than 18 million viewers.[10]

47.     Professional wrestling, as a form of sports entertainment, is also distinct from sports, including boxing and mixed martial arts ("MMA").  Boxing and MMA are focused on striking and do not have a pre-determined outcome whereas professional wrestling is scripted with a pre-determined winner.  Further, professional wrestling storylines can be adapted to suit the interests of

---

[8] *See* Dade Hayes, *WWE Poised To Jump Off Top Rope At NBCUniversal & Fox Upfront Pitches To Advertisers: "We Can Script The Buzzer-Beater Moments"*, Deadline (May 14, 2022, 8:30 AM), https://deadline.com/2022/05/wwe-nbcuniversal-fox-upfronts-advertisers-streaming-1235023355/.

[9] Mohit Raghuwanshi, *WWE NXT Rating: Latest & All-Time Viewerships & Ratings*, ITN WWE (Mar. 1, 2023), https://www.itnwwe.com/wrestling/wwe-nxt-ratings-viewership/.

[10] Helen Coster & Lisa Richwine, *About 27.3 million people watched Biden Address, down from last year*, Reuters (Feb. 8, 2023, 7:19 PM), https://www.reuters.com/world/us/heres-how-many-watched-bidens-state-union-major-tv-networks-2023-02-08/; *Total number of viewers of the most watched television shows in the United States in the 2021/2022 season*, Statista, https://www.statista.com/statistics/804812/top-tv-series-usa-2015/ (last visited MONTH DAY, 2023).

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

its fans.  As MLW CEO Court Bauer has explained:  "Unlike the UFC, you can give fans the happy endings.  You can give them the cliffhangers, you can give them the mystery, you can give them the intrigue."[11]  Boxing and MMA are also governed by state athletic gaming commissions (or equivalents thereof) and are subject to commission-approved definitions and rules which in many states do not apply to professional wrestling.

48.    Other live team or individual sports are not meaningful substitutes for professional wrestling amongst the consuming public (and therefore amongst the purchasers of media rights).  The outcomes of live sports are not predetermined and scripted.  Professional wrestling promotions also are not organized into teams as is common in many organized sports.  Wrestlers are typically signed to a single promotion and compete against other wrestlers under contract with the same promotion.  Furthermore, professional wrestling is exempted from many state athletic commissions or is regulated separately from most competitive sports under various insurance or licensing boards.

49.    Moreover, unlike other live sports, professional wrestling has no off-season.  Team sports have competitions only in a certain season of the year and do not provide programming to television channels in the other seasons.  Even for individual sports, such as professional golf on the PGA Tour and other international top-tier golf tours that have year-round competitions, the best athletes only participate in less than half of the tournaments and programming.  For example, the PGA Tour has 13 Tour events that all top PGA Tour players agree to play together in.  These 13 "elevated" tournaments, in addition to the four major championships, means that the best and most marketable golfers on the PGA Tour are only guaranteed to compete against each other in 17 tournaments (17 weeks) in a year.  As a senior executive for Fox Sports explained, professional wrestling programming is "unique in that it's 52 weeks a year.  We've never broadcast a sport that's

---

[11] Lynette Rice, *MLW Founder Court Bauer On His New Partnership With Reelz And His Lawsuit Against WWE: "It's A Ruthless Business"*, Deadline (Feb. 7, 2023, 10 AM), https://deadline.com/2023/02/mlw-court-bauer-reelz-premiere-wwe-lawsuit-1235251519/.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

52 weeks a year.  Live program becomes that much more important and really is kind of the foundation for our new version of Fox."

50.     On information and belief, raising the prices for media rights for professional wrestling programming (or even the price of professional wrestling events) above the competitive level by a small but significant amount for a substantial period of time would not cause so many purchasers in the Relevant Market (or the consuming audience) to switch to other sporting events or entertainment options such that a price increase would be unprofitable.

## IV.     WWE'S MONOPOLY POWER IN THE RELEVANT MARKET.

51.     WWE has attempted to achieve monopoly power in the Relevant Market, and has succeeded in acquiring and maintaining monopoly power in that market through its predatory, anti-competitive and unfair conduct.  WWE's market power, as shown below, is evidenced by its supracompetitive pricing and ability to exclude competitors, its dominant share of the Relevant Market, and its ability to erect high barriers to entry to exclude and foreclose competition.

### A.     WWE Excludes Competitors and Charges Supracompetitive Prices

52.     WWE's monopoly power is evidenced by its ability to exclude competitors and decrease the output of professional wrestling programming.  WWE has excluded competition and restricted output by maintaining exclusivity agreements with the key media companies purchasing media rights to professional wrestling programs, such as Fox, USA Network and Peacock (owned by NBCUniversal).  Indeed, according to a source involved in the negotiations, "in most (possibly all) of WWE's TV contracts," WWE reportedly "includes a stipulation that the station is not allowed to broadcast any other wrestling promotion on their network."[12]

53.     WWE also has prevented MLW and other competitors from producing programs or from airing programs on other favored platforms such as Tubi (a Fox subsidiary) and VICE (co-

---

[12] Joseph Lee, *BT Sports Unlikely To Air AWE After Warner Bros. Discovery Takeover*, 411Mania (Aug. 12, 2022), https://411mania.com/wrestling/bt-sports-unlikely-to-air-aew-after-warner-bros-discovery-takeover/.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

owned by A&E).  Most recently, on February 28, 2023, MLW's new media partner Reelz announced a distribution deal with streaming service Peacock, including a live linear feed and to stream Reelz on-demand programming.  However, MLW is singularly excluded from the deal because "Peacock has a streaming deal with the WWE, which has exclusivity in the category on Peacock."[13]  MLW is also reportedly at risk of losing its Reelz deal as a result of WWE's exclusivity agreement with Peacock.

54.     WWE's actions were intended to, and had the effect of, systematically excluding competitors from the Relevant Market, and have impaired its competitors' ability to grow and pose a viable threat to, or constrain, WWE's exercise of monopoly power in the Relevant Market.

55.     WWE's market power is also evidenced by its supracompetitive pricing with respect to its media rights deals.  For example, the combined average annual value of WWE's U.S. TV rights for its flagship weekly programs *WWE Raw* and *WWE Smackdown* alone is $470 million, based on the 5-year media rights contracts that WWE negotiated with Fox and NBCUniversal in 2018.  By contrast, the combined average annual value of its largest competitor's (AEW) U.S. TV rights for its two similar weekly programs, *Dynamite* and *Rampage*, is just $43.8 million, based on the 4-year media rights contract that AEW negotiated with WarnerMedia (now Warner Bros. Discovery) in 2020.

