Daniel W. Fox (SBN 268757)
K&L GATES LLP
Four Embarcadero Center
San Francisco, CA  94103
Telephone: (415) 882-8200
Facsimile:  (415) 882-8220
daniel.fox@klgates.com

Jerry S. McDevitt (*pro hac vice*)
K&L GATES LLP
210 Sixth Ave.
Pittsburgh, PA 15222
Telephone:  (412) 355-8608
jerry.mcdevitt@klgates.com

Christopher S. Finnerty (*pro hac vice*)
Morgan Nickerson (*pro hac vice*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone:  (617) 261-3123
christopher.finnerty@klgates.com
morgan.nickerson@klgates.com

Derek W. Kelley (*pro hac vice*)
K&L GATES LLP
1601 K St. NW #1
Washington, D.C. 20006
Telephone: (202) 778-9467
derek.kelley@klgates.com

*Counsel for Defendant*
World Wrestling Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MLW MEDIA LLC, | **Case No. 5:22-cv-00179-EJD** |
| Plaintiff, | **DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF MLW MEDIA LLC'S FIRST AMENDED COMPLAINT AND MEMORANDUM IN SUPPORT** |
| v. | |
| WORLD WRESTLING ENTERTAINMENT, INC., | |
| Defendant. | Hearing Date: July 20, 2023 Time: 9:00 AM Place: Courtroom 4 or videoconference Judge: Hon. Edward J. Davila |

1

## NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT

2

**PLEASE TAKE NOTICE** that on July 20, 2023, or as soon thereafter as this matter may

3

be heard, either in Courtroom 4 of this Court, located at 280 South 1st Street, San Jose, California

4

95113, or by videoconference or teleconference (if the Court prefers), Defendant World Wrestling

5

Entertainment, Inc. ("WWE") will and hereby does move the Court for an order granting

6

Defendant's Motion to Dismiss Plaintiff MLW Media LLC's ("MLW") First Amended Complaint

7

("FAC") with prejudice.  The grounds for dismissal are as follows:

8

*First*, MLW has failed to allege antitrust claims for monopolization or attempted

9

monopolization.  Both claims require allegations of (1) a relevant product and geographic market;

10

(2) monopoly power or the dangerous probability of obtaining monopoly power; (3)

11

anticompetitive conduct; and (4) antitrust standing. MLW fails to plausibly allege any of these

12

elements.

13

*Second*, MLW's state law claims for intentional interference with contractual relations,

14

intentional interference with prospective economic advantage, and a violation of California's

15

Unfair Competition Law must be dismissed for lack of subject matter jurisdiction.

16

*Third*, if MLW's antitrust claims survive, MLW's state law claims must be dismissed for

17

failure to state a claim, as discussed in WWE's initial motion to dismiss, ECF 19, pp. 16-22, and

18

incorporated by reference herein.

19

*Fourth*, WWE respectfully preserves the issue of whether this Court has personal

20

jurisdiction, as recent Supreme Court decisions call binding Ninth Circuit precedent into question.

21

This Motion is based upon this Notice; the accompanying Memorandum of Points and

22

Authorities; any reply memorandum; the pleadings and files in this action; and such other matters

23

as may be presented at or before the hearing.

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

STATEMENT OF THE ISSUES TO BE DECIDED.................................................. 1

INTRODUCTION ..................................................................................................... 1

ARGUMENT AND AUTHORITIES ........................................................................ 4

   I.   MLW FAILS TO PLEAD PLAUSIBLE CLAIMS UNDER SECTION 2 OF THE SHERMAN ACT ................................................................................................ 4

      A.  MLW FAILS TO ALLEGE A PLAUSIBLE RELEVANT PRODUCT OR GEOGRAPHIC MARKET ........................................................................ 5

         i.   MLW Does Not Plead a Plausible Relevant Market around Professional Wrestling Media Rights ................................................................ 5

         ii.  MLW Does Not Even Attempt to Define a Geographic Market ........................... 7

      B.  MLW FAILS TO PLEAD THAT WWE POSSESSES MONOPOLY POWER OR HAS A DANGEROUS PROBABILITY OF OBTAINING IT.................................. 8

         i.   MLW Alleges No Direct Evidence of Monopoly Power........................................ 8

         ii.  MLW Alleges No Circumstantial Evidence of Monopoly Power ........................ 10

      C.  MLW DOES NOT PLEAD ANTICOMPETITIVE CONDUCT .............................. 13

         i.   MLW Does Not Plead Substantial Foreclosure of Television Networks and Streaming Services ............................................................................. 14

         ii.  MLW Does Not Plead Substantial Foreclosure of Professional Wrestlers or Arenas .............................................................................................. 17

      D.  MLW STILL FAILS TO PLEAD ANTITRUST INJURY ........................................ 21

  II.  MLW FAILS TO PLEAD COGNIZABLE STATE LAW CLAIMS .............................. 24

  III.  WWE RESPECTFULLY PRESERVES THE ISSUE OF THIS COURT'S PERSONAL JURISDICTION OVER WWE ........................................................................... 24

CONCLUSION ........................................................................................................ 25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
5
*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
    368 F.3d 1174 (9th Cir. 2004)............................................................................ 24

6
7
*Aerotec Intern., Inc. v. Honeywell Intern., Inc.*,
    4 F. Supp. 3d 1123 (D. Ariz. 2014)................................................................... 13

8
*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
    190 F.3d 1051 (9th Cir. 1999)........................................................................... 21

9
10
*American Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*,
    108 F.3d 1147 (9th Cir. 1997)........................................................................... 18

11
12
*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................ 3

13
14
*BNSF Ry. Co. v. Tyrrell*,
    137 S. Ct. 1549 (2017)....................................................................................... 24

15
*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012)...................................................................... 21, 22

16
17
*Bristol-Myers Squibb v. Superior Court*,
    37 S. Ct. 1773 (2017)......................................................................................... 24

18
19
*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)........................................................................................... 10

20
*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)........................................................................................... 20

21
22
*Church & Dwight Co. v. Mayer Labs., Inc.*,
    868 F. Supp. 2d 876 (N.D. Cal. 2012) .............................................................. 13

23
24
*Colonial Med. Group, Inc. v. Catholic Healthcare West*,
    No. C-09-2192 MMC, 2010 WL 2108123 ........................................................... 7

25
*Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*,
    99 F.3d 937 (9th Cir.1996)................................................................................... 8

26
27
*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014)................................................................................ 4

28

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ...................................................................... 4

*Fox Film Corp. v. Doyal*,
    286 U.S. 123 (1932) ................................................................................................ 19

*Intel Corp. v. Fortress Inv. Grp. LLC*,
    511 F. Supp. 3d 1006 (N.D. Cal. 2021) .................................................................. 22

*Kaplan v. Burroughs Corp.*,
    611 F.2d 286 (9th Cir. 1979) .................................................................................... 5

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ................................................................................... 4

*Kolon Indus., Inc. v. EI DuPont de Nemours and Co.*,
    748 F.3d 160 (4th Cir. 2014) .................................................................................. 15

*Le v. Zuffa, Inc.*,
    216 F.Supp.3d 1154 (D. Nev. 2016) ....................................................................... 17

*Leegin Creative Leath Prod., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ................................................................................................ 21

*McGlinchy v. Shell Chemical*,
    845 F.2d 802, 813 .................................................................................................... 23

*Netafirm Irrigation, Inc. v. Jain Irrigation, Inc.*,
    2022 WL 2791201 (E.D. Cal. Jul. 15, 2022) .......................................................... 21

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................................... 5, 7

*In re NFL's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ................................................................................ 21

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
    305 F. Supp. 3d 1065 (N.D. Cal. 2018) .................................................................. 22

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) ................................................................................................ 21

