Jason S. Takenouchi (CBN 234835)
**KASOWITZ BENSON TORRES LLP**
101 California Street, Suite 3000
San Francisco, California 94111
Telephone: (415) 421-6140
Fax: (415) 398-5030
JTakenouchi@kasowitz.com

Marc E. Kasowitz (*pro hac vice*)
Christine A. Montenegro (*pro hac vice*)
Nicholas A. Rendino (*pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Fax: (212) 506-1800
mkasowitz@kasowitz.com
cmontenegro@kasowitz.com
nrendino@kasowitz.com

*Attorneys for Plaintiff MLW Media LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MLW MEDIA LLC,<br><br>            Plaintiff,<br><br>      v.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>            Defendant. | Case No: 5:22-cv-00179-EJD<br><br>**PLAINTIFF MLW MEDIA LLC's OPPOSITION TO DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MOTION TO DISMISS MLW MEDIA LLC'S FIRST AMENDED COMPLAINT** |

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

I.      STATEMENT OF THE ISSUES TO BE DECIDED ................................................ 1

II.     INTRODUCTION AND SUMMARY OF ARGUMENT ......................................... 1

III.    FACTS ..................................................................................................................... 4

        A.     The Relevant Market ................................................................................... 4

        B.     WWE's Monopoly Power in the Relevant Market ...................................... 4

        C.     WWE's Anticompetitive Conduct Has Caused Antitrust Harm .................. 6

IV.     ARGUMENT ............................................................................................................ 7

        A.     Legal Standard ............................................................................................. 7

        B.     MLW has Sufficiently Pleaded a Claim Under Section 2 of the Sherman Act ......... 7

               1.     MLW has Plausibly Alleged a Relevant Market .............................. 8

                      a.     MLW Has Plausibly Alleged a Relevant Product Market ............... 8

                      b.     MLW Has Plausibly Alleged a Relevant Geographic Market ........ 11

               2.     MLW has Sufficiently Pleaded Direct Evidence of Monopoly Power ....... 11

               3.     MLW has Sufficiently Pleaded Circumstantial Evidence of
                      Monopoly Power ............................................................................. 14

               4.     MLW Plausibly Alleges A Broad Anticompetitive Scheme ............ 17

                      a.     MLW has Plausibly Alleged Substantial Foreclosure ................... 17

                      b.     MLW has Plausibly Alleged Anticompetitive Conduct With
                             Respect to Professional Wrestlers And Arenas ............................. 19

               5.     MLW has Plausibly Alleged Antitrust Injury ................................. 21

        C.     This Court Has Personal Jurisdiction Over WWE ...................................... 23

        D.     If Necessary, Leave To Amend Should Be Granted ................................... 24

V.      CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
   368 F.3d 1174 (9th Cir. 2004) ................................................................................................ 23

*al-Kidd v. Ashcroft*,
   580 F.3d 949 (9th Cir. 2009) .................................................................................................... 7

*Amarel v. Connell*,
   102 F.3d 1494 (9th Cir. 1996) ................................................................................................ 21

*B&H Med., L.L.C. v. ABP Admin., Inc.*,
   2004 WL 7347089 (E.D. Mich. Oct. 29, 2004) ...................................................................... 18

*Barnes & Noble, Inc. v. LSI Corp.*,
   849 F. Supp. 2d 925 (N.D. Cal. 2012) .................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................................. 7

*Bly-Magee v. California*,
   236 F.3d 1014 (9th Cir. 2001) ................................................................................................ 24

*Brader v. Allegheny Gen. Hosp.*,
   64 F.3d 869 (3d Cir. 1995) ...................................................................................................... 21

*Brantley v. NBC Universal, Inc.*,
   2008 WL 11357958 (C.D. Cal. June 25, 2008) ...................................................................... 14

*Chicago Bridge & Iron Co. N.V. v. F.T.C.*,
   534 F.3d 410 (5th Cir. 2008) .................................................................................................. 15

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
   868 F. Supp. 2d 876 (N.D. Cal. 2012) .................................................................................... 16

*City of Anaheim v. S. Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) ................................................................................................ 17

*CollegeNet, Inc. v. Common Application, Inc.*,
   355 F. Supp. 3d 926 (D. Or. 2018) ................................................................................... 15, 16

*CollegeNET, Inc. v. Common Application, Inc.*,
   711 F. App'x 405 (9th Cir. 2017) ........................................................................................... 23

*Colonial Med. Grp., Inc. v. Cath. Healthcare W.*,
   2010 WL 2108123 (N.D. Cal. May 25, 2010) .......................................................................... 9

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

ii

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002)................................................................. 10, 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) .......................................................... 8, 11, 12, 13

*In re eBay Seller Antitrust Litig.*,
  545 F. Supp. 2d 1027 (N.D. Cal. 2008) ......................................... 12

*F.T.C. v. Shkreli*,
  581 F. Supp. 3d 579 (S.D.N.Y. 2022) ........................................... 20

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................. 12, 17, 20

*Greyhound Comput. Corp. v. Inter. Bus. Machs. Corp.*,
  559 F.2d 488 (9th Cir. 1977).................................................*passim*

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
  2012 WL 2711040 (N.D. Cal. July 6, 2012) ................................. 21

*GSI Tech, Inc. v. Cypress Semiconductor Corp.*,
  2015 WL 365491 (N.D. Cal. Jan. 27, 2015) .................................. 16

*In re IAMS Co. Litig.*,
  1990 WL 1016520 (S.D. Ohio Jan. 12, 1990)................................ 12

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  511 F. Supp. 3d 1006 (N.D. Cal. 2021) ....................................... 23

*In re Juul Labs, Inc., Antitrust Litig.*,
  555 F. Supp. 3d 932 (N.D. Cal. 2021) ........................................... 7

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)....................................................... 21

*Klein v. Facebook, Inc.*,
  580 F. Supp. 3d 743, 776-77 (N.D. Cal. 2022) ........................... 14

*Koch Agronomic Servs., LLC v. Eco Agro Res. LLC*,
  2015 WL 5712640 (M.D.N.C. Sept. 29, 2015) ............................ 22

*Laumann v. Nat'l Hockey League*,
  907 F. Supp. 2d 465 (S.D.N.Y. 2012) ............................................ 9

*Le v. Zuffa, LLC*,
  216 F. Supp. 3d 1154 (D. Nev. 2016)....................................... 9, 20

*Leegin Creative Leath Prod., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) .................................................................... 23

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

iii

*LePage's, Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ............................................................................. 14, 21

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   467 F. Supp. 2d 74 (D.D.C. 2006) .......................................................................... 20

*Solyndra Residual Tr. ex rel. Neilson v. Suntech Power Holdings Co.*,
   62 F. Supp. 3d 1027 (N.D. Cal. 2014) ..................................................................... 11

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
   2022 WL 2791201 (E.D. Cal. July 15, 2022) ........................................................... 23

*In re NFL Sunday Ticket Antitrust Litig.*,
   2017 WL 3084276 (C.D. Cal. June 30, 2017) ............................................................ 8

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
   305 F. Supp. 3d 1065 (N.D. Cal. 2018) ................................................................... 22

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988) ................................................................................. 16

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   2017 WL 4310767 (N.D. Cal. Sept. 28, 2017) ........................................................... 7

*Pac. Steel Grp. v. Com. Metals Co.*,
   600 F. Supp. 3d 1056 (N.D. Cal. 2022) ................................................................... 11

*Portney v. CIBA Vision Corp.*,
   593 F. Supp. 2d 1120 (C.D. Cal. 2008) ................................................................... 10

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
   2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) ............................................................. 21

*Rebel Oil Co. Inc. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ................................................................................. 14

*Reilly v. Apple Inc.*,
   2022 WL 74162 (N.D. Cal. Jan. 7, 2022) ................................................................... 9

*Retrophin, Inc. v. Questcor Pharms., Inc.*,
   41 F. Supp. 3d 906 (C.D. Cal. 2014) ....................................................................... 15

*Reveal Chat Holdco, LLC v. Facebook*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ..................................................................... 22

*Rochester Drug Co-op., Inc. v. Braintree Labs.*,
   712 F. Supp. 2d 308 (D. Del. 2010) ........................................................................ 21

