UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MLW MEDIA LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>        Defendant. | Case No.  22-cv-00179-EJD<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Re: ECF No. 68 |

Plaintiff MLW Media LLC ("MLW") filed this action in January 2022, asserting claims against Defendant World Wrestling Entertainment, Inc ("WWE") for monopolization and attempted monopolization in violation of the Sherman Antitrust Act, 15 U.S.C. § 2; intentional interference with prospective economic advantage; intentional interference with contractual relations; and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*  Complaint, ECF No. 1 ("Compl.") ¶¶ 53–81.  WWE moved to dismiss, and the Court granted the motion with leave to amend.  ECF Nos. 19, 62.  MLW filed a First Amended Complaint on March 6, 2023, alleging the same claims.  First Am. Compl., ECF No. 64 ("FAC"). Now pending before the Court is WWE's Motion to Dismiss the First Amended Complaint (the "Motion").  ECF No. 68 ("Mot.").  The Court finds the Motion appropriate for decision without oral argument pursuant to Civil Local Rule 7-1(b) and, for the reasons discussed below, DENIES the Motion.

**I.    BACKGROUND**

Plaintiff MLW Media LLC ("Plaintiff" or "MLW") is a professional wrestling promotion company that is in "the business of promoting sporting events, particularly live events,

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
1

programming, and digital content related to professional wrestling." FAC ¶ 16. According to MLW, it competes with Defendant World Wrestling Entertainment ("Defendant" or "WWE") and non-parties All Elite Wrestling ("AEW"), Impact Wrestling ("Impact"), New Japan Pro-Wrestling ("NJPW"), Women of Wrestling ("WOW"), Ring of Honor ("ROH"), and the National Wrestling Alliance ("National") for distribution channels—*e.g.*, television networks, cable, and streaming services—for professional wrestling content in the United States. *Id.* ¶¶ 30–31. MLW describes itself as an "innovative startup" and, by contrast, alleges that Defendant WWE "has been in the business of promoting professional wrestling and sports entertainment for decades." *Id.* ¶¶ 16–17.

Professional wrestling promotion companies like WWE and MLW offer a form of sports entertainment that is a "unique spectacle that showcases an ostensibly competitive sports event using a high level of theatrical flourish and creative storytelling for the primary purpose of entertaining an audience." *Id.* ¶¶ 24–25. Industry insiders and experts have stated that professional wrestling programming is a niche market segment distinct from comedy, drama, reality, news, or sports shows. *Id.* ¶¶ 45, 47–49. The professional wrestling audience skews toward men in the 35 to 44 age range, as opposed to the general audience watching prescheduled television shows on national channels, which skews toward women over the age of 65. FAC ¶ 44.

Media rights deals for professional wrestling programs generate about $725.3 million per year. *See id.* ¶¶ 61–62. WWE receives $670 million, or 92%, of this total yearly revenue by way of licensing deals with Fox Corporation ("Fox") and NBCUniversal ("NBC"). *See id.* ¶¶ 60–61, 63. AEW's licensing deal with Warner Bros. Discovery ("Warner Bros.") generates $43.8 million per year, or 6% of the total revenue, and the remaining professional wrestling promotion companies (excluding National, which streams pay-per-view events but does not have a TV rights deal) receive a combined $11.5 million per year from deals with AXS TV, CBS, The CW, Paramount Global, and Sinclair Broadcast Group, among others. *Id.* ¶¶ 32, 61–62. According to MLW, WWE's current TV rights agreements are valued well-above competitive levels, in comparison to AEW's deals, and they are also more than three times greater than WWE's own prior TV rights agreements. *Id.* ¶¶ 55–56. In addition to capturing revenue, WWE also captures

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
2

about 69% of the weekly viewers of professional wrestling programs. FAC ¶ 65.