56.     Not only are WWE's current TV rights agreements valued well above competitive levels, they are more than three times greater than its prior TV rights agreement, which covered both *WWE Raw* and *WWE Smackdown*, and had an annual value of $130 million (5-year contract with NBCUniversal from 2014-2019).[14]  WWE thus has been able to raise the price for both programs by

---

[13] Aidan Gibbons, *MLW Unable To Air On Peacock Due To WWE Exclusivity*, Cutaholic (Mar. 1, 2023, 7:30 PM), https://cultaholic.com/posts/mlw-unable-to-air-on-peacock-due-to-wwe-exclusivity.

[14] Marisa Guthrie, *How Fox Bodyslammed Rivals to Win WWE Rights*, The Hollywood Reporter (May 30, 2018, 6:30 AM), https://www.hollywoodreporter.com/tv/tv-news/wrestling-rights-shakeup-fox-nabs-wwe-espn-signs-ufc-nbc-gets-raw-1115156/; Marc Middleton, *When WWE TV*

18

more than 261%, entering into separate deals in 2018 worth $205 million and $265 million a year for five years with Fox and NBCUniversal, respectively, even as a number of competitors have attempted to enter or return to the Relevant Market.  WWE has extracted these increased prices despite decreased viewership ratings.[15]  And the combined effect of existing barriers to entry, as further set forth below, and WWE's anti-competitive conduct is that WWE has maintained its dominant market power and has faced no meaningful price discipline from rival wrestling promotions.

57.     WWE's monopoly power has earned WWE growing revenues and profits.  In four of the past five years, WWE has reported an increase in net income, growing by 206% in 2018, decreasing by 23% in 2019, and then growing by 71% in 2020, 35% in 2021, and 10% in 2022.  In contrast, WWE's largest competitor, AEW, has been unable to earn a profit since its founding in 2019.

58.     WWE's revenues also grew at artificially-inflated rates during this period.  WWE's revenues from media increase from more than $683 million in 2018 to more than $1.03 billion in 2022, representing a 50.8% increase.  In contrast, AEW's *total* income -- not just revenue generated from media -- for 2022 was approximately $100 million, or less than 10% of WWE's media-generated revenue.

---

*Deals Expire, John Cena Hosting Awards Show*, Wrestling Inc. (Jun. 21, 2016, 1:08 PM), https://www.wrestlinginc.com/wi/news/2016/0621/612886/john-cena-hosting-awards-show-video/.

[15] Brendan Wahl, *WWE RAW Viewership Report (12.31.18)*, Wrestling News World (Jan. 3, 2019), https://www.wrestlingnewsworld.com/wwe/raw-ratings-nye-2018; Brandon Thurston, *WWE Raw long-term ratings compared to wider TV trends*, Wrestlenomics (Jul. 20, 2021), https://wrestlenomics.com/2021/07/19/wwe-raw-ratings-compared-to-wider-trends-in-tv/; Colin Vassallo, *Smackdown improves its viewership average compared to 2015*, Wrestling Online (Dec. 29, 2016), https://www.wrestling-online.com/wwe/smackdown-improves-its-viewership-average-compared-to-2015/.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

**B.      WWE Possesses a Dominant Market Share and Imposes and Exploits High Barriers to Entry in the Relevant Market**

59.      WWE's monopoly power is also evidenced by its dominant share of the Relevant Market and the high barriers to entry that WWE erects to exclude and foreclose potential competitors from the Relevant Market.

**i.        WWE Has a Dominant Share of the Relevant Market**

60.      WWE controls a dominant share of the Relevant Market.  As noted, WWE has captured at least approximately 92% of all revenue generated from the sale or licensing of media rights for professional wrestling programming in the United States.  As former WCW President Eric Bischoff recently observed, "we're talking about WWE, [which] is by far the dominant (company). There is no competition."[16]

61.      The total revenues generated from the Relevant Market is overwhelmingly derived from four agreements:  WWE's licensing deals with Fox and NBCUniversal (USA Network and Peacock), which generate $205 million, $265 million, and $200 million in revenue a year, respectively; and AEW's licensing deal with Warner Bros. Discovery, which generates $43.8 million annually.

62.      The remaining competitors in the Relevant Market (Impact, MLW, NJPW, ROH and WOW[17]) collectively have only a *de minimis* market share -- an estimated value of approximately $11.5 million of the total media rights deals.  While the media rights agreements are not publicly available, the value of those deals have been conservatively estimated.  MLW's recent agreement with Reelz and agreement with Pro Wrestling TV have the potential to generate ████████

---

[16] Andrew Ravens, *Eric Bischoff: 'AEW Is Not Competition To WWE No Matter How Much Tony Khan Wants To Believe It Is'*, Wrestling Headlines (Aug. 2, 2022), https://wrestlingheadlines.com/eric-bischoff-aew-is-not-competition-to-wwe-no-matter-how-much-tony-khan-wants-to-believe-it-is/.

[17] NWA currently lacks a TV rights deal or major media partner and, on information and belief, NWA does not receive fees for its content on YouTube.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

1   ████████████████████   The value of NJPW's U.S. media rights deal is undisclosed, but on

2   information and belief, is no more than $1.57 million.[18][19]  The value of WOW's U.S. media rights

3   deal is undisclosed, but on information and belief, is no more than $8.45 million.[20]  As for Impact

4   and ROH, which do not generate revenue from the sale of media rights fees, no value has been

5   ascribed to their deals.  Specifically, Impact airs on AXS TV and streams on Impact Plus, which are

6   both owned by Impact's parent corporation, and thus, on information and belief, do not involve

7   negotiated fees or generate revenue from the sale of media rights in the same manner as competitors

8   in the Relevant Market.  The same applies, on information and belief, for ROH, which likewise had

9   been broadcast on television stations owned by its parent company at the time (Sinclair) and

10  currently streams on its standalone streaming platform (Honor Club).[21]

11          63.     Accordingly, WWE controls approximately 92% or $670 million of the entire

12  approximately $725 million of revenue generated from the sale of media rights for professional

13  wrestling content in the Relevant Market.  In other words, WWE has a 92% market share based on

14  revenues.  AEW, the next largest competitor, has a market share based on revenues of approximately

---

[18] This estimate of NJPW's deal value is derived by calculating AEW's revenue per weekly viewer
for its Warner Bros. Discovery agreement ($43,800,000 / 1,482,376 average 2021 viewers = $29.55
per viewer), and applying that per/viewer metric to NJPW's average weekly 2021 viewers (53,220
viewers x $29.55 = $1,572,651).  Given AEW's relative market position, this valuation likely
significantly overestimates the value of NJPW's U.S. media rights.  Information on average 2021
weekly viewership by entity is provided *infra* at note 23.

[19] Jeremy Lambert, *NJPW Returning To AXS TV With New Episodes In March*, Fightful (Jan. 4,
2022, 4:38 AM), https://www.fightful.com/wrestling/njpw-returning-axs-tv-march.