*Olin Corp. v. FTC*,
    986 F.2d 1295 (9th Cir. 1993) ................................................................................ 10

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    No. 5:16-CV-06370-EJD, 2017 WL 4310767 (N.D. Cal. Sept. 28, 2017) ............. 11

*Power Analytics Corp. v. Operation Tech., Inc.*,
    2018 WL 10231437 (C.D. Cal. Jul. 24, 2018) ........................................................ 14

*Rebel Oil Co., Inc. v. Atlantic Richfield, Co.*,
    51 F.3d 1421 (9th Cir.) ........................................................................... 8, 11, 14

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ................................................................ 22

*Sidibe v. Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) .................................................................... 8

*Somers v. Apple*,
    729 F.3d 953 (9th Cir. 2013) ............................................................................. 23

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
    376 F.3d 1065 (11th Cir. 2004) ......................................................................... 22

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................... 4, 20

*Stiles v. Walmart, Inc.*,
    2022 WL 16806210 (E.D. Cal. Nov. 7, 2022) ....................................................... 22

*Titan Sports, Inc. v. Turner Broadcasting Sys., Inc.*,
    981 F. Supp. 65 (D. Conn. 1997) ....................................................................... 19

*Tops Mkts. v. Quality Mkts.*,
    142 F.3d 90 (2d Cir. 1998) .............................................................................. 13

*United States v. AMR Corp.*,
    140 F. Supp.2d 1141 (D. Kan. 2001) .................................................................. 12

*United States v. Archer-Daniels-Midland Co.*,
    781 F. Supp. 1400 (S.D. Iowa 1991) .................................................................... 9

*United States v. Dentsply Int'l, Inc.*
    399 F.3d 181 (3d Cir. 2005) ............................................................................. 15

*United States v. H&R Block, Inc.*
    833 F. Supp. 2d 36 (D.D.C. 2011) ...................................................................... 12

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ....................................................................... 12, 13

*Verizon Commc'ns Inc. v. Law offices of Curts V. Trinko, LLP*,
    540 U.S. 398, 407 (2004) ........................................................................... 10, 13

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**CASE NO. 5:22-CV-00179-EJD**

*Western Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
  65 F. Supp. 2d 1052 (N.D. Cal. 1998) ................................................................. 10, 12

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
  588 F.3d 659 (9th Cir. 2009) ........................................................................................ 4, 9

*Zef Scientific, Inc. v. Shimadzu Scientific Instruments*,
  2016 WL 1255787 (S.D. Cal. Mar. 31, 2016) ..................................................... 23

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ......................................................................................... 14

**Statutes**

Ca. Bus. and Prof. Code § 17200 *et seq.* ....................................................................... 1, 1

Clayton Act, 15 U.S.C. § 22 ............................................................................................... 24

Sherman Act, 15 U.S.C. § 2 ................................................................................... 1, 4, 23

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ......................................................................................................... 3

Fed. R. Civ. P. 12(c) ............................................................................................................ 23

1

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**STATEMENT OF THE ISSUES TO BE DECIDED**

3       1.      Whether the Court should dismiss the entire complaint for failure to state a claim

4   and lack of subject matter jurisdiction, where plaintiff fails to plausibly allege violations of

5   Sherman Act § 2, and this Court thus has no supplemental jurisdiction over state law claims asserted

6   against a non-diverse defendant.

7       2.      Whether the Court should separately dismiss state law claims for intentional

8   interference with contractual relations, intentional interference with prospective economic

9   advantage, and a violation of California's Unfair Competition Law, where plaintiff failed to

10  plausibly allege such conduct by defendant.

11      3.      Whether the Court should dismiss the complaint for lack of personal jurisdiction,

12  where neither party is a resident of California, no harm specific to California is alleged, and none

13  of the alleged misconduct took place in California.

14                              **INTRODUCTION**

15      Last year, MLW filed this baseless lawsuit, falsely claiming that it could not sell its media

16  rights because of nonexistent antitrust violations by WWE.  It now admits in its equally baseless

17  first amended complaint ("FAC") that it in fact sold its media rights to a cable network, Reelz.  It

18  also now admits that All Elite Wrestling ("AEW") expanded its sale of media rights since its 2019

19  launch and that recent entrant Women of Wrestling ("WOW") successfully sold its media rights

20  for allegedly millions of dollars as well.  FAC ¶¶ 55, 62.  Rather than suggest any lessening of

21  competition, the FAC shows that producers of professional wrestling content continue to thrive.

22  Indeed, by MLW's own admission, more wrestling promotions today are successfully selling media

23  rights than have in decades.

24      These are the simple truths that MLW cannot overcome.  No matter how many bites at the

25  apple it gets, MLW cannot erase the fact that wrestling promotions have all the tools needed to

26  succeed, and that WWE has done nothing to inhibit their success.  Thus, despite its best attempts

27

28

at reviving its moribund antitrust claims, MLW's FAC suffers the same incurable defects as the original.

**First**, MLW's proposed market definition remains fatally flawed. MLW alleges a relevant product market around "the sale or licensing of media rights for professional wrestling programming." FAC ¶ 1. In layman's terms, MLW asserts that networks and streaming services do not consider television content featuring professional wrestling to be reasonably interchangeable with other forms of television content. However, MLW again fails to allege any facts suggesting that media companies view wrestling shows any differently from courtroom dramas, zombie shows, scripted reality shows, or other kinds of fictional programming. This Court dismissed MLW's first complaint because it failed to plead "allegations addressing why other 'sports entertainment' or 'media' content for which broadcast rights might be sold to distribution channels are not appropriate substitutes." ECF 62, p. 6. That same deficiency remains and the Court should, once again, dismiss MLW's antitrust claims for this reason alone.

**Second**, MLW's assertion that WWE possesses or has a dangerous probability of obtaining monopoly power remains equally flawed. The Court found that MLW included only "bare" allegations of high market shares and failed to sufficiently allege direct evidence of monopoly power. ECF 62, p. 7-8. Even if the Court accepts MLW's botched attempt at defining a narrow market around professional wrestling shows, the FAC continues to lack any non-conclusory allegations that WWE wields market or monopoly power over the hundreds of networks and streaming services with which it has no commercial relationships.

**Third**, MLW has not alleged any anticompetitive conduct. MLW now asserts two theories of such conduct: (1) WWE foreclosed MLW from the "key" or "favored" networks and streaming services, which are the direct customers for wrestling media rights; and (2) WWE foreclosed MLW from vital input markets – wrestlers and arenas – that it needs to produce the television content that it sells to networks and streaming services. Neither theory passes muster.

- No matter how much MLW attempts to narrow the pool of potential purchasers through conclusory labels such as "key" or "favored," MLW can never plausibly allege that WWE's

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**CASE NO. 5:22-CV-00179-EJD**

1   purportedly exclusive contracts with just FOX and NBCUniversal prevent it from selling to

2   the numerous alternative purchasers of media rights (including channels and platforms

3   owned by Disney, Netflix, WarnerBros/Discovery, CBS, and Amazon) with which WWE

4   has no alleged commercial relationships.  Indeed, MLW could never plausibly allege this

5   because, based on the FAC, MLW never attempted to sell its media rights to any of these

6   companies.  Furthermore, MLW refutes its own allegations when it admits that it

7   successfully sold its linear television media rights to a cable network.

8   • MLW's attempt to allege input foreclosure trips at the starting line.  MLW does not even

9   attempt to define relevant markets for wrestlers or arenas, thus providing no possible basis

10   to measure foreclosure from either input.  Furthermore, MLW does not attempt to plead

11   even one instance of WWE unlawfully interfering with MLW's contracts with professional

12   wrestlers or venues.  Indeed, MLW does not allege that WWE ever prevented it from

13   securing a *single* venue.