*Sanger Ins. Agency v. HUB Int'l, Ltd.*,
   802 F.3d 732 (5th Cir. 2015) ................................................................................. 22

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

iv

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Sidibe v. Sutter Health*,
   4 F. Supp. 3d 1160 (N.D. Cal. 2013) ................................................................. 12

*Simon & Simon, PC v. Align Tech., Inc.*,
   533 F. Supp. 3d 904 (N.D. Cal. 2021) ............................................................... 17

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
   376 F.3d 1065 (11th Cir. 2004) ......................................................................... 22

*Stiles v. Walmart, Inc.*,
   2022 WL 16806210 (E.D. Cal. Nov. 7, 2022) ................................................... 22

*Tops Markets v. Quality Markets*,
   142 F.3d 90 (2d Cir. 1998) ................................................................................ 16

*Toranto v. Jaffurs*,
   297 F. Supp. 3d 1073 (S.D. Cal. 2018) ............................................................. 11

*Twin City Sportserv., Inc. v. Charles O. Finley & Co.*,
   676 F.2d 1291 (9th Cir. 1982) ........................................................................ 7, 8

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.*,
   200 F. Supp. 3d 1012 (N.D. Cal. 2016) ............................................................ 21

*United States v. Dentsply*,
   399 F.3d 181 (3d Cir. 2005) ........................................................................*passim*

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .............................................................14, 18-19, 22

*United States v. Rockford Mem'l Corp.*,
   717 F. Supp. 1251 (N.D. Ill. 1989) ................................................................... 15

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) ............................................................................. 16

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
   914 F.2d 1256 (9th Cir. 1990) ........................................................................... 20

*Woolfson v. Conn Appliances, Inc.*,
   2022 WL 3139522 (N.D. Cal. Aug. 5, 2022) ..................................................... 1

*In re: Zinc Antitrust Litig.*,
   2016 WL 3167192 (S.D.N.Y. June 6, 2016) ..................................................... 12

**Statutes**

15 U.S.C. § 2 .................................................................................................*passim*

15 U.S.C. § 22 ........................................................................................................ 23

v

28 U.S.C. §§ 1331, 1333 ................................................................................................ 1

Fed. R. Civ. P. 8 ........................................................................................................ 20

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 7, 12

**Other Authorities**

18D Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th & 5th Ed. 2018-
2022) .............................................................................................................. 18, 20

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 5:22-cv-00179-EJD

1    MLW Media LLC ("MLW") submits this memorandum of law in opposition to World

2  Wrestling Entertainment, Inc.'s ("WWE") motion to dismiss (ECF No. 68) ("Mot." or "Motion")

3  MLW's first amended complaint (ECF No. 64) (the "FAC").[1]

## I.    **STATEMENT OF THE ISSUES TO BE DECIDED**

5        1.  Whether MLW has sufficiently pleaded a claim for violation of § 2 of the Sherman Act.

6        2.  Whether this Court has supplemental jurisdiction over MLW's state law claims where

7  MLW sufficiently pleads a violation of § 2 of the Sherman Act.[2]

8        3.  Whether this Court has personal jurisdiction where WWE concedes that binding Ninth

9  Circuit precedent authorizes a plaintiff to file an antitrust suit against a domestic corporation in any

10  federal court and MLW also sufficiently alleges harm and misconduct specific to California.

## II.   **INTRODUCTION AND SUMMARY OF ARGUMENT**

12       This action arises from WWE's willful anticompetitive scheme to maintain its monopoly

13  power over, or at a minimum, attempt to monopolize, the U.S. market for the sale or licensing of

---

[1]  Submitted herewith is the Declaration of Christine A. Montenegro, dated May 8, 2023 ("Decl.")
with accompanying exhibit ("Ex.").

[2]  As MLW has sufficiently alleged a claim under the Sherman Act, this Court has subject matter
jurisdiction to hear all claims alleged.  28 U.S.C. §§ 1331, 1333.  WWE's incorporation (Mot. 24)
of its prior briefing with respect to MLW's claims—for intentional interference with contractual
relations, intentional interference with prospective economic advantage, and violations of Section
17200 of California's Business and Professions Code ("UCL") and California common law—
should be stricken and not considered.  The Federal Rules do "not provide for the incorporation by
reference of legal arguments asserted in prior briefs."  *Woolfson v. Conn Appliances, Inc.*, 2022
WL 3139522, at *6 (N.D. Cal. Aug. 5, 2022) (citing *Swanson v. U.S. Forest Serv.*, 87 F.3d 339,
345 (9th Cir. 1996)).  If prior briefing is considered, MLW refers to its opposition to WWE's prior
motion to dismiss, (ECF 33), and to the FAC's additional allegations supporting those claims
(FAC ¶¶ 6-10, 88-102, 106-109, 130-147)—allegations WWE ignores.

KASOWITZ BENSON TORRES LLP
101 California Street, Suite 3000
San Francisco, California 94111

1  media rights for professional wrestling programs—a scheme that has included egregious and

2  predatory conduct harming competition and seeking to destroy the business of its competitors,

3  including MLW.  Attempting to escape accountability, WWE weaves a fictitious and fanciful tale—

4  entirely divorced from and belied by the facts—of robust competition and "thriv[ing]" competitors.

5  (Mot. 1.)  Among the central facts elided by WWE in its entirely fictitious account are its control of

6  approximately 92% of the relevant market, its extraction of supracompetitive pricing from

7  purchasers in the market, its stranglehold over the market through exclusivity agreements with key

8  media companies, and direct interference with competitors' existing and prospective media rights

9  contracts.  WWE's unlawful and predatory conduct also harms competition by substantially

10  foreclosing competitors, including MLW, from the relevant market, and locking up essential inputs

11  for the creation of professional wrestling programming.

12       In doing so, WWE mischaracterizes or ignores the FAC, misstates the law, ignores

13  important controlling precedent, and improperly raises a litany of factual issues that cannot be

14  decided on a motion to dismiss.  (Mot. 2-3.)

15       *First*, WWE argues that the relevant product market—the sale or licensing of media rights

16  for professional wrestling programming—is flawed because MLW supposedly does not explain the

17  reasons that "other programming" is not a substitute for professional wrestling.  (Mot. 2.)  But that

18  argument mischaracterizes the FAC and ignores the extensive factual allegations, corroborated by

19  industry studies, rating metrics, and other metrics reflecting the lack of sensitivity to price changes,

20  that, from the standpoint of the purchasers and audience, professional wrestling programming is not

21  interchangeable with other content because, among other reasons, it attracts a unique viewing

22  audience.  In fact, in contrast to its litigation-driven position here, WWE's own media contracts

23  reflect and underscore its own understanding that professional wrestling content lacks substitutes

24  because they expressly prohibit purchasers from "broadcast[ing] any other *wrestling promotion* on

25  their network," and maintain "exclusivity [solely in that] category"—and not with respect to any

26  other content.  (FAC ¶¶ 52-53.)

27       *Second*, contrary to WWE's contention (Mot. 2), MLW has sufficiently alleged facts

28  demonstrating that WWE possesses—or has a dangerous probability of acquiring—monopoly

KASOWITZ BENSON TORRES LLP
101 California Street, Suite 3000
San Francisco, California 94111

2

power through both direct and circumstantial evidence.  WWE's monopoly power, as alleged, is directly evidenced by its ability to suppress and exclude competition, restrain output and extract supracompetitive pricing for media rights deals.  (FAC ¶¶ 52-58.)  WWE's dominance in the relevant market and monopoly power is further evidenced by its control over approximately 92% of all revenue generated from the sale or licensing of media rights for professional wrestling programming, and its intentional conduct substantially increasing barriers to entry or expansion in the relevant market, including by restricting or limiting access to key distribution channels, wrestling talent, and arenas.  (*Id.* ¶¶ 59-86.)