MLW also alleges that WWE has actively interfered with MLW's potential media rights deals on at least two occasions. *See id.* ¶¶ 87–102. First, in June 2021, upon learning of a television broadcasting deal between MLW and VICE TV ("VICE") to air MLW's archival content, WWE's Senior Vice President informed a VICE executive that WWE's owner wanted VICE to cease airing MLW's content. *Id.* ¶¶ 88–89. As a result of this call, MLW asserts, VICE aired only a single MLW archival program and stopped engaging in business negotiations about airing new MLW content. *Id.* ¶ 90. Second, in August 2021, after MLW had entered into a "lucrative" deal with the ad-supported streaming service Tubi—which is owned by Fox Corporation ("Fox")—a different WWE executive exerted pressure on a Tubi executive and caused Tubi to terminate an agreement with MLW. *Id.* ¶¶ 92, 99–101. According to MLW, the terms of the agreement greatly increased MLW's valuation, strengthened its brand recognition, including among viewers of Fox television and NFL football, and would have made MLW more attractive to new wrestling talent. FAC ¶ 95. After executing the agreement with Tubi, MLW ceased talks with other potential partners and began preparing two live events. *Id.* ¶¶ 96–97. But on the same day that WWE contacted Tubi about its agreement with MLW, Tubi wrote to MLW and purported to terminate the agreement, despite an agreement to issue a joint press release announcing the deal the very next day. *Id.* ¶¶ 100–01.

MLW has a cable deal with Reelz and began broadcasting on the channel in February 2023, and also streams content on Pro Wrestling TV. *Id.* ¶¶ 11, 32. On February 28, 2023, Reelz—*i.e.*, MLW's new media partner—announced a distribution deal with streaming service Peacock, which is owned by NBC (one of WWE's media partners). *Id.* ¶¶ 32, 53. MLW alleges its content is excluded from the deal to stream Reelz's programming on Peacock because WWE "has exclusivity in the category on Peacock." FAC ¶ 53 (citation omitted). MLW states it is reportedly at risk of losing its Reelz deal as a result of WWE's exclusivity agreement with Peacock. *Id.* WWE allegedly includes a stipulation in almost every TV licensing contract that prevents the TV station from broadcasting another professional wrestling promotion company on

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
3

its network. *Id.* ¶ 52. Because Fox and NBC are the two cable networks with the largest coverage in the United States, WWE's exclusivity provisions with most or all of its media partners bar competitors from accessing the most prevalent and far-reaching media platforms. *Id.* ¶ 68.

MLW alleges that WWE restricts competitors' access to both distributors and content creation inputs, such as skilled performers and performance arenas and venues. *Id.* ¶¶ 73, 81. WWE has allegedly told wrestling performers that it will never hire them again if they work with MLW. FAC ¶¶ 73, 78. WWE has also hired MLW wrestlers who were under exclusive contracts. *Id.* ¶ 76. MLW further alleges that WWE has blocked competitors from accessing favorable venues, such as by pressuring Madison Square Garden to cancel a sold-out show with ROH and NJPW.[1] *Id.* ¶¶ 82–84. WWE also has a longstanding relationship with the largest indoor arena in Cincinnati, Ohio, which refused to book AEW shows in 2019 and early 2020. *Id.* ¶ 85.

## II.   LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, the complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Eclectic Props.*

---

[1] MSG later rescheduled the show after it was threatened with a lawsuit. *Id.* ¶ 84.

*East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). In evaluating a Rule 12(b)(6) motion, the district court is limited to the allegations of the complaint, documents incorporated into the complaint by reference, and matters which are subject to judicial notice. *See Louisiana Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

## III. DISCUSSION

WWE moves to dismiss all five claims in the FAC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[2] The Court first addresses WWE's arguments regarding MLW's Sherman Act claims and then turns to the state law claims.

### A. Sherman Act Claims

MLW asserts claims for monopolization and attempted monopolization in violation of Section 2 of the Sherman Act. FAC ¶¶ 110–29. WWE argues that MLW has not sufficiently alleged four elements required for its monopolization and attempted monopolization claims, *i.e.*, relevant market, monopoly power (or a dangerous probability of obtaining monopoly power), anticompetitive conduct, and antitrust injury. *See* Mot. 2–3. The Court addresses each in turn.

#### 1. Relevant Market

"Antitrust law requires [an] allegation of both a product market and a geographic market." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008); *see also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."). Although the definition of a relevant market for antitrust purposes is typically a factual inquiry, an antitrust claim may be dismissed under Rule 12(b)(6) if the plaintiff's relevant market definition is "facially unsustainable." *Newcal*, 513 F.3d at 1045 (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436–37 (3d Cir.1997)). A relevant product market must "encompass the product at issue as well as all economic substitutes for the product." *Newcal*, 513 F.3d at 1045; *see also Reilly v. Apple*

---

[2] WWE also states that it preserves for appeal the issue of this Court's personal jurisdiction over WWE, but it does not here seek dismissal for lack of personal jurisdiction. *See* Mot. 24.

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
5

*Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022) ("[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, . . . the relevant market is legally insufficient."). However, "a relevant market cannot meaningfully encompass th[e] infinite range" of substitutes for a product. *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1271 (9th Cir. 1982) (quoting *Times Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953)).