[20] This estimate of WOW's deal value is derived by calculating AEW's revenue per weekly viewer
for its Warner Bros. Discovery agreement ($43,800,000 / 1,482,376 average 2021 viewers = $29.55
per viewer), and applying that per/viewer metric to WOW's average weekly 2021 viewers (285,857
viewers x $29.55 = $ 8,447,074.35). Given AEW's relative market position, this valuation likely
significantly overestimates the value of WOW's media rights.

[21] Similarly, NJPW streams on its standalone streaming platform (NJPW World).

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

6%.  The combined market share of the remaining competitors (*i.e.*, MLW, NJPW, WOW) in the Relevant Market amounts to less than approximately 2%.

64.     While AEW has had greater financial resources relative to other non-WWE promotions companies and has thus far been able to withstand years of negative profits to overcome the barriers to entry erected and expanded upon by WWE in the Relevant Market, other competitors are unable to compete on like terms with WWE.  Moreover, even with AEW's financial resources, WWE does not view AEW as "near close" to the intense competition it faced two decades ago from WCW, frankly telling its investors that the competition "is certainly not going to a situation [like with WCW] . . . when Ted Turner was coming after [WWE] with all of Time Warner's assets as well" and that WWE does not "consider them a competition like . . . WCW back in the day, nowhere near close to that."[22]

65.     WWE's dominant share of the Relevant Market is similarly shown by a variety of other important metrics.  One such metric is the total number of viewers of professional wrestling. In 2021, professional wrestling programs garnered, on average, approximately 6,416,000 total viewers a week.  WWE captures approximately 69% of those viewers, or approximately 4,408,000 viewers.[23]  In other words, more than two-thirds of viewers watch professional wrestling programs, a critical component in obtaining (and byproduct of) lucrative television rights agreements.

---

[22] Mike Chiari, *Vince McMahon Says AEW Isn't 'Anywhere Near Close to' the Competition WCW Was to WWE*, Bleacher Report (Jul. 30, 2021), https://bleacherreport.com/articles/10009156-vince-mcmahon-says-aew-isnt-anywhere-near-close-to-the-competition-wcw-was-to-wwe.

[23] Average weekly viewership figures were aggregated from publicly available reports and data about each of the competing promotions' viewership in 2021:  (i) WWE's aggregate average weekly viewership for *RAW*, *Smackdown*, and *NXT* of 4,407,808; (ii) AEW's aggregate average weekly viewership for *Dynamite* and *Rampage* of 1,482,376; (iii) Impact's average weekly viewership of 120,855; and (iv) MLW's average weekly viewership of 5,200.  Reliable public data for ROH's average viewership in the United States in 2021 is not available, but ROH reportedly garnered about 400,000 weekly viewers before it paused airing in December 2021.  NJPW and WOW were not televised in the United States in 2021.  However, in 2022, NJPW's viewership figures were approximately 53,220 viewers per episode on average.  WOW was previously cancelled by AXS TV in 2020 and did not begin broadcasting again (via Paramount Global) until late 2022.  Since airing in

i.      **WWE Exploits Barriers to Entry in the Relevant Market Through Anti-competitive Practices Designed to Raise Competitors' Long-Run Costs of Production And Maintain Its Dominance**

66.     Not only does WWE control a dominant share of the Relevant Market, it effectively maintains its position and excludes competitors from entering the Relevant Market by erecting and exacerbating the high barriers to entry.  Specifically, through WWE's predatory and anti-competitive conduct, as set forth below, WWE has increased its competitors' long-run costs of production and other barriers to entry to impair their growth and ability to pose a viable threat to WWE's market share.  These barriers that WWE has exacerbated include, among others:  limited and more costly access to major media partners and key distribution channels; limited and more costly access to wrestling talent; limited and more costly access to arenas; and the importance of brand recognition to attract the talent necessary to produce content and entice potential new business partners to enter into media rights deals.

*(1)     Substantial Foreclosure of The Relevant Market By Tying Up Key Media Partners*

67.     At the core of WWE's overarching anti-competitive scheme is its exclusivity agreements with key media companies, which intentionally are designed and intended to foreclose competition in a substantial share of the Relevant Market.  As alleged, WWE requires most (possibly all) of its media partners to agree to exclusivity provisions, which require that WWE's programs will be the exclusive professional wrestling programming on their networks or platforms.  While media companies, as the licensees, will often seek exclusive licensing or distribution rights from the licensor, exclusivity in the other direction is not the norm in the industry.  For example, ESPN has media rights agreements with and broadcasts both competing MMA promotions:  Ultimate Fighting

---

late 2022, WOW has averaged approximately 285,857 viewers per episode.  Even if the 2022 figures for NJPW and WOW are included into the 2021 totals, WWE would still have approximately 65% of all weekly viewers for professional wrestling.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

Championship and Professional Fighters League.  Further, AXS TV broadcasts both Impact and NJPW (and previously also broadcast WOW).  WWE's exclusive dealing therefore is not necessary for the production of professional wrestling programming or  justified by pro-competitive purposes. Rather, the purpose and intent of WWE's exclusivity agreements is the substantial foreclosure of the Relevant Market by impairing its rivals' ability to compete and increase their share in the Relevant Market.

68.     Through its media rights contracts with major networks and distribution channels, WWE has tied up networks (including streaming networks) and other partners into offering only WWE programming, or into providing WWE programs more favorable time slots and marketing opportunities.  For example, WWE has exclusive television rights agreements with Fox and NBCUniversal, two major media companies on the buy-side of the Relevant Market, who operate the two cable networks with the largest coverage in the United States.  Indeed, as of February 1, 2022, Fox was available in 122.4 million U.S. TV homes -- which is all of them.[24]  WWE's exclusive arrangements bar competitors from accessing the most prevalent and far-reaching media platforms, foreclosing competitors from key purchasers in the Relevant Market and a significant portion of the media audience for professional wrestling programming.

69.     WWE's exclusivity agreements with media companies exacerbate barriers to entry by imposing additional long-run costs on competitors who must license or distribute their programming through less efficient platforms, which reach fewer viewers and cannot afford the same licensing fees or other revenues and marketing opportunities as more efficient platforms, or must incur additional costs to try to reach viewers in other ways, such as through creating their own streaming networks.  This barrier to entry is particularly significant because there are only a limited number of existing purchasers for professional wrestling media rights.  As previously described, the

---

[24] Tony Maglio, *From WWE 'SmackDown' to AEW 'Rampage': How Every Pro Wrestling Show Ranks in Ratings*, The Wrap (Feb. 25, 2022, 6:00 AM), https://www.thewrap.com/pro-wrestling-ratings-wwe-smackdown-aew-rampage/.

commercial reality is that, in addition to Fox's national television network, professional wrestling programming has appeared in recent years on 13 cable television networks, a tiny fraction of the total number of networks.  And through its media rights deals WWE forecloses approximately 92% of the potential media platforms in the Relevant Market as measured by share of licensing revenue. WWE's own annual reports note that "[o]ur failure to maintain or renew key agreements could adversely affect our ability to distribute our media content, WWE Network, our films and/or other of our goods and services, which could adversely affect our operating results."