14   **Fourth**, MLW continues not to allege any harm to "competition at large."  ECF 62, p. 8.

15   As the Court is well aware, the antitrust laws protect competition, not competitors, yet the FAC

16   still fails to allege any plausible facts demonstrating harm to the competitive process.  Indeed,

17   MLW has now pled that the competition to sell media rights has *intensified* since MLW first filed

18   its complaint last year, with MLW and WWE's other alleged competitors securing new, material

19   media rights agreements.

20   Separate from the antitrust claims, MLW raises California state law claims for intentional

21   interference with contractual relations, intentional interference with prospective economic

22   relations, and a violation of the UCL.  As before, this Court should dismiss those claims for lack of

23   subject matter jurisdiction.  As the allegations in the FAC are otherwise unchanged from the

24   original complaint, WWE refers the Court to its arguments in its prior Motion to Dismiss, ECF 19,

25   and incorporates those arguments by reference herein.

26   For these reasons addressed more fully below, WWE respectfully requests that this Court

27   dismiss MLW's FAC with prejudice.

28

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**CASE NO. 5:22-CV-00179-EJD**

## ARGUMENT AND AUTHORITIES

To survive a Rule 12(b)(6) motion, MLW's factual allegations must be sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558, 570 (2007). "However, as the Supreme Court has noted precisely in the context of private antitrust litigation, 'it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.'" *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1025 (N.D. Cal. 2015) (quoting *Twombly*, 550 U.S. at 558-59). "As such, 'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Id.* at 1025–26 (quoting *Assoc.'d Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983), quoted with approval in *Twombly*, 550 U.S. at 559). Thus, "[a]llegations of facts that could just as easily suggest rational, legal business behavior" are insufficient to plead an antitrust case. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008). Indeed, allegations of wrongdoing must be "plausible in light of basic economic principles." *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009). And, "[w]hen considering plausibility, courts must also consider an 'obvious alternative explanation[]' for defendant's behavior." *Eclectic Props. E., LLC v. Marcus & Millichap Co.,* 751 F.3d 990, 996 (9th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2008)).

### I.      MLW Fails to Plead Plausible Claims under Section 2 of the Sherman Act

MLW asserts monopolization and attempted monopolization claims under Section 2 of the Sherman Act.[1]  These claims both fail for four (4) reasons.  First, MLW still fails to allege a plausible relevant market around media rights for professional wrestling.  Second, MLW still fails to allege that WWE possesses or has a dangerous probability of obtaining monopoly power within

---

[1] The elements of monopolization and attempted monopolization claims are the same except that, while a monopolization claim requires allegations of monopoly power, an attempted monopolization claim requires allegations only of a dangerous probability of obtaining monopoly power. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

any relevant market.  Third, MLW still fails to plead substantial foreclosure in the supposed market for professional wrestling media rights sold to television networks and streaming services, as well as in the now referenced (but not remotely defined) input "markets" for professional wrestlers or arenas used to produce television content.  And fourth, MLW still fails to plead antitrust injury and harm to competition.  Each of these deficiencies alone requires dismissal of MLW's Sherman Act claims.   Taken together, these deficiencies reveal that MLW's theory of antitrust liability is hopelessly flawed and must be dismissed.

### A. MLW Fails to Allege a Plausible Relevant Product or Geographic Market

As this Court held, a relevant product market must "encompass the product at issue as well as all economic substitutes for the product."  ECF 62, p. 4 (citing *Newcal Indus., Inc. v. Ikon Office Sol.,* 513 F.3d 1038, 1045 (9th Cir. 2008)).  "The principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services."  *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 291-92 (9th Cir. 1979).  "Authorities far too numerous to cite or discuss in detail have established" that "[t]he principle most fundamental to product market definition is 'cross-elasticity of demand.'"  *Id.*  "In defining the relevant market, the court must look beyond the particular commodity produced by an alleged monopolist because the relevant product market for determining monopoly power, or the threat of monopoly control, depends upon the availability of alternative commodities for buyers."  *Id.* at 292 (citing *Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296, 1301 (9th Cir. 1978)).  "A plaintiff cannot ignore economic reality and 'arbitrarily choose the product market relevant to its claims'; rather, the plaintiff must 'justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand.'"  *Reilly*, 2022 WL 74162, at *4 (citing *Buccaneer Energy (USA) v. Gunnison Energy Corp.,* 846 F.3d 1297, 1313 (10th Cir. 2017)).

### i. MLW Does Not Plead a Plausible Relevant Market around Professional Wrestling Media Rights

MLW's attempt to define a relevant product market around "the sale or licensing of media rights for professional wrestling programming" remains hopelessly flawed and narrow.  MLW still

has not and could never allege that purchasers – here, alleged to be television networks and streaming services – do not have reasonably interchangeable content alternatives to wrestling programming.  In attempting to define professional wrestling as an antitrust market, MLW simply asserts that "professional wrestling presents scripted athletic performances featuring theatrical gimmicks and creative storylines . . ."  FAC ¶ 41.  If true, networks and streaming services could easily consider *American Ninja Warrior* or Tchaikovski's *The Nutcracker* as alternatives.  While professional wrestling might be a distinct genre of television show, WWE never disputed that its brand of sports entertainment is unique, just as zombie shows, courtroom dramas, or "reality" TV are distinct genres of television.  Nor did WWE dispute that there may be particular requirements for filming its shows, just as a zombie show may need heavy special effects and dilapidated filming locations, whereas a courtroom drama may only need suits, robes, and a single courtroom set.  At a fundamental level, however, MLW cannot explain how those differences make professional wrestling content not interchangeable with other popular fictional programming such as *The Walking Dead* or *Better Call Saul* (two programs in different genres recently aired by AMC in the same timeslot).

The FAC in fact admits that professional wrestling programming is just one type of content for which many substitutes exist.  MLW alleges that only a "tiny fraction of the vast number of US media platforms" air professional wrestling.  FAC ¶ 34.  This would be impossible if networks and streaming services viewed professional wrestling as without substitute.  The decision of many to air zero wrestling content confirms that they view other content as reasonable alternatives for professional wrestling.  Indeed, MLW even admits that, when it supposedly "ceased all talks with other potential partners in mid-July 2021," those potential partners did not stop airing programming and "go dark" but instead *purchased other non-wrestling content*.  FAC ¶¶ 97, 107.

MLW's attempts to plead a lack of cross-elasticity of demand fail to meet the *Twombly* pleading threshold.  It states in conclusory fashion that "no meaningful substitute for professional wrestling programming" exists. FAC ¶ 41.  It supports this statement with the ridiculous observation that one WWE program supposedly lost only 8% of its viewers to the State of the

Union.  FAC ¶ 46.  This fact at most suggests that wrestling viewers do not view a Presidential speech as an alternative to professional wrestling.  It says nothing about the substitutability of other fictional programs.  Elsewhere, MLW states that "a study of consumers of WWE and professional wrestling programs found that the audience for WWE and professional wrestling programming skews male in the 35-44 years age range and is distinctive."  FAC ¶ 44.  However, to define a relevant market, MLW must plausibly allege that men aged 35-44 *only* watch professional wrestling, and thus networks and streaming services *must* purchase professional wrestling content in order to attract those viewers.  MLW does not and could never allege this.

"In short, a plausible market requires alleged facts explaining why the products *included* in the market *are substitutes* for one another as well as alleged facts explaining why seemingly similar products *excluded* from the market *are not substitutes* for those in the market."  *Reilly*, 2022 WL 74162, *6 (emphasis in original).  MLW's FAC still falls woefully short of alleging these critical facts and is subject to dismissal for this reason alone.  *See, e.g.*, *Colonial Med. Group, Inc. v. Catholic Healthcare West*, No. C-09-2192 MMC, 2010 WL 2108123, at *3 (When a plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."); *see also Reilly*, 2022 WL 74162, *6 (dismissing complaint that failed to discuss cross-elasticity of demand).