*Third*, MLW has alleged unlawful anticompetitive conduct through WWE's "use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor," including through WWE's use of "exclusionary tactics to maintain an existing monopoly."  *See Greyhound Comput. Corp. v. Inter. Bus. Machs. Corp.*, 559 F.2d 488, 503 (9th Cir. 1977), *cert denied*, 434 U.S. 1040 (1978).  Detailed factual allegations in the FAC describe with specificity WWE's anticompetitive conduct, including preventing MLW from airing new content on Tubi, a streaming service owned by Fox Corporation ("Fox"), which reaches a broad audience of 64 million viewers, and on VICE TV ("VICE"), a cable network catering to a professional wrestling audience, and foreclosing all of its competitors from accessing 92% of the market through its exclusivity agreements.  WWE also harms competition by requiring wrestling talent to sign non-compete agreements, predatorily hiring away rivals' talent, blacklisting talent that works with MLW, and blocking its competitors' access to arenas.

The FAC also sufficiently alleges, contrary to WWE's contention, that MLW's anticompetitive conduct has harmed and suppressed competition, and resulted in antitrust injury including, among other things, attempting to destroy MLW's business, interfering with and preventing MLW from securing, maintaining and extending potentially valuable contracts and improperly raising its costs, all of which have resulted in a significant loss of revenues and profits.

WWE's Motion should be denied.

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

### III.    FACTS

### A.    The Relevant Market

The relevant market in this action is the United States national market for the sale or licensing of media rights for professional wrestling programs ("Relevant Market").  (FAC ¶ 30.) Professional wrestling is a form of sports entertainment which involves scripted athletic performances featuring theatrical gimmicks and creative storylines and which is unlike any other sport or form of entertainment.  (*Id.* ¶¶ 24-25, 41.)

To effectively compete in the Relevant Market, professional wrestling promotions need to license or sell their media rights for professional wrestling programming to a media company that can afford them the fees, sponsors, distribution, and unique viewership to sign top talent and produce and market their programs.  (*Id.* ¶¶ 33, 36-38, 68-69, 72.)  Media companies, in designing their programming portfolios, seek to appeal to their subscribers' or viewers' interests, and they therefore do not view all programs as meaningful substitutes for one another.  (*Id.* ¶¶ 42-43.)  Media companies recognize that different channels and platforms cater to the preferences of different audiences and that viewership diverges as to different programs.  (*Id.* ¶ 43-44.)

Professional wrestling is a niche market segment for media companies and consumers alike, for which there is no meaningful substitute.  (*Id.* ¶¶ 45-50.)  There is a strong demand for professional wrestling programming by professional wrestling fans, who are loyal viewers and are unlikely to substitute other programming for professional wrestling.  (*Id.* ¶ 46.)  Indeed, professional wrestling is distinct from sports, including boxing and mixed martial arts ("MMA") or other live team or individual sports.  (*Id.* ¶¶ 47-49.)  There are a limited number of media companies whose portfolios are suited to broadcasting professional wrestling programming.  (*Id.* ¶¶ 34, 42-43, 69.)  Only 13 cable television networks and 7 streaming platforms have aired professional wrestling in recent years.  (*Id.* ¶ 34.)

### B.    WWE's Monopoly Power in the Relevant Market

WWE's monopoly power is directly evidenced by its ability to exclude competition and restrict output by maintaining unlawful exclusivity agreements with Fox and NBCUniversal (USA Network and Peacock), among the most prevalent and far-reaching media platforms for professional

4

1   wrestling programming.  (*Id.* ¶¶ 22, 52-54, 67-72.)  WWE has thus foreclosed competitors from

2   licensing their programming to those key media companies and reaching a significant portion of the

3   professional wrestling audience.  (*Id.* ¶¶ 52-54, 68, 71, 104, 108.)

4         WWE has also—contrary to WWE's factual challenge (Mot. 16 n.8)—directly interfered

5   with the existing and prospective business relationships of its competitors.  For example, in mid-

6   2021, WWE pressured VICE to end negotiations with MLW for a deal to air new MLW programs

7   on VICE platforms.  (*Id.* ¶¶ 89-90.)  After WWE learned that MLW and VICE were working on a

8   deal, WWE Senior Vice President Susan Levison ("Levison") warned a VICE executive to stop

9   airing MLW programs, saying that WWE owner Vince McMahon ("McMahon") was "pissed" that

10  VICE was airing MLW content.  (*Id.* ¶ 89.)  The VICE executive responded to Levison that, "I

11  think this is illegal what you're doing" and that it was probably an antitrust violation, to which

12  Levison responded that she could not control McMahon.  (*Id.* ¶ 90.)

13        A few months later, WWE intentionally subverted MLW's licensing deal with Tubi after

14  WWE executive Stephanie McMahon pressured a Tubi executive to end the arrangement.  (*Id.*

15  ¶¶ 99-102.)  WWE's interference with MLW's licensing agreement with Tubi harmed competition

16  by foreclosing MLW from licensing professional wrestling programming to Tubi and reaching its

17  64 million monthly active viewers.  (*Id.* ¶¶ 71, 108.)

18        WWE's monopoly power is also directly evidenced by its ability to extract supracompetitive

19  pricing with little concern for its competitors.  For example, since 2018, WWE's combined average

20  annual value of its TV agreements is $470 million, more than three times greater than its prior TV

21  rights agreement, which covered both WWE *Raw* and *Smackdown* programs.  (*Id.* ¶¶ 55-56.)  By

22  contrast, the average annual value of two weekly programs of its largest competitor, All Elite

23  Wrestling ("AEW") is only $43.8 million.  (*Id.* ¶ 55.)  Through the willful exercise of its monopoly

24  power, WWE has been able to extract large increases in revenues and profits—a 50.8% increase in

25  revenues from 2018 to 2022 (*id.* ¶ 58), 206% net income increase in 2018, 23% decrease in 2019,

26  and increases of 71% in 2020, 35% in 2021, and 10% in 2022 (*id.* ¶ 57)  In contrast, AEW has been

27  prevented from earning a profit since its founding in 2019.  (*Id.*)

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ BENSON TORRES LLP
101 California Street, Suite 3000
SAN FRANCISCO, CALIFORNIA 94111

1   WWE's monopoly power is also demonstrated by its control of a predominant share of the

2   Relevant Market—approximately 92% of all revenue generated from the sale or licensing of media

3   rights for professional wrestling and 69% of the total number of viewers of professional wrestling.

4   (*Id.* ¶¶ 31, 60-63, 65-66.)

5   WWE has also increased barriers to entry in the Relevant Market and raised the long-run

6   costs of its competitors by entering into exclusivity agreements with media companies that force

7   competitors to license or distribute their programming through less efficient platforms that reach

8   fewer viewers, or to incur additional costs to try to reach viewers in other less efficient ways, such

9   as through creating their own streaming networks.  (*Id.* ¶¶ 67-71.)  WWE also increased barriers to

10   entry and raised competitors' costs to hire and retain wrestling talent by (i) requiring wrestlers to

11   sign unlawful non-compete agreements, (ii) hiring away rivals' talent, (iii) blacklisting talent that

12   works with competitors, and (iv) controlling the wrestlers' intellectual property to prevent their use

13   by competitors.  (*Id.* ¶¶ 72-80.)  Further, WWE restricted inputs and raised costs by exploiting its

14   decades-long relationships with virtually every major sports arena in the United States to make it

15   difficult and more costly for WWE's competitors to book arenas.  (*Id.* ¶¶ 81-85.)

16   **C.**   **WWE's Anticompetitive Conduct Has Caused Antitrust Harm**

17   Through its predatory and exclusionary conduct and abuse of its market power, WWE has

18   substantially harmed competition in the Relevant Market by depriving MLW and other competitors

19   of access to key media distribution platforms, increasing competitors' long-run production costs,

20   decreasing revenues and profits, diminishing their brand recognition, impairing their talent, and

21   threatening the destruction of their business.  (*Id.* ¶¶ 103-109.)  In addition to the antitrust harm

22   caused to competition and MLW, WWE's conduct also has harmed purchasers of media rights for

23   professional wrestling programming by depriving them of programs and extracting

24   supracompetitive prices, and viewers, by increasing their costs for, and reducing their choices and

25   quality of, professional wrestling programming.  (*Id.* ¶¶ 103-105.)