MLW alleges a relevant product market defined as "the sale or licensing of media rights for professional wrestling programming" and a relevant geographic market of the United States. FAC ¶ 30. The relevant market "includes the media rights for professional wrestling TV series and programs that are aired on U.S. national television networks, U.S. cable and satellite television networks, pay-per-views purchased by U.S. households, and U.S. streaming services." *Id.*

WWE argues that the FAC does not sufficiently allege that purchasers of the relevant product—*i.e.*, television networks and streaming services—have no reasonably interchangeable content alternatives to wrestling programming. Mot. 5–7. WWE contends that the small fraction of media platforms that air professional wrestling content, as alleged in the FAC, "confirms that [the majority of platforms] view other content as reasonable alternatives for professional wrestling." *Id.* at 6 (citing FAC ¶ 34). Additionally, WWE posits that "to define a relevant market, MLW must plausibly allege that men aged 35-44 *only* watch professional wrestling, and thus networks and streaming services *must* purchase professional wrestling content in order to attract those viewers. MLW does not and could never allege this." *Id.* at 7.

The Court disagrees. Although the professional wrestling media rights market may be narrow, the Court may reasonably infer from the FAC's allegations that other forms of programming content are not economic substitutes for professional wrestling. Importantly, MLW defines its relevant market by explicitly distinguishing it from reasonably interchangeable substitutes. *Cf. Tanaka*, 252 F.3d at 1063–64 (finding complaint failed to define relevant market where allegations regarding product market did not discuss interchangeability with any specificity). For example, the FAC alleges that professional wrestling programming is a niche

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
6

market segment that is distinct from comedy, drama, reality, news, or sports shows. FAC ¶¶ 45, 47–49. The FAC further alleges that the professional wrestling audience is demographically distinct from the general audience for prescheduled television shows in that it skews male and toward the 35 to 44 age range, as opposed to female and toward the over-60 age range. *Id.* ¶ 44.[3]

Based on the above allegations, it is not "apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Newcal*, 513 F.3d at 1045. Here, Plaintiff's allegations regarding the relevant product market are sufficiently detailed to survive a motion to dismiss. *See Sidibe v. Sutter Health*, 667 F. App'x 641, 642–43 (9th Cir. 2016) (finding dismissal of antitrust action based on market definition inappropriate where allegations were "sufficiently detailed").

Defendant's cursory challenge to Plaintiff's alleged relevant geographic market of the United States also fails. *See* Mot. 7. Defendant suggests that Plaintiff was required to allege "fact[s] suggesting the market for media rights is limited to the United States and is not, instead, a [U.S.] and Canadian market or a global market." *Id.* As the Ninth Circuit has noted, "the 'relevant market' is typically a factual element rather than a legal element," and alleged markets may therefore "survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Newcal*, 513 F.3d at 1045 (citation omitted). And although Plaintiff is not required at this stage to plead specific facts eliminating all other possible markets as the relevant geographic market, the Court notes that the FAC's allegations do support the claimed market. *See, e.g.*, FAC ¶ 68 (alleging that Fox and NBC operate the two cable networks with the largest coverage in the United States), ¶ 71 ("WWE reached a five-year agreement with NBCUniversal's streaming platform, Peacock, for the exclusive streaming rights of WWE programming in the United States."). Accordingly, the Court finds that Plaintiff had adequately alleged relevant product and geographic markets.

---

[3] WWE provides no legal authority supporting its proposition that MLW must plausibly allege that the professional wrestling audience watches nothing on TV but professional wrestling, *see* Mot. 7, and the suggestion defies common sense. The demographic allegations support the inference that professional wrestling content is not interchangeable with every other fictional program.

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
7

### 2. Monopoly Power

Plaintiff must allege that Defendant possesses monopoly power in the relevant market for its monopolization claim, and, for its attempted monopolization claim, that there is a "dangerous probability" that Defendant will achieve monopoly power. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). Monopoly power—also commonly referred to as market power—is the power to control prices or exclude competition. *Id.* (citations omitted). A plaintiff may show market power by either direct evidence, *i.e.*, the actual exercise of control over prices or the actual exclusion of competition from the relevant market, or circumstantial evidence. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (using direct proof to show market power); *Image Tech. Servs.*, 125 F.3d at 1202 (evaluating circumstantial evidence of market power). "To demonstrate market power by circumstantial evidence, a plaintiff must: '(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run.'" *Image Tech. Servs.*, 125 F.3d at 1202 (quoting *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995)).