70.      WWE similarly forecloses competitors from digital streaming, which is generally only viable with media partners who can provide a pre-existing platform.  While WWE attempted to create an online streaming network called the WWE Network in 2014, it experienced technical challenges and failed to attract the necessary amount of subscribers to remain a viable standalone streaming network.  In light of the WWE Network's failure, WWE's Chief Brand Officer noted the challenges to creating a streaming platform as a means of distribution for wrestling companies: "we're not a technology company and shouldn't try to be."[25]

71.      In 2021, WWE reached a five-year agreement with NBCUniversal's streaming platform, Peacock, for the exclusive streaming rights of WWE programming in the United States, worth a reported $1 billion.  WWE currently can reach more than 20 million paid subscribers through Peacock.  MLW and other competitors are foreclosed from Peacock's streaming platform as a result of WWE's exclusivity agreements.  Additionally, as set forth above, WWE interfered with MLW's licensing agreement with Tubi, a Fox-owned streaming service, which would have allowed MLW to reach Tubi's 64 million monthly active users as of January 2023.  The purpose, intent and effect of WWE's predatory conduct in locking up key streaming networks and other distribution channels through exclusive dealing agreements, is to impede the ability of its competitors to compete

---

[25] Jabari Young, *WWE is fully converted to Peacock, now it wants to make more content*, CNBC (Apr. 8, 2021, 9:55 AM), https://www.cnbc.com/2021/04/08/wwe-is-fully-converted-to-peacock-now-it-wants-to-make-more-content.html.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

for media rights deals, and to increase competitors' costs to compete in or exclude them from the Relevant Market.

72.     Further, WWE's exclusivity agreements with media companies also impairs competitors' ability to acquire commercially-essential talent.  Industry observers like Dave Meltzer note that wrestling companies "need television money to sign the industry's top-tier talent", *i.e.*, they need U.S. television media rights agreements that can afford them the fees and clout to recruit and retain top performers.  By tying up the major media channels for itself, WWE has also made it difficult for competitors to attract top and up-and-coming talent, who seek the fame and fortune that come from working with promotions that have major television media rights deals.

### (2)     *Restricting Access to and Raising Costs of Skilled Performers*

73.     WWE's predatory and anti-competitive conduct raises rivals' costs and forecloses rivals by restricting their access to the critical and scarce inputs required for professional wrestling programming, namely, athletic performers with the requisite physical skills, acting talent, and marketability to be professional wrestlers, including by hiring away rivals' wrestlers, for purposes of harming competition rather than any legitimate business purpose.  This predatory conduct includes WWE's threats to wrestling performers that they will never be hired if they previously worked with its competitor, MLW.

74.     Wrestlers are essential to the production of professional wrestling programs and, therefore, to the sale or licensing of media rights for that programming.  Top wrestling talent also draws larger audiences and loyal fans, and the advertisers keen to reach them.  Indeed, WWE has disclosed to shareholders that "[o]ur success depends, in large part, upon our ability to recruit, train and retain athletic performers who have the physical presence, acting ability and charisma to portray characters in our live events, programming and films."  The failure to identify and retain talent, "could lead to a decline in the appeal of our storylines and the popularity of our brand of entertainment."

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

75.     Through its aggressive and anti-competitive practice of predatory hiring, as detailed below, WWE has worked to block other professional wrestling promotors from hiring and retaining promising or popular wrestlers, thereby ensuring that competing professional wrestling promotors are unable to grow or develop their brands and business or pose a threat to WWE's monopoly power.

76.     WWE began hiring away MLW's wrestlers who were under exclusive contracts as early as 2018.  For example, WWE successfully solicited MLW's World Champion Stephon Strickland, while he was under contract with MLW.  Canyon Ceman, WWE's Senior Director of Talent Development at the time, had reached out to Strickland to encourage him to opt-out of his agreement with MLW.  WWE's interference with that relationship was devastating to MLW's marketing and creative strategy, resulting in MLW incurring substantial costs to change programming, merchandise strategies, creative direction and more.  AEW also recently demanded that WWE stop contacting numerous AEW wrestlers in an attempt to hire their wrestlers away from AEW.

77.     WWE's motivation for the predatory hiring of talent is to lock up the pool of commercially successful and talented wrestlers in order to suppress competition rather than to innovate or produce content.  For example, in July 2021, WWE hired away Davey Boy Smith Jr., one of MLW's most popular wrestlers, from MLW.  Rather than using Smith in its programs and incorporating him into its storylines, WWE kept Smith out of its programming, with Smith only appearing in one dark match during his tenure at WWE.  By WWE failing to use Smith in its programming, WWE made clear its intent to impair MLW's ability to build its brand and viewership by removing one of its successful wrestlers.

78.     WWE further prevents MLW and other professional wrestling promoters from retaining and hiring promising talent by making it known to wrestlers in the industry that they will not hire wrestlers who have previously worked with MLW.  By doing so, WWE impairs the ability of competitors to identify and develop wrestlers who could serve as a basis for successful storylines.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

79.    Additionally, WWE has raised competitors' costs of recruiting, training, and retaining such performers by using worldwide exclusive contracts to limit and restrict competitors' access to wrestlers, even though WWE treats such wrestlers as independent contractors.  For example, WWE reportedly "began hoarding talent" in response to the launch of AEW and has signed up wrestlers when other promotions such as ROH "got real hot" in order to deny a crucial input to rivals and impair rivals' ability to grow.[26]  Indeed, WWE boasts of having "nearly 250 Superstars under *exclusive* contracts, ranging from multi-year guaranteed contracts with established Superstars to developmental contracts with our Superstars in training."

80.    Not only do WWE's agreements prevent wrestlers from working for competitors, but WWE also owns the wrestlers' intellectual property, thereby foreclosing the use of their developed storylines or characters.  Promotions must therefore incur additional costs and efforts to also recreate a wrestler's character and history, against their fans' memory and experience, and defying *kayfabe*, which is core to the promotion of professional wrestling.[27]  Moreover, some WWE wrestler contracts can have terms that last up to twenty years, effectively precluding the performer from ever working for a competitor,[28] and in turn, preventing wrestlers from operating as independent contractors in a competitive environment.  WWE's predatory conduct has exacerbated the barriers to entry by increasing the costs to acquire and retain talent.