### ii.  MLW Does Not Even Attempt to Define a Geographic Market

MLW's attempt at market definition should also be rejected for the basic failure to allege any fact to support its claim of a US geographic market.  "Antitrust law requires [an] allegation of both a product market *and* a geographic market."  *Newcal Indus., Inc. v. Ikon Office Sol.,* 513 F.3d 1038, 1045 n.4 (9th Cir. 2008) (emphasis added).  MLW does not allege a single fact suggesting the market for media rights is limited to the United States and is not, instead, a US and Canadian market or a global market.

**B.  MLW Fails to Plead that WWE Possesses Monopoly Power or has a Dangerous Probability of Obtaining It**

In dismissing MLW's complaint, this Court held that MLW's allegation of monopoly power was "unlikely to withstand a motion to dismiss."  ECF 62, p. 7.  The FAC presents the same deficiencies as the original complaint and, for that reason, should not survive a motion to dismiss.[2]

A plaintiff asserting either a monopolization or attempted monopolization claim must plausibly allege that the defendant possesses monopoly power or that there exists a dangerous probability of the defendant achieving monopoly power.  *See Image Tech. Servs.*, 125 F.3d at 1202; *Rebel Oil Co., Inc. v. Atlantic Richfield, Co.,* 51 F.3d 1421, 1434 (9th Cir.).  "Market power[3] can be proven by either direct or circumstantial evidence."  *Id.*

**i.  MLW Alleges No Direct Evidence of Monopoly Power**

Direct evidence "is the power to control prices or exclude competition."  *Image Tech. Servs., Inc.*, 125 F.3d at 1202.  MLW alleges neither.

First, MLW does not plausibly allege that WWE can control the price for professional wrestling media rights.  MLW alleges that WWE secured improved contractual terms during its 2018 negotiations with FOX and NBCUniversal.  FAC ¶ 56.  That alone is not direct evidence of price control.  *See Sidibe v. Health,* 4 F. Supp. 3d 1160, 1180 (N.D. Cal. 2013) (dismissing complaint because "Plaintiffs' conclusory allegations [that defendant forced consumers to pay more] do not establish direct evidence of market power").  It is as equally plausible, if not more so, that FOX and NBCUniversal – as two of the largest media companies on earth – ***competed*** with one another and with other large media companies to secure WWE's media rights.  Similarly, MLW asserts that WWE has power over NBCUniversal and FOX because they allegedly granted WWE mutual exclusivity in their contracts.  FAC ¶ 67.  However, MLW does not support its conclusion

---

[2] As before, MLW's failure to allege a relevant product means no further analysis is required.

[3] The terms "market power" and "monopoly power" are interchangeable.  *See Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.,* 99 F.3d 937, 950 n. 15 (9th Cir.1996); *Image Tech. Servs., Inc.*, 125 F.3d at 1202.

1   that mutual exclusivity is evidence of market power.  MLW does not consider the procompetitive

2   benefits of mutual exclusivity, such as encouraging mutual promotion or avoiding freeriding.

3        Second, MLW does not plausibly allege that WWE has the power to force a material number

4   of networks and streaming services (which include some of the world's largest companies) to

5   forego purchasing media rights from MLW or other professional wrestling promotions.  MLW

6   ignores that there are thousands of content providers (of which the WWE is but one) that sell

7   programming to networks and streaming services.  MLW further ignores that, in these countless

8   transactions, the *purchasers* of content wield predominately all the power, not the content

9   providers, and MLW pleads no facts to suggest otherwise.  Indeed,  WWE – which produces seven

10   (7) hours of weekly television content out of tens of thousands of content aired each week – can no

11   more control what networks and streaming services purchase than can the author of one book

12   control what other books Amazon, Barnes & Noble, and bookshops around the country purchase

13   and re-sell.

14        The FAC fatally shows that WWE cannot possibly control prices or exclude competitors.[4]

15   MLW alleges that WWE depends on its media rights agreements with media distribution channels

16   such as NBCUniversal and FOX for 85% of its revenue.  FAC ¶ 36.  As such, if media rights

17   distribution channels such as NBCUniversal or FOX refused to purchase WWE's broadcast rights,

18   WWE would lose 85% of its annual revenue.  Furthermore, even if WWE were the only active

19   wrestling promotion producing television content, nothing in the FAC suggests that these

20   purchasers could not sponsor a new promotion and create its own alternative.  *See United States v.*

21   *Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1416 (S.D. Iowa 1991) ("The existence of large,

22   powerful buyers of a product mitigates against the ability of sellers to raise prices."); *see also* Dep't

23   of Justice and Fed. Trade Comm'n Horizontal Merger Guidelines (Aug. 19, 2010) at § 8 (discussing

24   powerful buyers).

---

26   [4] MLW, of course, asserts (however implausibly) that WWE interfered with two distributors;

27   however, as explained *infra*, MLW fails to allege that it or any other wrestling company faced

28   *substantial foreclosure* from a significant number of networks or streaming services.

1    While it is absurd that WWE has monopoly power over its media partners, FOX and

2    NBCUniversal, the notion that WWE has monopoly power over networks and streaming services

3    with which it has no commercial relationship is wholly implausible "in light of basic economic

4    principles." *Atl. Richfield Co.*, 588 F.3d at 662.  MLW does not explain why large media companies

5    that derive *zero* revenue from WWE would not purchase other professional wrestling promotions'

6    media rights in order to compete with NBCUniversal and FOX.  To the contrary, MLW *admits* that

7    CBS, The CW, TBS, and TNT have all recently done just that.  The inability to exclude competitors

8    warrants dismissal.  *See W. Parcel Exp. v. UPS*, 190 F.3d 974, 977 (9th Cir. 1999).

9    **ii.   MLW Alleges No Circumstantial Evidence of Monopoly Power**

10    Without direct evidence of monopoly power, MLW must rely on circumstantial evidence.

11    As such, it must: "(1) define the relevant market, (2) show that the defendant owns a dominant

12    share of that market, and (3) show that there are significant barriers to entry and show that existing

13    competitors lack the capacity to increase their output in the short run." *Id*.  Even if monopoly power

14    is properly pled, mere "possession of monopoly power will not be found unlawful unless it is

15    accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns Inc. v. Law offices of*

16    *Curts V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis in original).  The FAC fails to meet this

17    burden.

18    ***First***, MLW alleges that WWE possesses 92% market share as measured by revenue

19    because it supposedly captured 92% of the money US networks and streaming services spent on

20    professional wrestling media rights in one year.  FAC ¶ 63.  This is wholly conclusory and facially

21    absurd for three reasons.

22    • MLW fails to allege any facts suggesting that revenues are an appropriate measure for

23    market share.  *See*, *e.g.*, *Olin Corp. v. FTC*, 986 F.2d 1295, 1298 n.2 (9th Cir. 1993)

24    (discussing market share figures based on capacity); *Brown Shoe Co. v. United States*, 370

25    U.S. 294, 342-343 n.69 (1962) (calculating share based on units, not revenues, so companies

26    that sold shoes in the "low and medium price ranges" would not be understated).