26

27

28

1    IV.     **ARGUMENT**

2    **A.      Legal Standard**

3           On a Rule 12(b)(6) motion, the Court must presume all factual allegations of the complaint

4    to be true, is confined to the facts of the complaint, and must draw all reasonable inferences in favor

5    of the nonmoving party.  *See, e.g.*, *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009), *rev'd on*

6    *other grounds*, 563 U.S. 731, 734 (2011).  The factual allegations in the complaint "must be enough

7    to raise a right to relief above the speculative level" such that the claim "is plausible on its face."

8    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "If there are two alternative

9    explanations, one advanced by defendant and the other advanced by plaintiff, both of which are

10   plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."  *In re Juul Labs,*

11   *Inc., Antitrust Litig.*, 555 F. Supp. 3d 932, 960 (N.D. Cal. 2021) (quoting *Starr v. Baca*, 652 F.3d

12   1202, 1216 (9th Cir. 2011)).

13   **B.      MLW has Sufficiently Pleaded a Claim Under Section 2 of the Sherman Act**

14          The Sherman Act makes it unlawful to "monopolize, or attempt to monopolize . . . any part

15   of the trade or commerce among the several States . . . ."  15 U.S.C. § 2.  "A monopoly claim has

16   two elements, aside from antitrust injury:  (1) defendant possessed monopoly power in the relevant

17   market and (2) defendant willfully acquired or maintained that power."  *Optronic Techs., Inc. v.*

18   *Ningbo Sunny Elec. Co.*, 2017 WL 4310767, at *3 (N.D. Cal. Sept. 28, 2017) (Davila, J.) (citation

19   omitted).[3]

20

21   _____

22   [3]  The elements of attempted monopolization are similar (Mot. 4 n.1), and the allegations of

23   WWE's "clearly exclusionary" conduct similarly "support[] an inference of a specific intent to

24   destroy competition, and in turn, an inference of a dangerous probability of success" to state a

25   claim.  *See Twin City Sportserv., Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1308-1309 (9th

26   Cir. 1982) (affirming attempt liability).  (*See, e.g.*, FAC ¶¶ 28-29, 52-54, 67-69, 71, 75-79, 84, 89-

27   90, 100-102, 108, 124.)

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1.      **MLW has Plausibly Alleged a Relevant Market**

The "definition of the relevant market is basically a fact question dependent upon the special characteristics of the industry involved." *Twin City*, 676 F.2d at 1299.  Because the definition depends on "factual inquiry into the 'commercial realities' faced by consumers," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (citation omitted), it is an issue for the jury to decide.  Here, the FAC sufficiently alleges a product and geographic market that provides "an understanding of the characteristics of the relevant market" (Order, ECF 62):

> "The Relevant Market in this action is the United States national market for the sale or licensing of media rights for professional wrestling programs, which includes the media rights for professional wrestling TV series and programs that are aired on U.S. national television networks, U.S. cable and satellite television networks, pay-per-views purchased by U.S. households, and U.S. streaming services."

(FAC ¶ 30; *see also id.* ¶¶ 24-50, 72-74, 81, 109).

a.      **MLW Has Plausibly Alleged a Relevant Product Market**

WWE concedes that professional wrestling programming is "unique," that it has "particular requirements" for production, and that it "might be a distinct genre," but contends that MLW "could never allege that purchasers . . . do not have reasonably interchangeable content alternatives to wrestling programming."  (Mot. 6.)  WWE asserts, without any factual or legal support, that media companies could "consider *American Ninja Warrior* or Tchaikovski's *The Nutcracker* as alternatives."  (*Id.*)  That argument is contrary to well-established antitrust law holding that media programming is not reasonably interchangeable with other sports and entertainment content where—like here (FAC ¶¶ 41-50)—the programming attracts a unique audience and has "limited substitutes from a consumer standpoint."[4]  *In re NFL Sunday Ticket Antitrust Litig.*, 2017 WL

---

[4]  WWE also contends, without any legal support, that to plausibly plead a relevant market, MLW must "allege that men aged 35-44 *only* watch professional wrestling."  (Mot. 7.)  According to WWE, a monopoly claim would require plaintiffs to demonstrate that viewers in a relevant market

3084276, at *17 (C.D. Cal. June 30, 2017) ("many viewers would not believe a Sunday afternoon marathon of NCIS, a syndicated drama, or the live broadcast of a tennis tournament to be a viable alternative to a Denver Broncos football game"), *rev'd on other grounds*, 933 F.3d 1136 (9th Cir. 2019); *see also Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1165-67 (D. Nev. 2016) (recognizing professional mixed martial arts bouts as a relevant market); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 491-92 (S.D.N.Y. 2012).

Here, MLW alleges in detail that professional wrestling programming attracts a unique audience as supported by industry studies, ratings metrics, lack of sensitivity to price changes, and purchasers' perceptions.  (FAC ¶¶ 41-50.)  Professional wrestling programs offer a unique value proposition, which make them a "niche market segment for producers and consumers alike," including its distinctive and hard-to-reach audience, its ability to generate weekly programming without an off-season, and other characteristics that distinguish professional wrestling from other sports or entertainment programming.[5]  (*Id.*)

Moreover, WWE's own business practice belies its litigation position.  Indeed, WWE's media rights contracts prohibit purchasers from "broadcast[ing] any other *wrestling promotion* on their network" and include "exclusivity in [solely the professional wrestling] category," but no other types of programming.  (*Id.* ¶¶ 52-53, 67.)

---

watch only one type of programming and nothing else.  That is not the standard.  *See, e.g.*, *Laumann*, 907 F. Supp. 2d at 491-92 (finding that MLB and NHL have monopolies in the broadcast rights for their respective sports given the "peculiar and unique characteristics" that distinguish them).

[5] WWE's reliance (Mot. 7) on *Colonial Med. Grp., Inc. v. Cath. Healthcare W.*, 2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010), is misplaced because in that case—unlike here—the plaintiff had "no allegations to support a finding" that the market did not include obvious identical substitutes.  *Reilly v. Apple Inc.*, 2022 WL 74162, at *5 (N.D. Cal. Jan. 7, 2022) (Mot. 7), is likewise distinguishable because, unlike here, the *Reilly* plaintiff asserted a "single-brand market."

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

9

WWE's remaining arguments—improper factual critiques concerning the nature of purported substitutes—cannot be considered on a motion to dismiss and therefore should be rejected.  *Portney v. CIBA Vision Corp.*, 593 F. Supp. 2d 1120, 1126-27 (C.D. Cal. 2008) (rejecting challenges to relevant product market on a motion to dismiss because "they are factual critiques" and "[w]ithout a factual showing, the Court is unable to determine whether the potential economic substitutes suggested by Plaintiff are reasonably interchangeable").  WWE makes the factual assertion, for instance, that there are "many substitutes" for professional wrestling given the decision of many media platforms to "air zero wrestling content."  (Mot. 6.)  Even if that assertion were logical, which it is not, it impermissibly disputes the FAC's factual allegations that media companies choose not to air professional wrestling content because not all media platforms cater to viewers of professional wrestling.  (FAC ¶¶ 34, 41-45.)  WWE downplays (Mot. 6-7) the fact that WWE's "NXT" program "lost only 8% of its viewership despite going head-to-head with [the President's State of the Union address]."  (FAC ¶ 46.)  But the fact that viewers did not switch from professional wrestling to "the most watched television show in the United States" underscores the lack of reasonably interchangeable alternatives to professional wrestling programming.  (*Id.*)  And WWE's complaint that "[MLW] says nothing about the substitutability of other fictional programs" (Mot. 7) ignores MLW's allegations contrasting the audience for professional wrestling programming with a range of television shows.  (*See, e.g.*, FAC ¶ 44.)[6]

---

[6] WWE's suggestion that there are substitutes for professional wrestling programming because distributors did not cease operations and "go dark" after ceasing talks with MLW (Mot. 6) is contrary to the law.  Under WWE's theory, no Section 2 claim could ever be sustained if the downstream purchasers or distributors of a product derived portions of their revenue from other sources.  *See, e.g.*, *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) (no allegation that Walmart or Kroger would go out of business if plaintiff's moist snuff products were excluded from shelves).