WWE argues that the FAC fails because it does not allege sufficient direct or circumstantial evidence of WWE's power in the professional wrestling media rights market. Mot. 8–13. WWE contends that it is the media rights purchasers, such as Fox and NBC, who predominantly wield the power in the market, rather than the content providers, noting that the FAC alleges that 85% of Defendant's revenue derives from its media rights agreements, so that WWE is dependent on the purchasers for a vast proportion of its annual revenue. *Id.* at 9 (citing *United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1416 (S.D. Iowa 1991) ("The existence of large, powerful buyers of a product mitigates against the ability of sellers to raise prices.")). With respect to circumstantial evidence, WWE argues that MLW does not sufficiently allege that revenue is an appropriate metric for market share, so that the allegations of WWE's large share of the revenue generated from the sale of professional wrestling media rights do not indicate that WWE owns a dominant share of the market. *Id.* at 10–13. WWE further argues that

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
8

MLW has not shown significant barriers to entry. *Id.*

The Court finds that MLW has sufficiently pleaded circumstantial evidence of WWE's monopoly power. The FAC alleges that WWE captures 92% of the revenue generated by the sale of media rights for professional wrestling programming. FAC ¶ 63. Defendant argues that MLW must allege facts explaining why revenue share is an appropriate measurement of market share, but cites only to cases that evaluated the proper market share metric based on factual findings. *See Olin Corp. v. FTC*, 986 F.2d 1295, 1298 n.2 (9th Cir. 1993) (reviewing FTC's findings of fact and economic conclusions and discussing production capacity); *Brown Shoe Co. v. United States*, 370 U.S. 294, 342–43 n.69 (1962) (analyzing appeal from judgment and discussing presentation of expert testimony regarding propriety of revenue share or unit share for calculation of market power). At the pleading stage, MLW's allegations of the revenues generated from the sale of professional wrestling media rights, and WWE's 92% share of that revenue (with the next largest competitor possessing a 6% share), FAC ¶¶ 30, 60–63, are sufficient to show dominance in the market. *See United States v. Grinnell Corp.*, 384 U.S. 563, 567, 571 (1966) (inferring defendant's market power from its possession of "the predominant share of the market" where defendant controlled "the three largest companies in the business in terms of revenue," with an 87% share); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 776–77 (N.D. Cal. 2022) (denying motion to dismiss where plaintiff alleged defendant possessed 85% share of market revenue and second-place competitor had 3.5% revenue share).

In addition to defining the relevant market and alleging WWE's dominance in that market, MLW has also sufficiently alleged barriers to entry, as required to show circumstantial evidence of market power. *See Image Tech. Servs.*, 125 F.3d at 1202. Plaintiff alleges that WWE has used its dominant stature in the market to prevent competitors from accessing certain distributors and arenas. *See, e.g.*, FAC ¶¶ 52–53 (alleging WWE's exclusivity agreement with Peacock prevents competitors from working with Peacock's partners, such as Reelz), ¶ 68 (alleging Fox and NBC are the two cable networks with the largest coverage in the United States, so that WWE's exclusivity provisions prevent competitors from accessing a wider audience), ¶¶ 73–85 (alleging

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
9

1  WWE caused at least two arenas to reject or cancel bookings by competitors other than MLW).

2  These barriers, as alleged, are plausible "additional long-run costs that were not incurred by

3  incumbent firms" and that "deter entry while permitting incumbent firms to earn monopoly

4  returns." *Rebel Oil Co.*, 51 F.3d at 1439.  The factual existence of these barriers, which WWE

5  challenges, *see* Mot. 12–13, is not a question to be resolved at the motion to dismiss stage.  *See,*

6  *e.g.*, *Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906, 917 (C.D. Cal. 2014)

7  ("Ultimately, whether there are in fact significant barriers to entry is not an issue appropriately

8  decided on this Motion [to dismiss].").

9  Accordingly, the Court finds that MLW has sufficiently alleged circumstantial evidence of

10  WWE's monopoly power.  It need not and does not address the parties' arguments regarding direct

11  evidence of monopoly power.  And since the possession of monopoly power is a greater showing

12  than a dangerous probability of obtaining monopoly power, MLW's monopoly power allegations

13  are sufficient for both of its claims under Section 2 of the Sherman Act.