---

[26] James Lessman, *Bryan Danielson Thinks WWE Began Hoarding Talent Because of AEW, Calls It An Overreaction*, RAJAH.com (Dec. 4, 2021), available at https://rajah.com/node/bryan-danielson-thinks-wwe-began-hoarding-talent-because-aew-calls-it-overreaction.

[27] In the convention of professional wrestling, *kayfabe* refers to presenting staged performances and characters as real and the act of maintaining that illusion outside the ring.

[28] Chris Smith, *Breaking Down How WWE Contracts Work*, Forbes (Mar. 28, 2015, 9:54 AM), https://www.forbes.com/sites/chrissmith/2015/03/28/breaking-down-how-wwe-contracts-work/?sh=529bd81b6713.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

*(3)   Cutting off Access to Arenas and Live Audiences*

81.   WWE has also leveraged its decades-long relationships with virtually every major arena in the United States to erect a third barrier to entry and make it harder for WWE's competitors to book arenas, which are critical for the production of weekly programming.  By blocking competitors from booking arenas, or by increasing competitors' costs to access such venues, WWE has also blocked competitors' entry into the Relevant Market by further impairing their ability to produce programming and compete.

82.   WWE has engaged in a continued pattern of blocking its competitors from accessing favorable venues.  For example, in the summer of 2018, ROH, a competing professional wrestling promotion owned at the time by Sinclair, booked a major wrestling show in New York's iconic Madison Square Garden ("MSG").  The show at MSG was to be a joint feature between NJPW and Sinclair's ROH.  MSG has long been considered WWE's "home turf" and Sinclair intentionally planned the show in MSG as "part of a move to expand the promotion's events into larger venues."

83.   ROH's MSG show sold out immediately, with wrestling fans excited about a show in this popular and iconic venue.  WWE, however, had other plans.  WWE had scheduled WrestleMania for the same weekend at the nearby MetLife Stadium, and did not want any ROH MSG show to compete with it.

84.   In a naked attempt to restrain competition through the abuse of its market power, WWE, through Paul Levesque, its then-Executive Vice President, called MSG to insist that MSG cancel the show with ROH and NJPW.  Unable to resist the pressure from the industry behemoth, MSG succumbed, and withdrew from the ROH agreement and cancelled the ROH show.  While Sinclair threatened to sue MSG over their agreement, and the show was rescheduled, ROH and NJPW were forced to incur significant legal expense to vindicate their legal rights and to defend against WWE's anti-competitive behavior.  A smaller nascent competitor, without the support of

1   Sinclair, may not have been able to resist such pressure and incur the necessary legal expenses to

2   vindicate its rights.

3         85.      Similarly, WWE blocked another competing wrestling promotion from hosting shows

4   at the Heritage Bank Center, the largest indoor arena in Cincinnati, Ohio.  AEW reportedly sought to

5   book the arena in or around 2019 and early 2020, only to be rebuffed on account of the arena's long-

6   standing relationship and agreement with WWE, to the great disappointment of its fans in the area.

7         86.      WWE has also leveraged its dominance and brand recognition to draw audiences

8   away from competing promotions and thereby prevent rivals from gaining a foothold in the Relevant

9   Market.  For example, WWE recently attempted to thwart the success of AEW's All Out pay-per-

10  view programming.  In previous years, AEW has run its popular All Out program with much success

11  during Labor Day weekend.  In an effort to prevent AEW from posing a real threat to WWE's

12  market share, in or around Labor Day 2022, WWE decided to run two premium live events to

13  coincide with AEW's programming.  By specifically targeting key dates of AEW's programming,

14  WWE sought to draw away the audience from AEW's popular program, even though its own

15  viewership numbers would also likely suffer from the competing time slots.

16  **V.**     **WWE INTERFERES WITH MLW'S MEDIA RIGHTS DEALS.**

17        87.      WWE has also exploited its dominance in the Relevant Market to suppress

18  competition by repeatedly interfering with and undermining MLW's key media rights deals.

19        **A.**     **WWE Interferes with MLW's Deal with VICE**

20        88.      In the spring of 2021, MLW entered into a television deal with VICE, under which

21  VICE would air MLW's archival footage.  At the same time, MLW and VICE were negotiating an

22  expanded relationship, which would include the airing of new MLW programs on VICE platforms,

23  as had been publicly reported.

24        89.      In June 2021, after WWE learned about MLW's agreement and expanding business

25  relations with VICE, including the parties' plans to air new MLW programs on VICE, WWE

26                                              30

27

28

executive Levison warned a VICE executive to stop airing MLW programs, saying that Vince McMahon was "pissed" that VICE was airing MLW programs.  At the time, WWE knew that it had leverage over VICE because VICE, which caters to viewers of professional wrestling, needed WWE's continued cooperation and access from WWE to ensure the success of its wrestling-related programs.  For instance, WWE knew that VICE's special programs included a series, *Dark Side of the Ring*, that often focused on WWE storylines and included input from individuals associated with WWE.  Additionally, A&E, which owns a 20% stake in VICE and runs and owns a majority of VICE's production operations, has a relationship with WWE, airing WWE programs and A&E/WWE partnership programs.

90.     The VICE executive responded to Levison that "I think this is illegal what you're doing" and that it was probably an antitrust violation.  Levison responded that she could not control McMahon.  As a result of WWE's threats to VICE, VICE stopped engaging in discussions with MLW about an expanded media rights deal.  WWE's interference resulted in VICE withdrawing from negotiations over airing new MLW programming and in VICE airing only a single MLW special program in October 2021, which the parties had previously committed to.  A few weeks later, VICE aired WWE attorney, Jerry McDevitt, in a starring role on an episode of *Dark Side of the Ring*.

91.     Around this same time, FITE, a streaming service focused on combat sports, approached MLW with a media rights offer that would have paid MLW for providing wrestling programs to FITE.  MLW immediately agreed to discuss the terms of the deal, but FITE then abandoned it.  MLW later learned that FITE's Executive Advisor of Corporate Development, Gregg Bernard, was at the same time working for WWE as Senior Vice President of Strategy and Operations, which -- along with FITE's past use of WWE content, and WWE's ongoing attempts to disrupt MLW opportunities -- further illustrates WWE's dominance and unfair competition in the market.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

1

**B.      WWE Interferes with MLW's Deal with Tubi**

2        92.     On July 22, 2021, MLW entered into a lucrative deal with Tubi -- an ad-supported

3  streaming service owned by Fox -- to air MLW programs documented in a license agreement

4  ("License Agreement").