27

28

- MLW does not allege facts to link revenues to market share.  To do so, MLW needed to allege that WWE's revenue from NBCUniversal and FOX would somehow be dispersed among rival wrestling promotions without regard for WWE's superior quality or acumen. MLW alleges no facts suggesting FOX would pay the same price for one (1) hour of WWE content and for one (1) hour of MLW content.[5]

- MLW's measure of market share is inconsistent with its own allegations.  MLW suggests as an alternative that WWE has 69% market share based on total number of viewers of wrestling programming aired over television.  FAC ¶ 65.  Notably, this was MLW's measure for market share in its original complaint.  ECF 1 ¶¶ 23-24.  However, last year WWE's share of viewers was supposedly 85%.  With no alleged factual support for the shift from viewership to revenue, one is left to conclude that MLW would change its measure of market share yet again if AEW's share of media rights revenues increased following the next negotiation cycle.

**Second**, MLW does not plausibly allege that barriers to entry exist.  "Entry barriers are *additional* long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to earn monopoly returns."  *Rebel Oil Co.*, 51 F.3d at 1439 (emphasis added).  MLW pleads (without factual support) that barriers to entry include access to "key media partners," "wrestling talent," "arenas," and "brand recognition."  FAC ¶ 66.  Putting aside that agreements with "key media partners" is MLW's alleged relevant market, and thus cannot possibly be a barrier to entering that market, "[t]hese references are a start, but they are not enough."  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2017 WL 4310767, at *9 (N.D. Cal. Sept. 28, 2017). "Missing are any supporting facts taking the allegations from possible to plausible."  *Id.*  MLW

---

[5] The absurdity of this proposition reinforces the problems with MLW's proposed relevant market. In truth, networks and streaming services have a budget to spend to fill some set number of hours of television, and they desire to capture as many viewers as possible.  Media platforms offer rights fees based on those factors; they do not set aside fixed amounts for particular genres of television.

must, at minimum, allege *how much* it costs to produce professional wrestling programming, *how* exclusive contracts (which MLW itself admits to using) reduce the talent pool, and *which* arenas are necessary to produce content but cannot be secured.  "Without a better description of the purported entry barriers, the allegations are too conclusory to be entitled to an assumption of truth." *Id.*

Even if properly alleged, they still would not constitute barriers to entry in the antitrust sense.  "The mere fact that entry [would require] a large absolute expenditure of funds does not constitute a 'barrier to entry;' a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm." *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1062 (N.D. Cal. 1998) (quoting *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993)).  Yet the costs MLW purports to face are costs that WWE, AEW, NJPW, WOW, Impact, and any other company producing wrestling shows also face; MLW does not allege that it is uniquely disadvantaged.  At most, MLW pleads that it is expensive to compete and getting more so as additional competitors enter this alleged market, driving up the costs for inputs and fulfilling consumer demand.  But the Ninth Circuit has rejected the premise that "competition is itself a structural barrier to entry."  *United States v. Syufy Enters.*, 903 F.2d 659, 667 (9th Cir. 1990).

The success of AEW and WOW further undercuts MLW's unsupported assertion that substantial barriers to entry exist.  The FAC alleges that WWE's popularity is declining.  FAC ¶ 4.  During the same period, MLW alleged last year that AEW entered the proposed market and successfully sold broadcast rights to WarnerMedia (now Warner Bros. Discovery), and that it averaged 810,755 US viewers for its one program, *Dynamite*.  ECF 1 ¶ 23.  Now according to the FAC – and during the timeframe when WWE supposedly somehow raised barriers to entry – AEW sold media rights for an additional program, *Rampage*, and its total weekly viewership increased to 1,482,376.[6]  In addition, MLW alleges that yet another new wrestling promotion, WOW, has fared

---

[6] MLW alleges without support that AEW is yet to be profitable and that AEW's media rights contract is for $43.8 million annually, much less than WWE's alleged revenues of $670 million

better in business than it has by securing a media rights deal with CBS and The CW, the value of which MLW estimates may be as high as $8.45 million.  FAC ¶¶ 32, 62.  Based on MLW's own allegations, this competitive pressure appears to have cut WWE's share of total wrestling viewership from 85% to 69% in just one year.  The successful entry and expansion of rivals refutes the existence of substantial barriers to entry.  *See Tops Mkts. v. Quality Mkts.*, 142 F.3d 90, 99 (2d Cir. 1998) (finding no monopoly power given successful entry of competitor); *Syufy*, 903 F.2d at 665-67 (concluding that entry is easy because entrants reduced incumbent's market share from 100 to 75 percent in four years).

*Third*, MLW fails to allege that WWE's competitors, including AEW, NJPW, WOW, and Impact, could not increase their output.  To the contrary, MLW pleads increased output.  Nor does MLW allege that a network or streaming service could not develop or purchase its own professional wrestling promotion if it felt that insufficient output exists or that it required an alternative to WWE.  MLW cannot plead this because, with adequate funding and acumen, any content creator could create and distribute professional wrestling content.  This pleading failure *alone* is fatal to MLW's allegation of monopoly power.  *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 876, 899-900 (N.D. Cal. 2012) (finding no market power despite 75 percent share and barriers to entry where no showing that "rivals lack the capacity to expand output").

### C.  MLW Does Not Plead Anticompetitive Conduct

Were MLW able to plead the other elements of its antitrust claims, it would still fail to plead an "element of anticompetitive *conduct*."  *Trinko, LLP*, 540 U.S. at 407; *see also Aerotec Intern.,*

---

annually.  FAC ¶ 61.  However, AEW is a new company.  It is well established that new, disruptive entrants may sell at a lower price in order to quickly capture market share.  *See, e.g.*, *U.S. v. H&R Block, Inc.* 833 F. Supp. 2d 36, 79-80 (D.D.C. 2011) (discussing the competitive effects of "maverick" entrants); *U.S. v. AMR Corp.*, 140 F. Supp.2d 1141, 1209 (D. Kan. 2001) (low cost carriers captured market share from monopolist during period of alleged predatory pricing).  Without more, MLW's allegation that AEW is not a competitive force in the market is wholly conclusory.

*Inc. v. Honeywell Intern., Inc.*, 4 F. Supp. 3d 1123, 1136-37 (D. Ariz. 2014).  First, MLW fails to plausibly allege that WWE substantially foreclosed it from selling media rights to networks and streaming services.  Second, MLW fails to plausibly allege that WWE substantially foreclosed it from hiring professional wrestlers and booking arenas.

        **i.**  **MLW Does Not Plead Substantial Foreclosure of Television Networks and Streaming Services**

MLW cannot possibly allege that WWE's purported exclusive contracts with NBCUniversal's USA Network and Peacock streaming service and with FOX's television network substantially foreclose it from the relevant market.  MLW asserts that these contracts foreclose competitors from "92% of the potential media platforms" because NBCUniversal and FOX allegedly account for 92% of the US spend on professional wrestling media rights.  FAC ¶ 69.  As an initial matter, foreclosure must be based on customers, not revenues.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012) ("substantial foreclosure" measured by customers' purchase volumes and mandatory purchase requirements).  That is particularly obvious here.  There is no allegation, nor could there be, that the roughly $600 million that WWE allegedly receives annually for its media rights constitute the limited pool of potential revenue that wrestling companies could earn.  To the contrary, any network or streaming service is free to purchase wrestling media rights.  Many, such as TBS, TNT, and CBS, have allegedly done so recently.  Furthermore, no allegation exists, nor could it, that FOX or NBCUniversal would value MLW or other competitors' television content as highly as WWE's.  Indeed, were WWE to cease operations, no allegation plausibly establishes that MLW or another promotion would capture anywhere close to the same revenues from FOX or NBCUniversal.