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 5:22-cv-00179-EJD

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1   Also meritless is WWE's contention that because some networks air other programming in

2   addition to professional wrestling, that means "that professional wrestling programming is just one

3   type of content for which many substitutes exist." (Mot. 6.)  As MLW plausibly alleges, "media

4   companies seek to appeal to the full spectrum of their subscribers' interests . . ., but the programs

5   are not viewed as meaningful substitutes for one another by media companies." (FAC ¶ 42.)

### b.   MLW Has Plausibly Alleged a Relevant Geographic Market

7   Contrary to WWE's contention (Mot. 7), MLW plausibly alleges that the relevant

8   geographic market is "the United States national market," based on the location of the purchasers

9   and the commercial realities of the sale or licensing of professional wrestling programming to U.S.

10   media companies. (FAC ¶ 30; *see also* FAC ¶¶ 29, 32, 34.)  The geographic market is "factual in

11   nature" and "better tested by a summary judgment motion or at trial." *Toranto v. Jaffurs*, 297 F.

12   Supp. 3d 1073, 1091 (S.D. Cal. 2018).  The national scope of the geographic market is further

13   bolstered by WWE's 2021 10-K, which shows that WWE generates 99.4% of its income before

14   taxes from the United States and that its company property, equipment, and employees are almost

15   entirely based in the United States. (Decl., Ex. A, at 7, 17, F-31, F-44.)[7]  *See Solyndra Residual Tr.*

16   *ex rel. Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1045 (N.D. Cal. 2014)

17   (national market plausible where defendants sold 95% of their output in the United States); *see also*

18   *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1068, 1070 (N.D. Cal. 2022) (a

19   geographic market may be defined "based on the location of the relevant suppliers" or

20   "customers").

### 2.   MLW has Sufficiently Pleaded Direct Evidence of Monopoly Power

22   Monopoly power can be shown by direct evidence of the "power to control prices or exclude

23   competition." *Eastman Kodak*, 504 U.S. at 481.  MLW adequately alleges both.  As to control over

24   price, WWE increased the price of its media rights by "more than 261%" in 2018, to levels that are

25

26   [7]  *See Barnes & Noble, Inc. v. LSI Corp.*, 849 F. Supp. 2d 925, 930-31 (N.D. Cal. 2012) (taking

27   judicial notice of 10-K on a motion to dismiss).

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

11

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 5:22-cv-00179-EJD

more than *ten times* the rate of WWE's largest competitor, and "has faced no meaningful price discipline" as it aggressively extracts large profits. (FAC ¶¶ 55-58.) This constitutes evidence of WWE's unrestricted ability to raise prices—not merely "improved contractual terms." (Mot. 8).[8] *See Eastman Kodak*, 504 U.S. at 465, 469, 477; *United States v. Dentsply*, 399 F.3d 181, 190-91 (3d Cir. 2005) (finding monopoly power where defendant had "aggressive price increases", "growing profit margins" and "sets prices with little concern for its competitors, 'something a firm without a monopoly would have been unable to do'" (citation omitted)); *In re: Zinc Antitrust Litig.*, 2016 WL 3167192, at *2, 15-17 (S.D.N.Y. June 6, 2016) (finding plaintiffs plausibly alleged monopoly power based on defendant's control over price). WWE disputes the factual allegations supporting its ability to control prices by contesting, through speculation (Mot. 8), that the price increases were driven by competition between Fox and NBCUniversal—which both entered into "separate deals" with WWE (FAC ¶¶ 56, 61). But such "speculative" contentions "are not properly a basis . . . on this motion [to dismiss]." *In re IAMS Co. Litig.*, 1990 WL 1016520, at *9 n.21 (S.D. Ohio Jan. 12, 1990).

MLW has also alleged direct evidence of monopoly power through WWE's exclusion of competition and restriction of market output by, *inter alia*, maintaining exclusive agreements[9] with the key distributors of professional wrestling programs, such as Fox and NBCUniversal (USA

---

[8]  In *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1180 (N.D. Cal. 2013) (Mot. 8), unlike here, the plaintiffs alleged only "conclusory allegations" of higher prices and failed to define the relevant market.

[9] WWE claims (Mot. 8-9) that it has mutual exclusivity agreements with media companies, but this is inconsistent with the fact that WWE can air its content on multiple media channels. (FAC ¶ 67.) Moreover, WWE's procompetitive justification for requiring exclusivity agreements cannot be considered on a Rule 12(b)(6) motion. *See Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1182 (N.D. Cal. 2012); *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal. 2008).

KASOWITZ BENSON TORRES LLP
101 California Street, Suite 3000
SAN FRANCISCO, CALIFORNIA 94111

Network and Peacock), and directly interfering with MLW's contracts with Tubi and VICE. (FAC ¶¶ 22, 52-54, 67-68, 87-102, 104, 108-09.)  *See Eastman Kodak*, 504 U.S. at 465, 469; *Dentsply*, 399 F.3d at 189-190 (finding monopoly power where defendant excluded rivals through interference and exclusivity policy with key dealers).  WWE argues that pleading direct evidence of monopoly power requires allegations that WWE "has the power to force a material number of networks and streaming services . . . to forego purchasing media rights from [its rivals]" or that "WWE has monopoly power over networks and streaming services with which it has no commercial relationship."[10] (Mot. 9-10.)  That is not so.  *See Eastman Kodak*, 504 U.S. at 477-78, 481 ("It is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition . . . since respondents offer direct evidence that Kodak did so."); *cf. Conwood Co.*, 290 F.3d at 783 (no requirement that plaintiff must prove that defendant had monopoly power over downstream retailers).  Rather, WWE's "monopoly power over the market" is sufficiently demonstrated by the allegations of WWE's "blocking of access to the key dealers" or purchasers of professional wrestling programming, which "is the part of the real market that is denied to [WWE's] rivals," *Dentsply*, 399 F.3d at 189-90.

---

[10]  WWE's contention (Mot. 9) that there are supposedly "thousands of content providers . . . that sell programming to networks and streaming services" and that therefore MLW cannot "plausibly allege that WWE has the power to" exclude "MLW or other professional wrestling promotions" similarly misses the point:  MLW alleged that WWE excluded competing wrestling promotions. Moreover, WWE's argument conflates professional wrestling content providers with all content providers and improperly challenges MLW's contrary allegations.  (FAC ¶¶ 31, 34-35, 40-50, 52-54, 60-64, 69.)  Further, WWE's improper factual assertions (Mot. 9) that purchasers "wield predominantly all the power" or that the purchasers could "sponsor a new promotion and create its own alternative" ignore the economic realities of the Relevant Market and is contrary to *Dentsply*. 399 F.3d at 190-91.

*Dentsply* is instructive.  In *Dentsply*, the Third Circuit found that a manufacturer violated Section 2 by preventing its rivals from selling their products through preferred dealers, *id.* at 184, 196, including by refusing to sell its products and threatening to sever access to its dealers who purchased or considered purchasing competing products.  *See id*. at 190.  The court held that the manufacturer could have monopoly power even if competitors' products could be sold via alternative means, because it had "supremacy over the dealer network" and "the firm that ties up the key dealers rules the market."  *Id.* at 189-90.  Therefore, even though the competitors had access to "hundreds of dealers" and the manufacturer only sold its products to 23 dealers, there was sufficient evidence that it exercised control over the key distribution channels.  *Id*. at 185, 193; *see also LePage's, Inc. v. 3M*, 324 F.3d 141, 159-60 (3d Cir. 2003) (foreclosure of high-volume distribution channels to the detriment of a rival violated Section 2); *United States v. Microsoft Corp.*, 253 F.3d 34, 70-71 (D.C. Cir. 2001).

Similarly here, MLW has sufficiently alleged direct evidence of monopoly power by WWE's exclusion of competition and restriction of output as well as by WWE's supracompetitive prices.  (FAC ¶¶ 22, 51-58, 67-68, 87-91, 99-102.)

### 3.      MLW has Sufficiently Pleaded Circumstantial Evidence of Monopoly Power

MLW has also sufficiently pleaded circumstantial evidence of monopoly power.  (*Id.* ¶¶ 30-86.)  To do so, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and that existing competitors lack capacity to increase their output in the short run."  *Rebel Oil Co. Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  MLW satisfies each of these elements.  (*See* Sections III, IV.B.1.)