### 3. Anticompetitive Conduct

15  Because the mere possession of monopoly power is not unlawful, an antitrust plaintiff

16  must show a defendant engaged in anticompetitive—also called exclusionary—conduct.  *Verizon*

17  *Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  Not all

18  aggressive business conduct is anticompetitive, even if such conduct forces rivals out of the

19  market.  *See, e.g.*, *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1002 (9th Cir. 2020) (holding that

20  defendant's requirement that customers obtain license was a profit-maximizing policy that did not

21  amount to exclusionary conduct).  The Supreme Court has explained that "[t]he question whether

22  . . . conduct may properly be characterized as exclusionary cannot be answered by simply

23  considering its effect on [the plaintiff]. . . . [I]t is relevant to consider its impact on consumers

24  and whether it has impaired competition in an unnecessarily restrictive way."  *Aspen Skiing Co. v.*

25  *Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985).  Courts have found that exclusionary

26  conduct may implicate Section 2 of the Sherman Act where exclusive deals "ha[ve] a substantial

27  effect in further foreclosing rival browsers from the market."  *See United States v. Microsoft*

28  Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
10

United States District Court
Northern District of California

*Corp.*, 253 F.3d 34, 72 (D.C. Cir. 2001).

WWE argues that the FAC does not plead substantial foreclosure of either upstream or downstream market needs, *i.e.*, of content distributors or inputs like professional wrestlers or arenas. Mot. 13–21. Defendant argues that because its competitors, including MLW, AEW, NJPW, and WOW sell media rights for their content, there is no foreclosure at all from the professional wrestling media rights market. *Id.* at 17 (citing FAC ¶ 32). MLW responds that it has adequately alleged a broad anticompetitive scheme, and that its allegations regarding WWE's use of exclusivity arrangements with media companies has substantially foreclosed 92% of the relevant market. ECF No. 69 ("Opp'n") 17–19.

The D.C. Circuit's opinion in *Microsoft* is instructive. There, the court noted that "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Microsoft*, 253 F.3d at 70. Because the record showed that Microsoft had "largely foreclosed the two primary channels [of browser distribution] to its rivals . . . [thereby] affecting the applications used by 'millions' of consumers, Microsoft's exclusive deals . . . had a substantial effect in further foreclosing rival browsers from the market." *Id.* at 72. The court held that plaintiff had made a *prima facie* showing that Microsoft's deals, which "ke[pt] rival browsers from gaining widespread distribution [and] ha[d] a substantial effect in preserving Microsoft's monopoly," constituted anticompetitive conduct. *Id.*

At the motion to dismiss stage, Plaintiff need only allege facts sufficient to create a *prima facie* showing that Defendant engaged in anticompetitive conduct. *See In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1032 (N.D. Cal. 2008) ("A procompetitive benefit may rebut a prima facie case. However, to survive dismissal Plaintiffs are required only to establish a prima facie case."). The FAC alleges that WWE's exclusivity agreements with Fox and NBC foreclosed competitors from the "two cable networks with the largest coverage in the United States." FAC ¶ 68. WWE also allegedly forecloses its competitors from accessing NBC's streaming platform, Peacock, which reaches more than 20 million paid subscribers. *Id.* ¶ 71. These allegations,

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
11

combined with WWE's 92% revenue share, AEW's 6% share, and the remaining competitors' combined 2% share, suffice to make a *prima facie* showing that WWE's exclusivity arrangements with NBC and Fox, which "largely foreclosed [] two primary [distribution] channels to its rivals," had a substantial effect in foreclosing competitors from the professional wrestling media rights market. *See Microsoft*, 253 F.3d at 72.[4]

Accordingly, the Court finds that MLW has sufficiently alleged that WWE engaged in anticompetitive conduct with respect to foreclosure of distribution channels. The Court need not address the parties' arguments regarding foreclosure of wrestling talent and arenas.

### 4. Antitrust Injury

Lastly, WWE argues that MLW has not alleged an antitrust injury. Mot. 21–23. "A plaintiff may only pursue an antitrust action if it can show 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 334 (1990)). To allege such an injury, a "plaintiff . . . must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). WWE argues that MLW has alleged only injury to itself, which does not constitute a cognizable antitrust injury. Mot. 21. WWE further contends that MLW's allegations regarding any harm to consumer choice or prices are conclusory and insufficient to plead harm to competition. *Id.* at 21–22 (citing FAC ¶¶ 52, 56–58). MLW argues that a motion to dismiss is not the appropriate stage at which to resolve the existence of an antitrust injury, and that WWE's actions preventing competitors from gaining market footholds are injurious to both the potential competitor and to competition in general. Opp'n 21.