5        93.     Under the License Agreement, ███████████████████████████████████

6  ███████████████████████████████████████  Unlike WWE's media rights deals,

7  ████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████

9        94.     The License Agreement was valid and enforceable ███████████████████

10 ████████████████████████████████  in the State of California, where Tubi is headquartered.

11 California is also home to two of the largest national media markets, the Los Angeles and San

12 Francisco Bay Area media markets, which together comprise the largest media market in the United

13 States.

14       95.     The License Agreement had a profound impact on MLW's business, greatly

15 increasing the company's valuation, strengthening its brand recognition -- including among viewers

16 of Fox television -- and making the company more attractive to new wrestling talent.  Tubi

17 benefitted because it would have new, modern professional wrestling programming on its platform.

18       96.     After the License Agreement was executed, MLW began preparing two live events,

19 including for a *Fusion* wrestling performance for September 11, 2021.  In preparation for the to-be-

20 televised event, MLW rented space at the NYTEX Sports Centre.  The second live event was

21 scheduled to take place in Mexico for an *Azteca* wrestling performance.

22       97.     MLW also took other steps to prepare Tubi programming, including hiring staff for

23 MLW's *Azteca Underground* series, hiring editors, a public relations agency and a marketing

24 consultant, signing several new wrestlers, and increasing salaries.  MLW also ceased all talks with

25

26                                           32

27

28

1  other potential partners in mid-July 2021,

2

3      98.     In advance of the highly anticipated September 11, 2021 launch date, Tubi and MLW

4  agreed to issue a joint press release on August 10, 2021 to announce the parties' new agreement.

5      99.     Prior to Tubi and MLW issuing the joint press release, WWE learned about the terms

6  and existence of the License Agreement.  On information and belief, executives for Fox Sports and

7  Tubi, which are both based in California, informed WWE about the terms of the License Agreement

8  the day before it was set to launch.

9      100.    On or about August 9, 2021, WWE executive Stephanie McMahon spoke with a Tubi

10 executive located in California about the License Agreement.  Ms. McMahon initially pressured the

11 Tubi executive to deny MLW a time slot that would compete head-to-head with WWE's NXT

12 programs on Tuesday nights.  But Ms. McMahon ultimately pressured the Tubi executive and other

13 senior executives at Fox to terminate the agreement in its entirety.  WWE threatened Tubi's affiliate,

14 Fox, that it could lose WWE's business or preferred content if Tubi did not acquiesce to WWE's

15 demand and terminate its agreement with MLW.  Indeed, as noted by an industry publication, WWE

16 had substantial leverage over Fox because Fox was competing with another network for better WWE

17 programming at the same time that WWE was pressuring Tubi to cancel the License Agreement.

18     101.    On August 9, 2021 -- the night before a planned press release about the Tubi-MLW

19 deal -- as a result of WWE's pressure and interference, MLW received a letter purporting to

20 unilaterally terminate the License Agreement.  Thus, with wanton, reckless disregard for MLW's

21 rights and the antitrust laws, WWE intentionally and unlawfully interfered with the performance of

22 the License Agreement and procured its termination.  WWE purposefully directed its

23 communications to Tubi in California in order to disrupt MLW's relationship with Tubi and to

24 deprive MLW of access to and competition in major national media markets.

25

26

27

28

102.     Wrestling industry publications reported on WWE's interference with the License Agreement.  One report noted that "shortly before the [Tubi-MLW] deal was to be announced publicly in August, WWE was made aware of it.  A source close to Fox . . . indicated that WWE did not respond favorably to the deal, which was to be announced imminently after WWE was made aware.  As a result, the future of that third party deal was in question."[29]

## VI.     WWE'S PREDATORY, ANTI-COMPETITIVE AND TORTIOUS CONDUCT HAS CAUSED HARM TO THE COMPETITIVE PROCESS, CONSUMERS AND MLW .

### A.     WWE's Anti-Competitive Conduct Has Caused Harm to Competition and Consumers

103.     WWE's exclusionary and anti-competitive conduct has caused harm to competition in the Relevant Market by increasing competitors' long-run production costs, including by denying or restricting access to arenas or other venues for the production of professional wrestling programming and restricting access to wrestlers, including through predatory hiring and exclusive dealing practices, and foreclosing the revenues from key media companies.

104.     WWE's conduct has also harmed purchasers and consumers, including purchasers based in California such as Tubi and Fox Sports as well as professional wrestling fans.  But for WWE's anti-competitive conduct, both purchasers and consumers would have increased access to professional wrestling programming at lower prices or without having to pay supracompetitive fees, and they would have access to and enjoy a greater variety of professional wrestling programs with higher quality.  In particular, MLW's programming is demanded by consumers and but for WWE's anti-competitive conduct, the consumers that demand MLW's programs would have had greater access to MLW programming.  The first three episodes of *MLW Underground* on Reelz averaged

---

[29] Sean Ross Sapp, *WWE/FOX Nixed An MLW Streaming Deal; Tons More On The WWE/Peacock Relationship*, Fightful (Oct. 17, 2021, 4:00PM), https://www.fightful.com/wrestling/exclusives/wwefox-nixed-mlw-streaming-deal-tons-more-wwepeacock-relationship.

83,000 viewers.  There are additional potential MLW viewers that were likely harmed due to MLW's exclusion from the Relevant Market stemming from WWE's conduct, including Tubi and Peacock subscribers, who would have been able to stream MLW's programs but for WWE's unfair and exclusionary conduct.  These harmed consumers are in addition to the professional wrestling television viewers that demand WWE programming and, on information and belief, are paying higher prices than they otherwise would have but for WWE's anti-competitive conduct.

105.    WWE's suppression of price competition through exclusive dealing and other anti-competitive acts designed to exclude competitors from the Relevant Market or to suppress its competitors' growth and ability to pose a viable threat to its monopoly power have allowed it to charge and maintain supracompetitive pricing in the Relevant Market, resulting in antitrust injury to purchasers of media rights for professional wrestling programming such as Fox and NBCUniversal.

**B.    WWE's Predatory, Anti-Competitive and Tortious Conduct Has Caused Antitrust Injury to MLW**

106.    As a result of WWE's anti-competitive and tortious conduct, MLW has suffered antitrust injury.  This harm includes the loss of a valuable and prospective television rights agreement with VICE, and the loss of a profitable contract with Tubi, along with lost future profits and marketing opportunities, both of which have resulted in a substantial decline in the company's valuation.  MLW also lost the momentum it had built with fans, including a major fan base in California, with ticket sales declining by 40% within weeks of WWE's unlawful interference with the License Agreement.

107.    Because MLW had ceased its discussions with other potential partners in advance of signing the License Agreement, those partners moved on with other deals, and when the Tubi deal abruptly ended, MLW was unable to resume those discussions.