Rather than complain about exclusive contracts with two companies, MLW must allege that WWE *substantially foreclosed* it from the whole market by excluding it from *at least* 30% or more of the purchasers of professional wrestling media rights.  *Rebel Oil*, 51 F.3d at 1438.  It does no such thing.  MLW does not allege that WWE in any way prevented it from selling programming to Disney networks (including ABC, Disney Channel, and Disney+), Paramount networks (including

CBS, MTV, and Nickelodeon, as well as Paramount+), Warner Brothers-Discovery networks (including TNT, TBS, HBO, Discovery, and TLC, as well as HBO Max), AMC Networks, Netflix, Amazon, Apple TV, PlutoTV, Roku, Pay-Per-View, or the hundreds (if not thousands) of other networks and streaming services.  Indeed, MLW fails to allege that it even *attempted* to sell its media rights to these companies.  MLW's failure to plausibly allege that these purchasers of media rights do not "represent a viable alternative" to NBCUniversal and FOX is fatal to MLW's allegation.  *See Power Analytics Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at *20 (C.D. Cal. Jul. 24, 2018).

MLW cannot save its deficient antitrust claims through conclusory allegations that WWE foreclosed it from the "key" or "favored" purchasers of professional wrestling media rights.  FAC ¶¶ 53, 68.  MLW borrows this concept from a Third Circuit case, *United States v. Dentsply Int'l, Inc.*  399 F.3d 181, 184 (3d Cir. 2005).  As explained in WWE's prior reply briefing, ECF 36, that court held that, although other dealers for false teeth existed, Dentsply had *de facto* exclusive contracts with the five (5) "key" dealers of artificial teeth that accounted for 83% of sales to dentists.  These five (5) dealers were the "real market" for false teeth, and other distribution networks did not provide sufficient access to dentists for Dentsply's competitors to compete.  *Id.* at 185, 189.[7] The allegations here do not remotely fit this paradigm.

***First***, MLW does not allege who these "key" purchasers even are.  At one point MLW appears to state that they are "major media companies."  FAC ¶ 12.  However, MLW never alleges what makes a media company "major."  Later, MLW seems to suggest that the "key" customers are instead the twenty (20) television networks and streaming services that purchased wrestling content in the past.  FAC ¶ 34.  This, of course, contradicts paragraph (12), as it would exclude numerous "major" media companies that have not yet purchased professional wrestling media rights but may in the future.  Moreover, identifying "key" purchasers based on past purchases

---

[7] There is considerable doubt whether the *Dentsply* theory of critical distributors applies to a case such as this, where MLW alleges that foreclosure from the ultimate consumers of media rights.  *See Kolon Indus., Inc. v. EI DuPont de Nemours and Co.*, 748 F.3d 160, 177 (4th Cir. 2014).

1   makes no sense in light of the FAC's own allegations.  If MLW crafted the same list in 2017, it

2   would have excluded TBS, TNT, CBS, and FOX, as these four (4) networks only recently began

3   purchasing professional wrestling content.  MLW's theory of "favored" purchasers is as absurd as

4   proclaiming *The Walking Dead* a monopolist in the "zombie show market" because it was once the

5   only one on television.  Of course, the producers of *The Walking Dead* and its contracts with AMC

6   in no way prevented Sony from selling *The Last of Us* to HBO.

7        ***Second***, even if MLW's vague allegations suggested that there are "key" purchasers of

8   professional wrestling media rights, MLW still has not alleged substantial foreclosure.  MLW only

9   alleges that WWE has exclusive contracts with FOX or NBCUniversal.  MLW fails to allege that

10  it ever attempted to sell content to the dozen-plus other "major" media companies or to the many

11  other past purchasers of professional wrestling content.  Thus, it has no factual basis to allege that

12  WWE foreclosed it from selling content to those purchasers.  Indeed, MLW could never allege this.

13  As discussed *supra*, WWE could not plausibly control the media rights purchases of companies

14  with which it has no commercial relationships.[8]  No matter how MLW attempts to narrow the

15  _____

16  [8] MLW asserts without factual support that WWE forced VICE to terminate negotiations with

17  MLW in exchange for participating in the production of one episode of The Dark Side of the Ring

18  that allegedly aired in October 2021.  FAC ¶ 90.  MLW has not alleged a single additional

19  interaction between WWE and VICE. Thus, it has not plausibly alleged that WWE prevented VICE

20  from purchasing MLW content in the intervening 18 months.  Similarly, MLW states, "[r]eporting

21  [] suggests that Reelz may not renew MLW's programming as a result of WWE's exclusivity

22  agreement with Peacock."  FAC ¶ 108.  Putting aside MLW's reference to uncited "reporting"

23  rather than to its own communications with Reelz, MLW's allegation is a red hearing.  Reelz is a

24  linear television channel.  After signing a contract with MLW, Reelz sought additional distribution

25  through Peacock.  FAC ¶ 11.  MLW alleges that Peacock refused to air Reelz' linear feed when

26  Reelz aired MLW.  FAC ¶ 53.  MLW does not allege that WWE prevents it from selling its media

27  rights to Reelz, nor that Reelz could distribute only through Peacock rather than, e.g., Amazon

28  Prime, Roku, Pluto, Apple TV, or other platforms.

1    potential number of purchasers, it cannot escape the reality that WWE only sells its media rights to

2    two of the many potential purchasers of MLW's content.

3         Absent allegations of substantial foreclosure, WWE's exclusive contracts remain lawful.

4    Indeed, "[i]f competitors can reach the ultimate consumers of the product by employing existing or

5    potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements]

6    foreclose competition from *any* part of the relevant market." *Omega*, 127 F.3d at 1164 (emphasis

7    in original).  MLW admits that AEW, NJPW, WOW, and even MLW all sell media rights for their

8    content.  FAC ¶ 32.  Thus, there is no foreclosure here, much less substantial foreclosure.

9             **ii. MLW Does Not Plead Substantial Foreclosure of Professional**

10                        **Wrestlers or Arenas**

11        As part of a new theory of anticompetitive conduct, MLW contends that WWE

12   "substantially increase[ed] barriers to entry in the Relevant Market" by making it harder for MLW

13   to secure professional wrestlers or arenas.  FAC ¶ 12.  Put differently, MLW alleges that

14   professional wrestlers and arenas are necessary inputs to producing television content, and WWE

15   somehow restricted MLW from accessing these inputs.  Any claim based on input foreclosure is

16   not plausibly alleged.

17        To start, MLW did not even attempt, as it must do, to allege relevant input markets around

18   professional wrestlers and arenas.  *Cf. Le v. Zuffa, Inc.*, 216 F.Supp.3d 1154, 1165 (D. Nev. 2016)

19   (alleging two relevant markets, one for "Elite Professional MMA bouts" and one for an input

20   market for "Elite Professional MMA Fighter services").  MLW states that professional wrestlers

21   are "athletic performers with the requisite skills, acting talent, and marketability to be professional

22   wrestlers."  FAC ¶12.  However, MLW fails to define the boundaries of a hypothetical market for

23   professional wrestlers and fails to plead how many wrestlers exist in that market.  Similarly, MLW

24   makes no attempt to define a market for arenas.  It says nothing about which arenas or venues are

25   suitable for producing professional wrestling programming, how many arenas a promotion needs

26   to film content, whether a promotion must travel to different arenas in order to produce content, or

27

28

1    even whether gyms, armories, or other venues are sufficient to constitute an "arena."  Without more,

2    MLW cannot possibly state a claim based on foreclosure in these undefined markets.

3         Had MLW adequately pled input markets for wrestlers and arenas, it would still not have

4    pled that WWE foreclosed it from those inputs.