WWE argues that MLW "fails to allege any facts suggesting that revenues are an appropriate measure for market share" and that MLW's allegations do not "link revenues to market share."  (Mot. 10-11.)  But it is well-settled that revenue is an appropriate measure for market share. *See Greyhound*, 559 F.2d at 496-97; *Dentsply*, 399 F.3d at 188; *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 776-77 (N.D. Cal. 2022) (market share allegations supported by revenue and social media use time are "more than sufficient"); *Brantley v. NBC Universal, Inc.*, 2008 WL 11357958,

14

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1    at *3 (C.D. Cal. June 25, 2008) (monopoly power may be established by "market share criteria such

2    as ratings and revenue").  Further, courts defer to the plaintiff's chosen metric of market share at the

3    motion to dismiss stage.[11]  *See CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926,

4    958-59 (D. Or. 2018) (rejecting defendant's competing market share metric at the pleading stage).

5    Here, the FAC allegation concerning WWE's 92% market share is supported by publicly available

6    data and plausible estimates of each competitor's share of market revenues.  (FAC ¶¶ 61-63.)

7         WWE's arguments concerning the sufficiency of MLW's allegations relating to barriers to

8    entry are likewise unavailing.  WWE incorrectly argues that to adequately plead barriers to entry

9    MLW needs to allege, "*how much* it costs to produce professional wrestling programing, *how*

10   exclusive contracts . . . reduce the talent pool, and *which* arenas are necessary to produce content

11   but cannot be secured."  (Mot. 12.)  But "[w]hether there are in fact significant barriers to entry is

12   not an issue appropriately decided" on a motion to dismiss.  *Retrophin, Inc. v. Questcor Pharms.,*

13   *Inc.*, 41 F. Supp. 3d 906, 917 (C.D. Cal. 2014).  MLW has sufficiently alleged barriers to entry

14   given WWE's exclusive contracts with key media companies and interference with critical inputs

15   (*e.g.* wrestling talent and arenas) that impose *additional* costs on WWE's competitors, (FAC ¶¶ 66-

16   86 and Section III).  *See United States v. Rockford Mem'l Corp.*, 717 F. Supp. 1251, 1282 (N.D. Ill.

17   1989) ("A barrier to entry is anything that provides an incumbent in a market an advantage over a

18   new entrant."), *aff'd*, 898 F.2d 1278 (7th Cir. 1990); *see also Chicago Bridge & Iron Co. N.V. v.*

19   *F.T.C.*, 534 F.3d 410, 439 (5th Cir. 2008) (skilled employees "can be considered a barrier to

20   entry"); *Dentsply*, 399 F.3d at 190, 194-96 (recognizing monopoly power over dealers presents a

21   barrier to entry).

22        Also without merit is WWE's conclusory assertion that the entry of AEW and Women of

23   Wrestling ("WOW")—two rivals with *de minimis* market share—establishes the absence of

24   _____

25   [11]  WWE also falsely claims that MLW's measures of market share are inconsistent between the

26   original complaint and the FAC (Mot. 11), but the 85% market share calculation in the original

27   complaint was based on different metrics than those alleged here.

28

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 5:22-cv-00179-EJD

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1    substantial entry barriers.[12]  (Mot. 12-13.)  To the contrary, "[t]he mere fact that a competitor

2    entered the market does not defeat Plaintiff's allegations that barriers to entry are high," and

3    "[w]hether the entry of [a competitor] is sufficient to defeat [a monopoly] claim is a factual

4    question."  *CollegeNet*, 355 F. Supp. 3d at 959.  This is especially true where, as here, output or

5    capacity of AEW and WOW are insufficient to take significant business away from WWE, and

6    AEW and WOW are unlikely to represent a challenge WWE's market power.  *See Oahu Gas Serv.,*

7    *Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 367 (9th Cir. 1988) ("evidence that [the rival] firm remained

8    very small could reasonably preclude a decision that [the rival's] entry reflected a breakdown of

9    barriers to entry."); *GSI Tech, Inc. v. Cypress Semiconductor Corp.*, 2015 WL 365491, at *7 (N.D.

10   Cal. Jan. 27, 2015) (Davila, J.) (denying summary judgment where entry or expansion is delayed).

11   (FAC ¶¶ 62-64; *see also id.* ¶ 108.)

12       WWE also asserts that "MLW pleads increased output" and that "MLW fails to allege that

13   WWE's competitors . . . could not increase their output."  (Mot. 13.)  This is plainly false.  MLW

14   repeatedly alleges throughout the FAC that its own output, as well as other competitors' output,

15   *decreased*.  (FAC ¶¶ 5-7, 10-13, 22, 52-54, 68, 90, 101, 104.)[13]

16

17

18

_____

19   [12]  WWE cites *Tops Markets v. Quality Markets*, 142 F.3d 90, 99 (2d Cir. 1998) and *United States*

20   *v. Syufy Enters.*, 903 F.2d 659, 665-67 (9th Cir. 1990), but neither was decided on a motion to

21   dismiss and—unlike here—in those cases there were effectively "no barriers to entry."  *See Tops*,

22   142 F.3d at 99; *Syufy*, 903 F.2d at 665.

23   [13]  WWE's reliance on *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 868 F. Supp. 2d 876, 915

24   (N.D. Cal. 2012) (Mot. 13) is misplaced because it was decided on summary judgment, and held

25   that evidence of exclusion, "even in the absence of market-wide restricted output or

26   supracompetitive prices, could suffice to demonstrate market power."  *Church & Dwight*, 868 F.

27   Supp. 2d at 900.

28

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 5:22-cv-00179-EJD

**4.     MLW Plausibly Alleges A Broad Anticompetitive Scheme**

The FAC sufficiently alleges the second element of a Section 2 claim by alleging that WWE "adopted certain practices that reflect 'the willful acquisition or maintenance of (monopoly) power,'" *Greyhound*, 559 F.2d at 498, and that WWE "used that power to foreclose competition, gain a competitive advantage, or destroy a competitor," *id.* at 503, through directly interfering with MLW and other rivals' contracts, interfering with essential inputs, such as wrestlers and arenas, and maintaining exclusivity agreements with key media distribution platforms.  (*See supra* at Section III).

In attempting to undermine MLW's well pleaded anticompetitive conduct allegations, WWE misstates the law, arguing that each of its anticompetitive practices must substantially foreclose the Relevant Market.  (*See* Mot. 13-21.)  That is directly contrary to Ninth Circuit law.  *Greyhound*, 559 F.2d at 503; *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect . . . We are dealing with what has been called the 'synergistic effect' of the mixture of the elements."); *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 913 (N.D. Cal. 2021) ("a series of activities will combine to create an antitrust violation even if no one activity is sufficiently 'anticompetitive' in isolation"); *Free FreeHand*, 852 F. Supp. 2d at 1180 (analyzing alleged anticompetitive practices "in the aggregate").  Here, MLW has properly pled a Section 2 claim based on the "synergistic effect" of WWE's conduct, and need not allege that each of WWE's anticompetitive activities resulted in substantial foreclosure of the relevant market.  *See Simon & Simon*, 533 F. Supp. 3d at 913-18 (finding that exclusive dealing allegations did not satisfy the "substantial foreclosure" test but combined with other allegations "to make a strong overall section 2 claim").