---

[4] WWE argues that "MLW must allege that WWE *substantially foreclosed* it from the whole market by excluding it from *at least* 30% or more of the purchasers of professional wrestling media rights." Mot. 14 (citing *Rebel Oil*, 51 F.3d at 1438). *Rebel Oil* states only that an attempted monopolization claim need not assert that the alleged monopolist holds over 50% of the market share, but that a 30% share "is presumptively insufficient to establish the power to control price." *Rebel Oil*, 51 F.3d at 1438.

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
12

The Court finds that MLW has sufficiently alleged antitrust injury. As described above, the FAC alleges that WWE engaged in exclusionary conduct, including foreclosure of primary content distribution channels, in an attempt to continue to dominate the professional wrestling media rights market. *See supra* Section III.A.3. MLW's allegations do not restrict these harms to MLW itself. *See, e.g.*, FAC ¶¶ 73–85 (alleging WWE prevented or attempted to prevent competitors other than MLW from accessing arenas). MLW also alleges that WWE's dominance restricts consumer choice, as evidenced by the high viewership of MLW's first three episodes aired on Reelz and MLW's inability to stream on Peacock. FAC ¶ 104. Although "limitation of consumer choice, in itself, does not amount to antitrust injury," *see* Mot. 22 (quoting *Netafirm Irrigation, Inc. v. Jain Irrigation, Inc.*, 2022 WL 2791201, at *12 (E.D. Cal. Jul. 15, 2022)),[5] MLW's allegations of harm to consumers and competitors in combination are sufficient to withstand a motion to dismiss. *See LaSalvia v. United Dairymen of Ariz.*, 804 F.2d 1113, 1116 (9th Cir. 1986) (holding anticompetitive conduct allegedly "employed in an unlawful quest for market dominance [was] precisely the sort that the antitrust laws were intended to remedy"); *Microsoft*, 253 F.3d at 71 (finding sufficient allegations of anticompetitive effects on competition where defendant's actions foreclosed enough distribution links to undermine survival of plaintiff as a viable competitor); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) (holding, in the predatory pricing context, that "[w]hen a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.").[6]

---

[5] WWE also argues that reduced consumer choice or increased prices can result from lawful, procompetitive conduct. Mot. 22 (citing *Brantley v. NBC Universal, Inc.,* 675 F.3d 1192, 1202 (9th Cir. 2012); *Leegin Creative Leath Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895–97 (2007)). However, neither *Brantley* nor *Leegin* addressed conduct by an alleged monopolist, and in fact the Supreme Court noted in *Leegin* that "[i]t makes all the difference whether minimum retail prices are imposed by the manufacturer in order to evoke point-of-sale services or by the dealers *in order to obtain monopoly profits*." 551 U.S. at 898 (citation omitted) (emphasis added). Here, WWE is alleged to have engaged in exclusionary conduct to preserve its market dominance, and its conduct is therefore of the sort targeted by the antitrust laws. *See Atl. Richfield*, 495 U.S. at 334.

[6] In its reply brief, WWE asserts that MLW has not been injured by WWE's deal with Peacock,

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
13

Accordingly, the Court finds that MLW has sufficiently alleged antitrust injury at this pleading stage.

### B. State Law Claims

WWE argues that if the Court finds that Plaintiff has stated its federal antitrust claims, it should nonetheless dismiss the state law claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and unfair competition for failure to state a claim. Mot. 24. WWE does not assert any legal argument on this position, but instead "respectfully directs the Court to its prior briefing on these counts and incorporates them herein by reference." *Id.* However, the Ninth Circuit has held that a party may not incorporate by reference legal arguments asserted in prior briefs. *See Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 345 (9th Cir. 1996). Because Defendant's prior arguments as to the insufficiency of Plaintiff's state law claims are not properly before the Court, the Court will not consider those arguments. *See id.; see also Williams v. Cnty. of Alameda*, 26 F. Supp. 3d 925, 947 (N.D. Cal. 2014) (declining to consider arguments plaintiff "improperly [sought] to incorporate by reference").

### IV. CONCLUSION

For the foregoing reasons, the Court hereby DENIES Defendant's motion to dismiss the First Amended Complaint.

**IT IS SO ORDERED.**

Dated: June 15, 2023

EDWARD J. DAVILA
United States District Judge

---

ECF No. 71 at 13, but these arguments implicate a factual, rather than pleading, question. *See In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d at 1032 n.4.

Case No.: 22-cv-00179-EJD
ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT
14