108.    As a result of WWE's interference, MLW has lost a critical platform to air its new programs.  It can take months, if not years, to find such a platform.  MLW recently entered into an

agreement with Reelz in January 2023 (*MLW Underground* debuted on Reelz on February 8, 2023), more than a year-and-a-half after WWE disrupted MLW's agreement with Tubi.  However, MLW's agreement with Reelz ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████  Further, through its exclusive dealing agreement with Peacock, WWE has denied MLW the full benefits of MLW's partnership with Reelz, which now streams its licensed programming on Peacock with the singular exception of MLW.  The reduced coverage on Reelz and exclusion from favored platforms such as Peacock, Tubi and VICE has limited MLW's ability to compete.  Reporting also suggests that Reelz may not renew MLW's programming as a result of WWE's exclusivity arrangement with Peacock.  Although MLW had been offering its programs for streaming on YouTube, that platform did not afford it a meaningful audience, and YouTube afforded MLW no fees for the rights to its programs and marketing support which are critical to its success as a business.

109.    To survive economically and meaningfully compete in the Relevant Market, professional wrestling promotion companies need fair, competitive access to media rights partners. As a result of WWE's past and continuing anti-competitive and unlawful conduct, including WWE's interference with MLW's media rights agreements, MLW has suffered antitrust injury, which includes the diminishment and continued decline of its brand recognition, the past and ongoing losses of its valuable talent, and the threatened irreparable destruction of its business.

## FIRST CLAIM FOR RELIEF
### (Monopolization Under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)

110.    Plaintiff MLW realleges and incorporates by reference Paragraphs 1 through 109 as if fully alleged herein.

111.    The Relevant Market is the national market for the sale or licensing of media rights for professional wrestling programs in the United States.

112.    WWE has willfully acquired and maintained monopoly power in the Relevant

Market.  WWE is the dominant competitor in the Relevant Market and has captured approximately

92% of the revenues for the sale or licensing of media rights for professional wrestling programming

in the United States.  WWE's dominance and the high barriers to entry in the Relevant Market give

it the ability to raise prices and exclude competition in the Relevant Market.

113.    WWE has systematically increased competitors' costs to access inputs critical to the

creation of professional wrestling programming by entering into exclusive dealing arrangements

with major media companies, controlling talent through exclusive agreements, predatory hiring of

competitors' well-recognized talent, and blocking access to arenas where live professional wrestling

events are performed and programming is produced.

114.    WWE has willfully acquired and maintained monopoly power in the Relevant Market

by means of anti-competitive, exclusionary, and predatory business practices including, among other

things, entering into exclusive dealing arrangements with major media companies, arenas, and

wrestlers, interfering with contracts (including competing promotions' contracts for the sale or

licensing of media rights to their programming with media companies and contracts with arenas and

with wrestlers), and predatory hiring.  As a result of WWE's anti-competitive conduct, WWE has

unlawfully restrained and undermined competition, thus maintaining and building its dominance of

the Relevant Market.

115.    Because of its unlawful acts of interference with MLW's contractual relations,

including its predatory efforts to prevent MLW and other competing promotions from selling or

licensing their media rights for professional wrestling programming for distribution on media

platforms such as Fox, Tubi, USA Network, Peacock, and VICE TV, among other unlawful acts,

WWE has harmed MLW's ability to attract and acquire talent, gain exposure to new customers,

attract and enter into business partnerships for its media rights, and to operate and meaningfully

compete in the market.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

116.    WWE's exclusionary behavior has also stifled competition generally.  Competing promotions' ability to grow, produce content and pose a viable threat to WWE's monopoly power is diminished, resulting in harm to purchasers in the Relevant Market by a reduction of choice and elimination of price competition.

117.    WWE's willful conduct as described above has given it the ability to increase prices and exclude competition and has caused antitrust injury, and WWE has exercised its monopoly power to extract supracompetitive prices for the sale or licensing of media rights for professional wrestling programming.

118.    There is no legitimate business justification for WWE's conduct.

119.    MLW has suffered and will suffer irreparable harm to its business from its antitrust injuries caused by WWE's unlawful attempts to exclude competitors, manipulate the market, and unlawfully attempt to monopolize the Relevant Market.  MLW therefore is entitled to an injunction that terminates the ongoing violations alleged in this Complaint pursuant to Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

120.    MLW also has incurred and will continue to incur actual damages as a result of WWE's anti-competitive conduct and is entitled to recover treble damages along with reasonable attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**
**(Attempted Monopolization Under the Sherman Antitrust Act, 15 U.S.C. § 2)**

121.    Plaintiff MLW realleges and incorporates by reference Paragraphs 1 through 120 as if fully alleged herein.

122.    The Relevant Market is the national market for the sale or licensing of media rights for professional wrestling programs in the United States.

123.    WWE's predatory, exclusionary, and anti-competitive business practices include, among other things, entering into exclusive dealing arrangements with major media companies,

arenas, and wrestlers, interfering with competing promotions' contracts for the sale or licensing of media rights to their programming and contracts with arenas and with wrestlers, and predatory hiring.  As a result of WWE's anti-competitive conduct, WWE has unlawfully restrained and undermined competition, thus maintaining and building its dominance of the Relevant Market, and threatens a dangerous probability of success at monopolizing the Relevant Market.

124.    WWE's predatory efforts to prevent and exclude MLW and other competing promotions from selling or licensing their media rights for professional wrestling programming for distribution on media platforms such as Fox, Tubi, USA Network, Peacock, and VICE TV were done with the specific intent to attempt to monopolize the Relevant Market in violation of Section 2 of the Sherman Antitrust Act.

125.    Because of its unlawful acts of interference with MLW's contractual relations, among other unlawful acts, WWE has harmed MLW's ability to attract and acquire talent, gain exposure to new customers, attract and enter into business partnerships for its media rights, and to operate and meaningfully compete in the market.

126.    Because of WWE's history of anti-competitive behavior, such as interfering with its competitors' contracts, and WWE's entrenched domination of the market, there is a dangerous probability that WWE will be successful in its intended goal of attempting to acquire or maintain monopoly power in the Relevant Market.

127.    There is no legitimate business justification for WWE's conduct.

128.    MLW has suffered and will suffer irreparable harm to its business from its antitrust injuries caused by WWE's unlawful attempts to exclude competitors, manipulate the market, and unlawfully attempt to monopolize the Relevant Market.  MLW therefore is entitled to an injunction that terminates the ongoing violations alleged in this Complaint pursuant to Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD

129.    MLW also has incurred and will continue to incur actual damages as a result of WWE's anti-competitive conduct and is entitled to recover treble damages along with reasonable attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF
### (Intentional Interference with Prospective Economic Advantage)

130.    Plaintiff MLW realleges and incorporates by reference Paragraphs 1 through 129 as if fully alleged herein.

131.    As alleged herein, in the spring of 2021, MLW announced that it had an agreement with VICE for the airing of older MLW programs on VICE platforms.  At the same time, MLW was negotiating a media rights deal with VICE that would have resulted in an array of MLW programs airing on VICE platforms.