5         Regarding arenas, MLW does not even attempt to allege that WWE foreclosed competitors

6    from at least 30% of those suitable for filming wrestling content, nor does it tie supposed

7    "monopoly" power in the sale of media rights to monopsony power over arenas.  MLW simply

8    states without support that WWE "leveraged its decades-long relationships with virtually every

9    major arena" in the US to block competitors from booking arenas.  However, MLW *never* alleges

10   that WWE prevented it from securing a *single* venue at any time or point in history, nor that WWE

11   has in any way driven up its cost to book arenas.  MLW alleges only *two* instances where WWE

12   purportedly attempted to prevent other third-parties from booking *two* arenas out of the presumably

13   thousands in the US.  First, MLW states that WWE attempted to block third-parties NJPW and

14   Ring of Honor from booking one arena, Madison Square Garden.  FAC ¶ 82.  However, MLW

15   admits that both companies ultimately booked the venue.  FAC ¶ 84.  Even if they could not have,

16   there is no allegation that Madison Square Garden is a necessary input for selling media rights.

17   Similarly, MLW nakedly claims that WWE prevented AEW from booking an arena in Cincinnati,

18   Ohio.  FAC ¶ 85.  Again, however, MLW does not allege that AEW was unable to film its television

19   show in Cincinnati, nor that filming in Cincinnati is a requirement to selling media rights.  As MLW

20   seems to suggest that there is a US-wide market for arenas, two arenas in two cities is nowhere near

21   substantial foreclosure.

22        Regarding professional wrestlers, MLW claims that WWE "restrict[s] [competitors']

23   access."  FAC ¶ 73.  As with arenas, MLW fails to allege any facts tying WWE's purported

24   "monopoly power" over networks and streaming services to some monopsonist power over a

25   hypothetical market for professional wrestlers.  Instead, MLW offers only conclusory assertions,

26   none of which can possibly support an antitrust claim.

27

28

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**CASE NO. 5:22-CV-00179-EJD**

- MLW accuses WWE of "aggressive and anti-competitive . . . predatory hiring." FAC ¶ 75. In truth, MLW is complaining that WWE properly and lawfully competes for wrestlers. Specifically, MLW claims that a WWE employee "reached out" to a single MLW wrestler to "encourage him to opt-out of his agreement with MLW." FAC ¶ 76. If the wrestler indeed had the ability to "opt-out" of his MLW contract, however, there is nothing unlawful about WWE competing for his services. Similarly, MLW alleges that WWE hired a talent from MLW and did not use him on WWE programming. FAC ¶ 77. However, "the court should not try to judge whether the acquired talent was used more effectively than readily available alternative personnel." *American Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 108 F.3d 1147, 1151 (9th Cir. 1997) (quoting Areeda, *Antitrust Law* ¶ 702b at 110). MLW's later assertion that WWE "hoards" talent (FAC ¶ 79), is similarly a misplaced complaint about robust competition for talent.

- MLW baldly states that WWE "blacklists" wrestlers that previously worked for MLW, thus incentivizing wrestlers not to contract with the company. FAC ¶ 78. However, MLW fails to identify even one wrestler threatened by WWE.[9]

- MLW complains that WWE retains intellectual property rights over the characters that WWE creates and that wrestlers portray when performing for WWE. FAC ¶ 80. However, a federal district court has already ruled that WWE's ownership interest in the characters delineated on its television product are as legitimate as DC's ownership interest in Superman. *Titan Sports, Inc. v. Turner Broadcasting Sys., Inc.*, 981 F. Supp. 65, 68 (D. Conn. 1997). It is, of course, blackletter law that enforcement of intellectual property rights does not constitute an antitrust violation. *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The owner of a copyright, if he pleases, may refrain from vending or licensing and

---

[9] MLW is well aware that this assertion is false. It alleges that WWE hired Davey Boy Smith Jr., who was previously contracted by MLW and who, after leaving WWE, began working again for MLW. FAC ¶ 77. In addition, WWE has hired numerous talents after they fulfilled their contractual obligations with MLW, including Matt Riddle and Kevin "Karrion Kross" Kesar.

content himself with simply exercising the right to exclude others from using his property."). At base, MLW is grousing that it cannot develop its own characters and would prefer to steal WWE's copyrighted characters.[10]

- Finally, MLW suggests that WWE should not use exclusive contracts with its wrestlers.[11] However, it is well settled that exclusive contracts are often procompetitive.[12] Furthermore, "exclusive personal services contracts cannot be 'predatory' as a matter of law," and "a monopolist does not have to share its employees with a competitor". *See Indep. Entertainment Group, Inc.* 853 F.Supp. 333, 340 (C.D. Cal. 1994). As in that case, MLW is "attempt[ing] to free-ride on [WWE's] investment in its star [wrestlers]." *Id.*

Were these conclusory allegations credited, they still could not plausibly show that WWE substantially foreclosed a hypothetical market for professional wrestlers. There is not even a conclusory allegation that WWE has contracts with 30% or more of the available professional wrestlers. Moreover, MLW never alleges that it or any other professional wrestling promotion has cancelled a single television taping or live event because they could not access talent. On the

---

[10] Indeed, even during the course of this litigation, WWE has had to send MLW a cease and desist letter regarding its attempted theft of the "Enzo Amore" character owned by WWE. (Attachment A).

[11] MLW suggests without support that WWE's contracts with wrestlers last up to twenty years. This is a misleading and uncited representation of WWE's 2021 Annual Report, which states that WWE has "[s]ervice contracts with certain vendors and independent contractors, including our talent, with terms ranging from one to twenty years." WWE 2021 Annual Report, available at https://corporate.wwe.com/~/media/Files/W/WWE/annual-reports/wwe-2021-annual-report.pdf. Talent contracts do not extend for twenty years.

[12] Indeed, MLW itself purports to sign wrestlers to exclusive contracts. FAC ¶ 76. MLW fails to allege facts even addressing plausible, procompetitive justifications for exclusive contracts, such as limiting the potential for wrestler injuries when working for other companies, ensuring that wrestlers are available when needed for filming or live events, or preventing free riding.

1    contrary, numerous promotions including MLW have successfully sold their media rights,

2    suggesting that they have access to the wrestlers needed to produce a marketable television product.

3                        **D.  MLW Still Fails to Plead Antitrust Injury**

4            As WWE previously explained, antitrust laws "were enacted for the protection

5    of *competition*, not *competitors*." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488

6    (1977).  Indeed, "[t]he law directs itself not against conduct which is competitive, even severely

7    so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc.*

8    *v. McQuillan*, 506 U.S. 447, 458 (1993).  Thus, a "plaintiff . . . must allege and prove harm, not

9    just to a single competitor, but to the competitive process, *i.e.*, to competition itself." *NYNEX Corp.*

10   *v. Discon, Inc.*, 525 U.S. 128, 135 (1998).

11           MLW still does not explain how WWE's purported conduct injured competition in the

12   proposed marketplace and not just MLW.  The Ninth Circuit is clear that an antitrust injury must

13   occur "in the market where competition is being restrained." *Am. Ad Mgmt.*, *Inc. v. Gen. Tel. Co.*

14   *of California*, 190 F.3d 1051, 1057 (9th Cir. 1999).  To state a claim, the alleged harm must be

15   "attributable to an anticompetitive aspect of the practice under scrutiny," harm that could have

16   occurred under the normal circumstances of free competition does not suffice.  *In re NFL's Sunday*

17   *Ticket Antitrust Litig.,* 933 F.3d 1136, 1150 (9th Cir. 2019) (citing *Atl. Richfield Co. v. USA*

18   *Petroleum Co.,* 495 U.S. 328, 334 (1990)).  MLW's allegations of harm are untethered to any harm

19   to competition.  MLW does not, and cannot, allege that it was unable to secure a sufficient number

20   of wrestlers in order to promote events and film television.  To the contrary, it and WWE's other

21   alleged competitors do just this.  Nor can MLW allege that WWE foreclosed MLW or its other

22   competitors from selling media rights.  Again, to the direct contrary, MLW alleges that AEW,

23   NJPW, WOW, and even itself have successfully sold media rights to networks and streaming

24   services.