**a.     MLW has Plausibly Alleged Substantial Foreclosure**

Moreover, even for those portions of the conduct to which a substantial foreclosure analysis might apply, MLW plausibly alleges that WWE's use of exclusivity arrangements with media companies has substantially foreclosed 92% of the Relevant Market.  (FAC ¶¶ 52-54, 67-72.) WWE challenges that estimate, arguing erroneously and without support that "foreclosure *must be*

17

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1    *based on customers*, not revenues." (Mot. 14.) *See B&H Med., L.L.C. v. ABP Admin., Inc.*, 2004

2    WL 7347089, at *11 (E.D. Mich. Oct. 29, 2004) (rejecting customer-based measure of market

3    foreclosure as "uninformative" and "pointless and perverse" because "one outlet might do a dollar's

4    worth of annual business while another generates $100 million in *annual sales revenue*" (emphasis

5    added)), *aff'd*, 526 F.3d 257 (6th Cir. 2008). Courts have recognized sales revenue as a common

6    metric to analyze foreclosure. *See Dentsply*, 399 F.3d at 185-86, 190-91, 196 (concluding that

7    foreclosure of key dealers was sufficient where "overwhelming numbers [of sales] were made to

8    dealers" and the top five foreclosed dealers accounted for 83% of defendant's sales); *B&H Med.*,

9    2004 WL 7347089, at *12 (approving of "revenue-based analysis" for calculating foreclosure); 18D

10   Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1821d4 (4th & 5th Ed. 2018-2022)

11   (analyzing volume of jeans sold, as opposed to number of outlets, in calculating percentage of

12   market foreclosed).

13          WWE attempts to distinguish the foreclosure alleged here from *Dentsply* on the basis that

14   Dentsply's exclusive dealing arrangements with five key distributors were the "real market"

15   because other distributors "did not provide sufficient access . . . for Dentsply's competitors to

16   compete." (Mot. 15.) But this distinction is meaningless. Here, as in *Dentsply*, WWE has

17   foreclosed the media purchasers that are needed for MLW to compete. (FAC ¶¶ 33, 52-54, 69.)

18   WWE asserts that "hundreds (if not thousands) of other networks and streaming services" could

19   have been used (Mot. 15); however, like the "hundreds of dealers who competed" in *Dentsply*, these

20   alternative distribution channels do not allow competitors to "pose a real threat" to WWE's power

21   because, among other reasons, these channels, which do not all cater to professional wrestling fans,

22   cannot provide the fees, viewership, and visibility necessary to compete. *See Dentsply*, 399 F.3d at

23   191-193, 196. (FAC ¶¶ 33, 35, 43, 64, 67-69, 71-72, 89, 91, 95, 108.) Indeed, "[t]he mere

24   existence of other avenues of distribution is insufficient without an assessment of their overall

25   significance to the market," *Dentsply*, 399 F.3d at 196, and such alternative channels must be

26   "practical or feasible" and not merely "possible," *id.* at 193. *See also Microsoft*, 253 F.3d at 64

27

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1   ("[A]lthough Microsoft did not bar its rivals from all means of distribution, it did bar them from the

2   cost-efficient ones.").[14]

3          And contrary to WWE's improper factual arguments (Mot. 15 n.8), the FAC alleges in detail

4   WWE's interference with and foreclosure of other favored platforms that cater to a professional

5   wrestling audience or that otherwise would have afforded MLW greater visibility and licensing

6   fees.  (FAC ¶¶ 6-11, 52-54, 71, 88-90, 92-102, 104, 106, 108, 124, 130-143, 146.)  In particular, the

7   FAC details that a WWE executive "warned a VICE executive to stop airing MLW programs" and

8   that "[a]s a result of WWE's threats to VICE, VICE stopped engaging in discussions with MLW

9   about an expanded media rights deal."  (*Id.* ¶¶ 89-90.)  The FAC also plausibly alleges that WWE

10  "had leverage over VICE because VICE, which caters to viewers of professional wrestling, needed

11  WWE's continued cooperation and access from WWE to ensure the success of its wrestling-related

12  programs," and also because "A&E, which owns a 20% stake in VICE and runs and owns a

13  majority of VICE's production operations, has a relationship with WWE, airing WWE programs

14  and A&E/WWE partnership programs."  (*Id.* ¶ 90.)  WWE also contends that it "could not plausibly

15  control the media rights purchases of companies with which it has no commercial relationships"

16  (Mot. 15), but the FAC also plausibly alleges how "Reelz may not renew MLW's programming as a

17  result of WWE's exclusivity arrangement with Peacock," which "singularly" interrupts Reelz's live

18  linear feed on Peacock during MLW programming.  (FAC ¶¶ 11, 53, 108.)

19          **b.      MLW has Plausibly Alleged Anticompetitive Conduct With Respect to
              Professional Wrestlers And Arenas**

20

21          WWE mischaracterizes the FAC as alleging a Section 2 monopsony claim premised on

22  WWE's anticompetitive practices of restricting access to the inputs of skilled performers and

23  arenas, and thus must allege separate relevant input markets.  However, courts do not require inputs

24  _____

25  [14]  Contrary to WWE's claim (Mot. 15), MLW has identified the "key purchasers" in WWE's

26  scheme:  NBCUniversal (USA Network and Peacock) and Fox, which generate more than 90% of

27  the revenue in the Relevant Market.

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1   to be defined as a separate relevant market where, like here, the Section 2 claim is premised in part

2   on the monopolist locking up or impairing access to necessary inputs to preserve its monopoly

3   position in the corresponding Relevant Market (the output market).  (Mot. 17-20).  *See, e.g.*,

4   *Greyhound*, 559 F.2d at 503 ("Failure to establish that IBM had monopoly power in the sales

5   market is not a legal bar to holding that IBM violated the Act by using exclusionary *sales* tactics to

6   maintain its monopoly power in the *lease* market." (emphasis added)); *In re Lorazepam &*

7   *Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 82- 84 (D.D.C. 2006) (exclusivity agreements with

8   input supplier caused substantial foreclosure of the output market); *F.T.C. v. Shkreli*, 581 F. Supp.

9   3d 579, 633-637 (S.D.N.Y. 2022) (finding exclusive "supply agreements" constituted

10  "anticompetitive barriers specifically erected to prevent" entry into the output market).

11        WWE cites *Le v. Zuffa* for the proposition that an input market must be alleged as an

12  additional Relevant Market (Mot. 17), but in that case, the plaintiffs, unlike MLW here, specifically

13  alleged additional monopsony claims based on the monopolist's control over that separate relevant

14  market.  216 F. Supp. 3d at 1166.  Nor does MLW need to allege substantial foreclosure of an arena

15  and wrestler market to demonstrate anticompetitive conduct as it relates to WWE interfering with

16  competitors' access to essential inputs.[15]  *See Greyhound*, 559 F.2d at 503.

17        WWE also contends that its exclusive ownership of wrestler characters and roles is

18  permissible protection of its intellectual property.  (Mot. 19.)  But locking up the intellectual

19  _____

20  [15] WWE contends that its practice of predatory hiring was not anticompetitive because it is

21  "lawful" and has procompetitive justifications.  (Mot. 19-20.)  But allegations of predatory hiring

22  survive a motion to dismiss despite such issues of fact.  *Universal Analytics, Inc. v. MacNeal-*

23  *Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990); *see also* Areeda & Hovenkamp, *Antitrust*

24  *Law* ¶ 702c.  And WWE's procompetitive justifications (Mot. 20) are improper on a motion to

25  dismiss.  *See Free FreeHand*, 852 F. Supp. 2d at 1182.  Further, contrary to WWE's contention,

26  nothing in Federal Rule of Civil Procedure 8 requires MLW to identify the wrestlers whom WWE

27  threatened with blacklisting.

28

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 5:22-cv-00179-EJD

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1    property rights of professional wrestlers is anticompetitive when willfully undertaken to maintain a

2    monopoly.  *See, e.g.*, *Greyhound*, 559 F.2d at 498 (otherwise lawful conduct may be exclusionary

3    when practiced by a monopolist).[16]

4           **5.      MLW has Plausibly Alleged Antitrust Injury**

5           To show antitrust injury, a plaintiff must demonstrate that the loss flows from an

6    anticompetitive aspect or effect of the defendant's behavior that is of the type the antitrust laws

7    were intended to prevent.  *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d

8    1012, 1023-24 (N.D. Cal. 2016).  Moreover, "the existence of an 'antitrust injury' is not typically

9    resolved through motions to dismiss."  *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir.

10   1995); *Rochester Drug Co-op., Inc. v. Braintree Labs.*, 712 F. Supp. 2d 308, 318 (D. Del. 2010).