132.    In June 2021, after WWE learned about the growing relationship between VICE and MLW, WWE executive Levison warned a VICE executive to stop airing MLW programs, saying that Vince McMahon was "pissed" that VICE was airing MLW programs.  At the time, WWE knew that VICE needed continued acquiescence, if not cooperation, from WWE for purposes of ongoing coverage of professional wrestling, and that this gave WWE leverage in discussions with VICE.

133.    The VICE executive responded to Levison that "I think this is illegal what you're doing" and that it was probably an antitrust violation.  Levison responded that she could not control McMahon.

134.    As a result of WWE's threats to VICE, VICE stopped engaging in discussions with MLW about an expanded media rights deal.  While VICE subsequently aired one MLW program in the fall of 2021, this was far smaller than the broad media rights deal the parties had been discussing before WWE's interference.  That media rights deal would have resulted in expanded profits and marketing opportunities for MLW.

135.    WWE acted with malice and willful disregard for MLW's prospective economic advantage with the intent of causing harm to MLW and MLW's relationship with VICE.  MLW has been damaged as a result of WWE's tortious and wrongful conduct, which was a substantial factor in causing that harm, including lost profits and marketing opportunities.

136.    By reason of the foregoing, MLW has incurred and will continue to incur actual damages in an amount to be determined at trial.  Because WWE acted with oppression, fraud and malice, MLW is also entitled to exemplary damages.

**FOURTH CLAIM FOR RELIEF**
**(Intentional Interference with Contractual Relations)**

137.    Plaintiff MLW realleges and incorporates by reference Paragraphs 1 through 136 as if fully alleged herein.

138.    MLW had a valid and enforceable contract with Tubi, executed ██████████ in the State of California, which is home to two of the largest national media markets and where Tubi is headquartered.

139.    MLW substantially performed its obligations under the License Agreement and was ready, willing and able to do so by, among other things, investing resources to rent space for a scheduled live performance, hiring staff for a planned series to be aired and distributed through Tubi, hiring editors, a public relations agency and a marketing consultant, and retaining several new wrestlers.

140.    Also as a result of entering into the License Agreement, MLW lost potential economic opportunities when it ceased all talks with other potential partners and rights bidders ██████████.

141.    WWE knew about the existence and terms of the License Agreement.  With the intent of disrupting that contract, WWE demanded that Tubi terminate the License Agreement.  WWE knew that it had leverage over Tubi due to WWE's business relationship with Tubi and its affiliate,

1  Fox.  WWE caused a disruption of the contractual relations by wrongfully inducing Tubi's early

2  termination of the License Agreement.

3      142.    WWE, acting with malice and willful disregard for MLW's rights, interfered with the

4  License Agreement with the intent of causing harm to MLW.  MLW has been damaged as a result of

5  WWE's tortious and wrongful conduct, which was a substantial factor in causing that harm,

6  including lost profits and money expended preparing programming pursuant to the now-terminated

7  contract.

8      143.    By reason of the foregoing, MLW has incurred and will continue to incur actual

9  damages in an amount to be determined at trial.  Because WWE acted with oppression, fraud and

10  malice, MLW is also entitled to exemplary damages.

**FIFTH CLAIM FOR RELIEF**
**(Cal. Bus. & Prof. Code §17200 _et seq._)**

13      144.    Plaintiff MLW realleges and incorporates by reference Paragraphs 1 through 143 as if

14  fully alleged herein.

15      145.    As described herein, WWE has a history of attempting to unfairly compete against

16  MLW.  Beginning from as early as 2018, WWE attempted to hire away MLW's talent under

17  contract.  WWE also attempted to induce MLW's wrestlers to breach their contracts.

18      146.    WWE's efforts to prevent MLW from broadcasting its licensed programs on other

19  media platforms, such as VICE TV and Tubi, violated Section 17200 of California's Business and

20  Professions Code (the Unfair Competition Law or "UCL") and California common law.  WWE's

21  anti-competitive conduct also violated the UCL.

22      147.    MLW is entitled to an injunction barring WWE from further interference with

23  MLW's operations and business opportunities.

**DEMAND FOR A JURY TRIAL**

25  MLW hereby demands a trial by jury of all issues triable of right by a jury.

26  42

**PRAYER FOR RELIEF**

WHEREFORE, MLW prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including but not limited to an order granting:

1. Judgment in favor of MLW and against WWE;

2. A declaration that WWE's unlawful and predatory interference with MLW's access to the Relevant Market was and is decreed a violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

3. An award of actual damages and all damages that were a natural result of WWE's tortious conduct, in an amount to be calculated at trial, inclusive of any pre-judgment or post-judgment interest accrued, pursuant to Cal. Civ. Code § 3333;

4. An award of exemplary damages for WWE's oppressive and malicious tortious conduct, pursuant to Cal. Civ. Code § 3294;

5. Injunctive relief to prevent WWE from engaging in anti-competitive and unfair business practices towards MLW pursuant to California Business and Professions Code § 17200 *et seq.*;

6. Injunctive relief to prevent WWE from engaging in anti-competitive and unfair business practices towards MLW pursuant to Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26;

7. An award of treble the amount of MLW's damages resulting from its antitrust injuries to be proven at trial in accordance with Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15;

8. An award of MLW's costs and expenses of litigation, including attorneys' fees and expert witness fees, in accordance with Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15;

9. Interest; and

43

10. Such other relief as the Court deems just and proper.

Dated: March 6, 2023                        Respectfully submitted,

                                            */s/ Christine A. Montenegro*
                                            Jason S. Takenouchi (CBN 234835)
                                            **Kasowitz Benson Torres LLP**
                                            101 California Street, Suite 3000
                                            San Francisco, California 94111
                                            Telephone: (415) 421-6140
                                            Fax: (415) 398-5030
                                            JTakenouchi@kasowitz.com

                                            Marc E. Kasowitz (*pro hac vice*)
                                            Christine A. Montenegro (*pro hac vice*)
                                            Nicholas A. Rendino (*pro hac vice*)
                                            **Kasowitz Benson Torres LLP**
                                            1633 Broadway
                                            New York, New York 10019
                                            Telephone: (212) 506-1700
                                            Fax: (212) 506-1800
                                            mkasowitz@kasowitz.com
                                            cmontenegro@kasowitz.com
                                            nrendino@kasowitz.com

                                            *Attorneys for Plaintiff MLW Media LLC*

FIRST AMENDED COMPLAINT
Case No. 5:22-cv-179-EJD