25           MLW instead relies on the conclusory epithets of anticompetitive harm eschewed by the

26   Supreme Court.  MLW recites that, but for WWE's conduct, networks and streaming services

27   would have "access to professional wrestling programming at lower prices or without having to

28

pay supracompetitive fees, and they would have access to and enjoy a greater variety of professional wrestling programs with higher quality."  FAC ¶ 52.  However, "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition.  Both effects are fully consistent with a free, competitive market." *Brantley v. NBC Universal, Inc.,* 675 F.3d 1192, 1202 (9th Cir. 2012); s*ee also Leegin Creative Leath Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895-97 (2007) (higher consumer prices can result from procompetitive conduct); *Netafirm Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 WL 2791201, at *12 (E.D. Cal. Jul. 15, 2022) (dismissing complaint with "conclusory references to increased prices and reduced quality without factual allegations suggesting [customers] suffered harm," and noting that "limitation of consumer choice, in itself, does not amount to antitrust injury.") (internal citations omitted).  Furthermore, MLW cites no facts to suggest that networks and streaming services even pay "supracompetitive" fees for content.  To the contrary, MLW's allegations suggest that WWE merely benefited from direct competition between FOX and NBCUniversal for its media rights.  FAC ¶¶ 56-58.  The Court should reject as a conclusory label the unsupported assertion that a lawful, competitive bidding process produced "supracompetitive" prices.  *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1027 (N.D. Cal. 2021) ("supracompetitive" label is "conclusory"). [13]

Such conclusory allegations are insufficient to plead harm to competition as a plaintiff cannot "merely recite the bare legal conclusion that competition has been restrained unreasonably" but must instead "at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail." *Brantley,* 675 F.3d at 1198 (quotation marks omitted; alteration in

---

[13] Of course, as an alleged competitor to WWE, MLW would benefit from WWE driving prices up and thus has no standing to sue WWE for alleged supracompetitive pricing. *Stiles v. Walmart, Inc.*, 2022 WL 16806210, at *5 (E.D. Cal. Nov. 7, 2022) ("If prices increased and consumers were forced to pay more, they could sue; [a competitor] cannot.").  No doubt if FOX or NBCUniversal felt that WWE was a monopolist, either company has more than sufficient resources to bring its own antitrust claim.

original); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.,* 471 F. Supp. 3d 981, 998 (N.D. Cal. 2020) (rejecting as "nothing more than conclusory" allegations that plaintiffs "had their business and assets destroyed by Facebook's anticompetitive scheme, and are prevented from entry or reentry into the relevant markets because of Facebook's exclusionary conduct"); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.,* 305 F. Supp. 3d 1065, 1074 (N.D. Cal. 2018) (dismissing antitrust claims because "there are no non-conclusory allegations that [defendant's] actions restrained trade in the relevant market or injured overall competition" and the allegations "lack factual enhancement and are conclusory."); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1078-79 (11th Cir. 2004) (allegations regarding harm to competition held to be conclusory where the complaint alleged that the defendant's conduct "caused injury to competition by limiting alternatives available to advertisers, performers and the listening audience" and "will continue to affect prices for advertisements, the quality of programming, and the prices for advertisers' products").

At base, MLW "construes any potential contract loss as an injury to competition and consumer choice." *Zef Scientific, Inc. v. Shimadzu Scientific Instruments*, 2016 WL 1255787, at *5 (S.D. Cal. Mar. 31, 2016). As in *Zef*, however, MLW has failed to allege how the purchasers in its proposed relevant market, television networks and streaming services, have been harmed. To the contrary, the FAC still depicts a market with multiple wrestling promotions competing to sell media rights – indeed, as discussed above, the market is alleged to be even more competitive than it was last year. Thus, based on MLW's allegations alone, the proposed market is highly competitive and unharmed. All market participants compete to sell media rights to the hundreds of networks and streaming services. Without allegations of harm to competition, there is no antitrust injury, and MLW's Sherman Act claim is improperly plead and must be dismissed. *Somers v. Apple*, 729 F.3d 953, 96-64 (9th Cir. 2013) (affirming the dismissal of Sherman Act Section 2 claims for lack of antitrust injury); *McGlinchy v. Shell Chemical,* 845 F.2d 802, 813 (9th Cir. 1988) (allowing Rule 12(c) motion to dismiss for failure to plead antitrust injury).

1    **II.     MLW Fails to Plead Cognizable State Law Claims**

2          Counts III, IV, and V assert California state law claims for intentional interference with

3    contractual relations, intentional interference with prospective economic advantage, and unfair

4    competition.  The Court should dismiss the state claims for lack of subject matter jurisdiction upon

5    dismissing the federal monopolization claim without further inquiry into the pleadings.  The Court

6    would lack supplemental jurisdiction, and it would further lack diversity jurisdiction because the

7    parties are both Delaware corporations.  Nonetheless, each of these claims also fails as a matter of

8    law and should be dismissed.  As MLW has provided no further allegations in support of its state

9    law claims, WWE respectfully directs the Court to its prior briefing on these counts and

10   incorporates them herein by reference. ECF 19, pp. 16-22.

11   **III.    WWE Respectfully Preserves the Issue of this Court's Personal Jurisdiction over**

12          **WWE**

13          WWE recognizes that Ninth Circuit precedent, binding on this Court, interprets the Clayton

14   Act, 15 U.S.C. § 22, to allow a plaintiff to file an antitrust suit against a domestic corporation in

15   any federal court.  *See Action Embroidery Corp. v. Atl. Embroidery, Inc.,* 368 F.3d 1174 (9th Cir.

16   2004).  However, recent Supreme Court decisions draw into question the power of a federal statute

17   to confer general jurisdiction over a corporation not incorporated in the forum state absent sufficient

18   conduct occurring in that state.  *See BNSF Ry. Co. v. Tyrrell,* 137 S. Ct. 1549 (2017); *Bristol-Myers*

19   *Squibb v. Superior Court,* 37 S. Ct. 1773, 1780 (2017).  Here, as discussed above, neither party is

20   a resident of California, no harm specific to California is alleged, and none of the alleged

21   misconduct took place in California.  As such, WWE believes that the Ninth Circuit would

22   reconsider its holding in *Action Embroidery* and rule that this Court lacks personal jurisdiction.

23   WWE respectfully preserves that issue.

24

25

26

27

28

1

## CONCLUSION

2

WHEREFORE, for each of the reasons explained above, World Wrestling Entertainment,

3  Inc. respectfully requests that the Court dismiss MLW Media LLC's complaint with prejudice for

4  failure to state a claim upon which relief can be granted and for whatever other relief the Court

5  deems just and equitable.

6

7      Dated: April 7, 2023

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

K&L GATES LLP

By: *Christopher S. Finnerty*

Daniel W. Fox (SBN 268757)
K&L GATES LLP
Four Embarcadero Center
Suite 1200
San Francisco, CA  94103
Telephone: (415) 882-8200
Facsimile:  (415) 882-8220
daniel.fox@klgates.com

Jerry S. McDevitt (*pro hac vice*)
K&L GATES LLP
210 Sixth Ave.
Pittsburgh, PA 15222
Telephone:  (412) 355-8608
jerry.mcdevitt@klgates.com

Christopher S. Finnerty (*pro hac vice*)
Morgan T. Nickerson (*pro hac vice*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone:  (617) 261-3123
christopher.finnerty@klgates.com
morgan.nickerson@klgates.com

Derek W. Kelley (*pro hac vice*)
K&L GATES LLP
K&L Gates LLP
1601 K St. NW #1
Washington, D.C. 20006
Telephone: (202) 778-9467
derek.kelley@klgates.com

*Counsel for Defendant*
World Wrestling Entertainment, Inc.