11          WWE contends that MLW has failed to sufficiently allege antitrust harm because its harm is

12   supposedly "untethered to any harm to competition."  (Mot. 21-22.)  However, the FAC alleges that

13   WWE's anticompetitive and predatory conduct harmed competition, has caused the loss of

14   contracts, revenues and profits and market share, and threatens the very existence of MLW as a

15   competitor in the Relevant Market.  (FAC ¶ 106.)  Courts have consistently held that where, as here,

16   "a monopolist's actions are designed to prevent one" competitor "from gaining a foothold in the

17   market," that "is not only injurious to the potential competitor but also to competition in general."

18   *LePage's*, 324 F.3d at 159; *see also Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996)

19   (antitrust injury occurs when "[a competitor] was either driven out of business or suffered reduced

20   profits because of the alleged anticompetitive acts of the attempted monopolist" (citation omitted));

21   *see also Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141, at *10 (C.D. Cal. Dec.

22   2, 2013) (finding antitrust injury "sufficiently pleaded" where plaintiff "lost a major customer

23   through [unlawful] conduct"); *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, 2012 WL 2711040,

24   _____

25   [16]  WWE's gratuitous reliance on its made-for-litigation letter in an effort to publicly trump up

26   false and meritless accusations against MLW should be rejected by this Court as improper

27   extraneous evidence.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

28

MLW'S OPPOSITION TO WWE'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 5:22-cv-00179-EJD

1   at *7 (N.D. Cal. July 6, 2012) (holding antitrust injury includes "lost revenues, lost profits and

2   market share").  None of the cases cited by WWE involved complaints with analogous

3   allegations.[17]

4          WWE contends that MLW cannot allege harm to competition because MLW and other

5   wrestling promotions have been able to sell media rights.  (Mot. 21.)  But exclusionary conduct may

6   be anticompetitive and result in antitrust injury regardless of whether it forecloses the entire market.

7   *See Microsoft*, 253 F.3d at 64 (finding violation of Section 2 even though monopolist barred only a

8   portion of distributors); *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015)

9   (holding antitrust injury existed while plaintiff was able to compete with defendant on a small

10  scale).[18]

11         WWE's further assertion that the FAC's allegations of consumer harm do not reflect harm

12  to competition is also meritless.  (Mot. 22.)  A plaintiff may assert antitrust injury from "[c]oercive

13  activity that prevents [consumers] from making free choices between market alternatives, as well as

14

15  [17]  In *Reveal Chat Holdco, LLC v. Facebook*, 471 F. Supp. 3d 981, 998 (N.D. Cal. 2020), the

16  complaint did not clearly allege plaintiffs were competitors or participants in the relevant market.

17  In *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d 1065, 1075

18  (N.D. Cal. 2018), the complaint failed to allege "a single example" of the alleged anticompetitive

19  steering.  In *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065,

20  1078-79 (11th Cir. 2004), the complaint alleged that anticompetitive conduct was not the cause of

21  increased prices and decreased output.

22  [18]  WWE's speculation that MLW may have benefited from an increase in prices for media rights

23  improperly raises factual issues and ignores "the harm to competition created by [WWE's

24  activities that] raised or maintained artificially high barriers to competition."  *Koch Agronomic*

25  *Servs., LLC v. Eco Agro Res. LLC*, 2015 WL 5712640, at *11 (M.D.N.C. Sept. 29, 2015).  (Mot.

26  22.)  WWE's reliance on *Stiles v. Walmart, Inc.*, 2022 WL 16806210, at *5 (E.D. Cal. Nov. 7,

27  2022), is inapposite as it was a summary judgment case applying the rule of reason.

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1   restraints that artificially erect barriers to market entry and protect lower quality products."

2   *CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405, 406 (9th Cir. 2017).[19]  Thus,

3   conduct that results in excluding competitors and increased prices may be sufficient indicia of

4   consumer harm and harm to the market.  *Id.* at 407.

5   **C.     This Court Has Personal Jurisdiction Over WWE**

6          WWE concedes (Mot. 24) "that Ninth Circuit precedent, binding on this Court, interprets

7   the Clayton Act, 15 U.S.C. § 22, to allow a plaintiff to file an antitrust suit against a domestic

8   corporation in any federal court."  *See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d

9   1174 (9th Cir. 2004).  (*See also* FAC ¶¶ 18-19.)  Although WWE does not challenge personal

10  jurisdiction here, WWE contends that the Ninth Circuit would reconsider governing law because

11  supposedly "no harm specific to California is alleged, and none of the alleged misconduct took

12  place in California."  (Mot. 24).  However, this Court need not reconsider established Ninth

13  Circuit precedent and the FAC sufficiently alleges harm specific to California and misconduct

14  directed at California.  (*See, e.g.*, FAC ¶¶ 19, 94, 99, 101, 104, 106, 138.)

15         For example, MLW alleges that a senior WWE executive spoke with an executive of Tubi

16  (a California company) located in California about the License Agreement—which was a

17  California contract governed by California law. (*Id.* ¶¶ 94, 138.)  The FAC further alleges that

18  "California is also home to two of the largest national media markets" (*id.* ¶ 94), that "WWE

19  purposefully directed its communications to Tubi in California in order to disrupt MLW's

_____

21  [19] WWE cites *Leegin Creative Leath Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895-97 (2007), to

22  suggest that higher prices are procompetitive, but *Leegin* addressed only whether a particular

23  vertical agreement was per se anticompetitive.  WWE's other cases also are readily

24  distinguishable: in *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 WL 2791201, at *12 (E.D.

25  Cal. July 15, 2022), the complaint failed to allege a "single instance" of consumer harm, and in

26  *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1027 (N.D. Cal. 2021), the complaint

27  failed to support allegations of supracompetitive pricing.

28

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

1    relationship with Tubi and to deprive MLW of access to and competition in major national media

2    markets" (*id.* ¶ 101), and that, as a result, MLW suffered the "loss of a profitable contract with

3    Tubi" and also "lost the momentum it had built with fans, including a major fan base in

4    California" (*id.* ¶ 106).  The FAC also alleges that WWE's exclusionary and anticompetitive

5    conduct has also harmed purchasers and consumers, including "purchasers based in California

6    such as Tubi and Fox Sports as well as professional wrestling fans."  (*Id.* ¶ 104.)  And while

7    WWE is not headquartered in California, "WWE is registered and transacts business in the State

8    of California."  (*Id.* ¶ 17.)

9    **D.**      **If Necessary, Leave To Amend Should Be Granted**

10            Consistent with well-established Ninth Circuit authority, if the Court determines that any of

11   the challenged claims are insufficiently pled, MLW requests leave to amend to add factual

12   allegations to cure its pleading.  *See, e.g.*, *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir.

13   2001).

14   **V.**      <u>**CONCLUSION**</u>

15            Because MLW has properly pleaded all of its claims, the Court should deny WWE's motion

16   to dismiss in its entirety or, in the alternative, grant MLW leave to amend to cure any pleading

17   issue.

18   Dated:  May 8, 2023

19                                                      Respectfully submitted,

20                                                      */s/ Christine A. Montenegro*

21

22                                                      MARC E. KASOWITZ (*pro hac vice*)
                                                       CHRISTINE A. MONTENEGRO (*pro hac vice*)
23                                                      NICHOLAS A. RENDINO (*pro hac vice*)
                                                       KASOWITZ BENSON TORRES LLP
24                                                      1633 Broadway
                                                       New York, New York 10019
25                                                      Telephone:     (212) 506-1700
                                                       Facsimile:     (212) 506-1800
26                                                      mkasowitz@kasowitz.com
                                                       cmontenegro@kasowitz.com
27                                                      nrendino@kasowitz.com

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JASON S. TAKENOUCHI (SBN 234835)
KASOWITZ BENSON TORRES LLP
101 California Street, Suite 3000
San Francisco, California 94111
Telephone:    (415) 421-6140
Facsimile:    (415) 398-5030
jtakenouchi@kasowitz.com

*Attorneys for Plaintiff MLW Media LLC*

KASOWITZ BENSON TORRES LLP
101 CALIFORNIA STREET, SUITE 3000
SAN FRANCISCO, CALIFORNIA 94111

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 8th day of May 2023, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

_/s/ Christine A. Montenegro_
Christine A. Montenegro